ACCEPTED
15-24-00113-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
2/5/2025 2:30 PM
CHRISTOPHER A. PRINE
CLERK

**No. 15-24-00113-CV**

In the Court of Appeals
for the Fifteenth District
Austin, Texas

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
2/5/2025 2:30:38 PM
CHRISTOPHER A. PRINE
Clerk

**Glenn Hegar, Comptroller of Public Accounts of the State of Texas, and Ken Paxton, Attorney General of the State of Texas**
*Appellants,*

v.

**American Airlines, Inc.,**
*Appellee.*

On Appeal from the 98th Judicial District Court, Travis County, Texas
Cause Number D-1-GN-16-000621

## Appellants' Brief

KEN PAXTON
Attorney General

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney
    General

JAMES LLOYD
Deputy Attorney General for Civil
    Litigation

STEVEN ROBINSON
Division Chief, Tax Litigation
    Division

DEBORAH J. RAO
Assistant Attorney General
State Bar No. 24131915
deborah.rao@oag.texas.gov
RAY LANGENBERG
Specially Deputized
Assistant Attorney General
State Bar No. 11911200
ray.langenberg@cpa.texas.gov
ALYSON "ALLY" THOMPSON
Assistant Attorney General

Office of the Attorney General
Tax Litigation Division
P.O. Box 12548
Austin, Texas 78711
Tel: 512-475-3503
Fax: 512-478-4013

*Counsel for Appellants*

***Oral Argument Requested***

## IDENTITY OF PARTIES AND COUNSEL

| | |
|---|---|
| **Appellants:** | Glenn Hegar, Comptroller of Public Accounts of the State of Texas, and Ken Paxton, Attorney General of the State of Texas |
| | |
| **Trial Counsel:** | Kyle Pierce Counce |
| | Amanda Romenesko |
| | Assistant Attorneys General |
| | Ray Langenberg |
| | ray.langenberg@cpa.texas.gov |
| | Specially Deputized |
| | Assistant Attorney General |
| | Texas Office of the Attorney General |
| | Tax Litigation Division |
| | P.O. Box 12548 |
| | Austin, Texas 78711 |
| | Tel: 512-463-3112 |
| | Fax: 512-478-4013 |
| | |
| **Appellate Counsel:** | Deborah J. Rao |
| | deborah.rao@oag.texas.gov |
| | Assistant Attorney General |
| | Ray Langenberg |
| | ray.langenberg@cpa.texas.gov |
| | Specially Deputized |
| | Assistant Attorney General |
| | Alyson "Ally" Thompson |
| | ally.thompson@oag.texas.gov |
| | Assistant Attorney General |
| | Texas Office of the Attorney General |
| | Tax Litigation Division |
| | P.O. Box 12548 |
| | Austin, Texas 78711 |
| | Tel: 512-475-3503 |
| | Fax: 512-478-4013 |

**Appellee**: American Airlines, Inc.

**Trial Counsel:** Mary A. McNulty
Mary.McNulty@hklaw.com
Leonora Meyercord
Lee.Meyercord@hklaw.com
J. Meghan McCaig
Meghan.McCaig@hklaw.com
Holland & Knight, LLP
One Arts Plaza
1722 Routh Street, Suite 1500
Dallas, Texas 75201
Tel: 214-969-1700
Fax: 214-964-9501

**Appellate Counsel:** Mary A. McNulty
Mary.McNulty@hklaw.com
Leonora Meyercord
Lee.Meyercord@hklaw.com
J. Meghan McCaig
Meghan.McCaig@hklaw.com
Richard B. Phillips, Jr.
Rich.Phillips@hklaw.com
Holland & Knight, LLP
One Arts Plaza
1722 Routh Street, Suite 1500
Dallas, Texas 75201
Tel: 214-964-9500
Fax: 214-964-9501

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL.................................................ii

TABLE OF CONTENTS ......................................................................iv

INDEX OF AUTHORITIES ................................................................vii

RECORD REFERENCES .....................................................................x

STATEMENT OF THE CASE ...............................................................xi

STATEMENT REGARDING ORAL ARGUMENT ..............................xii

ISSUES PRESENTED .......................................................................xiii

STATEMENT OF FACTS.................................................................... 1

    I.     Factual Background................................................................. 1

    II.    Procedural History ................................................................. 2

         A.    The Parties' Claims.................................................... 2

         B.    The Trial Court's Judgment ....................................... 3

    III.    Texas Franchise Tax ............................................................. 5

SUMMARY OF ARGUMENT ............................................................. 7

STANDARD OF REVIEW................................................................. 11

    I.     Preemption ........................................................................... 11

    II.    Findings of Fact and Conclusions of Law............................ 11

ARGUMENT ................................................................................... 13

    I.     The Texas franchise tax is a tax on the entire business of a taxable entity. ..................................................................... 13

         A.    The purpose and effect of the Texas franchise tax is not to impose a levy upon the gross receipts of airlines.... 13

B.     Preemption must be read narrowly. ............................ 16

C.     American's contortion of the Texas franchise tax does not change the purpose or effect of the tax. ................ 17

II.     There is no evidence or insufficient evidence to support Finding of Fact 8, and the record conclusively proves there are deductions or exclusions from American's revenues from passenger ticket sales, passenger baggage fees, and freight transportation in American's Texas franchise tax calculations for Report Year 2015. ........................................................ 19

III.    Because the franchise tax is a composite tax based on the entire business of a taxable entity and is not calculated on the gross receipts from individual transactions, American cannot single out a particular revenue stream for preemption. ...... 26

A.     "Total revenue" is determined from the "entire business" of a taxable entity and is not the sum of gross receipts from individual transactions. ..................................... 27

1.     "Entire business." .............................................. 27

2.     Total revenue is not the same as "gross receipts." .......................................................... 28

a.     Texas Franchise Tax Report Line 1—Gross Receipts or Sales. ..................................... 28

b.     Texas Franchise Tax Report Lines 4, 6, and 7—Rents, Gains/Losses, and Other Income. ................................................... 29

c.     Texas Franchise Tax Report Line 9— Exclusions from Gross Revenue. ............... 30

d.     Texas Franchise Tax Report Line 10—Total Revenue. .................................................. 31

B. In calculating "margin," the adjustments to "revenue" can only be determined from the entire business of a taxable entity, and not from the gross receipts of individual transactions. ..............................................32

C. The apportionment of margin to Texas can only be determined from the entire business of the taxable entity, and not from the receipts of individual transactions. ...............................................................33

D. The tax rate can only be determined from the entire business of the taxable entity. ......................................35

IV. This Court should render judgment of $1,802,668.33 for additional franchise tax due. .............................................36

PRAYER .................................................................................................38

CERTIFICATE OF COMPLIANCE........................................................40

CERTIFICATE OF SERVICE.................................................................41

INDEX OF APPENDICES ......................................................................42

# INDEX OF AUTHORITIES

**CASES**

*Aloha Airlines v. Director of Taxation of Hawaii,*
464 U.S. 7 (1983) ........................................................ 8, 14, 15, 16

*Anderson v. City of Seven Points,*
806 S.W.2d 791 (Tex. 1991) ........................................................ 12

*Cain v. Bain,*
709 S.W.2d 175 (Tex. 1986) ........................................................ 13

*Catalina v. Blasdel,*
881 S.W. 2d 295 (Tex. 1994) ........................................................ 12

*CTS Corp. v. Waldburger,*
573 U.S. 1 (2014) ........................................................ 8, 11

*Evansville-Vanderburgh Airport Authority District v. Delta Airlines,*
405 U.S. 707 (1972) ........................................................ 13

*Ford Motor Co. v. Castillo,*
444 S.W.3d 616 (Tex. 2014) ........................................................ 12

*Hegar v. American Multi-Cinema, Inc.,*
605 S.W.3d 35 (Tex. 2020) ........................................................ 9, 13, 15, 16

*Hegar v. Gulf Copper & Mfg. Corp.,*
601 S.W.3d 668 (Tex. 2020) ........................................................ 5

*Northwest Airlines v. County of Kent,*
510 U.S. 355 (1994) ........................................................ 13, 14

*Ortiz v. Jones,*
917 S.W.2d 770 (Tex. 1996) ........................................................ 12

*Tex. Mut. Ins. v. PHI Air Med., LLC,*
610 S.W.3d 839 (Tex. 2020) ........................................................ 11

**STATUTES**

49 U.S.C. § 40116 .................................................................. passim

Tex. Tax Code § 112.052 (2015) ................................................ xi

Tex. Tax Code § 171.0002 (2015) .......................................... 5, 15

Tex. Tax Code § 171.001 (2015) ...................................... 15, 16, 17

Tex. Tax Code § 171.002 (2015) .................................... 6, 7, 9, 35

Tex. Tax Code § 171.0023 (2015) ................................. 6, 7, 35, 36

Tex. Tax Code § 171.101 (2015) ......................................... passim

Tex. Tax Code § 171.1011 (2015) ....................................... passim

Tex. Tax Code § 171.1014 ........................................................... 5

Tex. Tax Code § 171.1016 (2015) .................................... 6, 7, 36

Tex. Tax Code § 171.103 ...................................................... 33, 34

Tex. Tax Code § 171.105 ...................................................... 33, 34

Tex. Tax Code § 171.106 (2015) ............................................ 6, 33

Tex. Tax Code § 171.151 ..................................................... xi, 1, 9

Tex. Tax Code § 171.1532 ........................................... xi, 1, 15, 16

**OTHER AUTHORITIES**

Act of July 5, 1994, Pub. L. No. 103-272, 108 Stat. 745 (1994)............. 16

FAA Reauthorization Act of 2018, Pub. L. No. 115-254, 132 Stat. 3186 (2018) .......................................................................... 3

S. Rep. No. 93-12 (1973) .................................................... 13, 14

Wikipedia, *Catch-22 (logic)*, https://en.wikipedia.org/wiki/Catch-22_(logic) .................................................................................... 24

# RECORD REFERENCES

"**CR**" refers to the clerk's record. An identification of the trial court cause record precedes the record referenced. "**1**" identifies the record from trial court Cause No. D-1-GN-15-003101, "**2**" identifies the record from trial court Cause No. D-1-GN-16-000621. The page number of the record follows the record referenced.

"**RR**" refers to the reporter's record filed December 5, 2024. The volume of the record precedes the record referenced, and the page number of the record follows the record referenced. A parenthetical following the reporter's record reference identifies the witness testifying.

"**PX**" refers to the Plaintiff's numbered exhibits in volume 4 of the reporter's record and the Plaintiff's numbered exhibits that were separately filed with the Court in .XLSX format. "**DX**" refers to the Defendants' numbered exhibits in volume 4 of the reporter's record.

"**FOF**" and "**COL**" refer to the trial court's findings of fact and conclusions of law.

"**App.**" refers to items included in the Appendix to the Appellants' Brief.

## STATEMENT OF THE CASE

| | |
|---|---|
| **Nature of the case:** | American Airlines, Inc. ("**American**") seeks to recover its protest payment of Texas franchise tax paid on baggage fees revenue for Report Year 2015.[1] 2 CR 39–58, 49; *see* Tex. Tax Code § 112.052 (2015).[2] American claims that the Anti-Head Tax Act, 49 U.S.C. § 40116, preempts the imposition of franchise tax on the revenue stream of baggage fees. 2 CR 45–48. The Comptroller and Attorney General counterclaimed that American improperly excluded revenue from passenger ticket sales and freight transportation, and owes additional Texas franchise tax for Report Year 2015 based on the inclusion of those revenue streams. 2 CR 28–29; 2 RR 49–50; *see* Tex. Tax Code § 112.052(c) (2015). |
| **Trial court and judge:** | 98th Judicial District<br>Hon. Jessica Mangrum |
| **Trial court proceedings and disposition:** | Following a bench trial, the trial court rendered a final judgment denying the Comptroller and Attorney General's counterclaim and awarding American a tax refund of $107,577.04, plus interest. 2 CR 232–33 (App. 1). |

---

[1] The term "Report Year 2015" refers to the annual privilege period covered by the report. *See* Tex. Tax Code § 171.151 (App. 5). The Report Year 2015 franchise tax report is based on American's data from its fiscal year 2014 (January 1, 2014–December 31, 2014). *See id.*, § 171.1532 (App. 6); 2 CR 547 (FOF 2) (App. 2); 2 RR 55, 85 (Smith).

[2] All statutory references to Texas Tax Code chapter 112 refer to the version in effect during the time this suit was originally filed in 2015. Texas Tax Code chapter 112 provisions that were in effect when this suit was filed but have since been amended are indicated by the section number followed by the parenthetical "(2015)."

## STATEMENT REGARDING ORAL ARGUMENT

The trial court's decision raises important questions regarding the ability of the state to collect tax revenue. Argument would provide the opportunity to fully explore American's preemption claims.

# ISSUES PRESENTED

**ISSUE ONE:**    Does the federal Anti-Head Tax Act (49 U.S.C. § 40116) preempt the inclusion of transportation receipts in the Texas franchise tax calculation?


**ISSUE TWO:**    For Report Year 2015, did American improperly exclude from its Texas franchise tax calculation over $36 billion of passenger revenue and freight revenue?

## STATEMENT OF FACTS

### I.      Factual Background

American is a major airline headquartered in Fort Worth, Texas. 2 CR 46, 547 (FOF 1) (App. 2); 2 RR 53 (Smith). For Report Year 2015, American operated a fleet of approximately 1,000 aircraft domestically and internationally under American Airlines, Inc., the affiliate US Airways, Inc., and other affiliate entities.[3] 2 CR 547 (FOF 1) (App. 2); 2 RR 53, 141 (Smith); 4 RR 20–72 (PX 4) (App. 25). American and its affiliates operated and earned revenue in Texas as well as other states and countries. 2 CR 547 (FOF 1) (App. 2); 2 RR 53, 140–41 (Smith).

For Report Year 2015, American had revenues from many sources, including passenger baggage fees, passenger ticket fees, and air freight fees. 2 CR 547 (FOF 4) (App. 2); 2 RR 53–54 (Smith).

---

[3] The term "Report Year 2015" refers to the annual privilege period covered by the report. *See* Tex. Tax Code § 171.151 (App. 5). The Report Year 2015 franchise tax report is based on American's data from fiscal year 2014 (January 1, 2014–December 31, 2014). *See id.*, § 171.1532 (App. 6); 2 CR 547 (FOF 2) (App. 2); 2 RR 55, 85 (Smith).

## II. Procedural History

### A. The Parties' Claims

American sued the Comptroller and the Attorney General (collectively, "**the Comptroller**") to recover franchise tax paid in the amount of $107,577.04 for Report Year 2015, allegedly based on the franchise tax paid on baggage fees. 2 CR 39–58; 2 RR 61–63 (Smith).[4] In its original franchise tax calculations for Report Year 2015, American had included approximately $1 billion in baggage fees revenue but excluded over $36 billion in revenue from passenger ticket sales and freight transportation. 2 CR 52; 2 RR 55–56 (Smith); 4 RR 20–21 (PX 4) (App. 25), 82 (PX 6) (App. 19), 84–96 (PX 6) (App. 20).

American alleged that its revenues from baggage fees for Report Year 2015 could not be subject to the Texas franchise tax because the tax was a tax on gross receipts from air commerce or transportation preempted by the federal Anti-Head Tax Act (the "**AHTA**"). 49 U.S.C.

---

[4] American originally filed its franchise tax return for Report Year 2015, paid the amount due under protest, and filed suit (trial court Cause No. D-1-GN-15-003101). 1 CR 3–20. The Comptroller later refunded the $107,577.04 paid and issued a determination requesting payment. 2 CR 56. American then paid under protest the $107,577.04 and filed suit (trial court Cause No. D-1-GN-16-000621). 2 CR 4–24. The two suits were then consolidated into Trial Court Cause No. D-1-GN-16-000621. 1 CR 38–39.

§ 40116 (App. 3);[5] 2 CR 46–48. The Comptroller counterclaimed for $1,802,668.33, alleging that American should have paid additional franchise tax if the revenue from passenger ticket sales and freight transportation had been included in American's report. 2 CR 29; 2 RR 49–50; RR PX 19 (Tab 2_TAS-Margin, Column E) (App. 21).

## B. The Trial Court's Judgment

The trial court held a bench trial. 3 RR 95–96. At trial, Patrick Smith, American's managing director and chief tax officer, testified regarding American's claim for a refund and American's operations. 2 RR 51–172 (Smith). Teresa Bostick, a tax analyst at the Texas Comptroller of Public Accounts, testified regarding the Texas franchise tax. 2 RR 172–254; 3 RR 5–15 (Bostick). Peter Thayer, the auditor at the Texas Comptroller of Public Accounts who completed the audit of American for Report Year 2015, testified regarding the franchise tax audit and the taxability of American's operations for Report Year 2015. 3 RR 16–65 (Thayer).

---

[5] In 2018, after the initiation of this suit, Congress amended the AHTA. FAA Reauthorization Act of 2018, Pub. L. No. 115-254, § 159, 132 Stat. 3186, 3220 (2018) (amending 49 U.S.C. § 40116 (1996)). All statutory references to 49 United States Code section 40116 are to the current version of the statute because the subsequent amendment does not affect the issue on appeal.

The trial court rendered final judgment awarding American the full amount of the refund sought, $107,577.04, plus interest, and denying the Comptroller's counterclaim. 2 CR 232–33 (App. 1).

Following the Comptroller's request, the trial court issued findings of facts and conclusions of law. 2 CR 234–38, 546–50 (App. 2). The trial court found that "[t]here are no deductions or exclusions from American's revenues from passenger ticket sales, passenger baggage fees, and freight transportation. American would pay the franchise tax on 70% of the gross receipts from those sources that are apportioned to the State of Texas." 2 CR 547 (FOF 8) (App. 2). Thus, the trial court concluded, "[t]he AHTA preempts Texas's franchise tax as applied to American's baggage fees, passenger ticket sales, and freight transportation because it is an impermissible tax on 'gross receipts' from 'air commerce or air transportation.'" 2 CR 549 (COL 20) (App. 2).

The Comptroller then requested additional findings of facts and conclusions of law that the trial court denied. 2 CR 551–723, 728. Following this, the Comptroller timely appealed. 2 CR 729–30.

4

## III.  Texas Franchise Tax

The Texas franchise tax is an annual tax on taxable entities for the privilege of doing business in the state and applies to what the Legislature has denominated as taxable margin. *Hegar v. Gulf Copper & Mfg. Corp.*, 601 S.W.3d 668, 673 (Tex. 2020); Tex. Tax Code § 171.101 (2015) (App. 7);[6] 4 RR 429–30 (DX 5). A taxable entity is essentially any business, or unitary group of businesses, operating with a liability shield. Tex. Tax Code §§ 171.0002(a) (2015) (App. 8); .1014(a) (App. 9).

The calculation applicable to American for Report Year 2015 is:

**Texas Franchise Tax Liability =**
**Taxable Margin x Tax Rate**

**Taxable Margin =**
**Margin** x **Texas Apportionment Factor** less any other allowable deductions

**Margin** = The <u>lesser</u> of: Total Revenue less (1) 30% of Total Revenue; (2) $1 million; (3) Cost of Goods Sold; or (4) Compensation

**Texas Apportionment Factor** $= \dfrac{\text{gross receipts from business done in the state}}{\text{gross receipts from entire business}}$

**Tax Rate =**
(1) Based on the total revenue of the entire business, is the taxable entity primarily engaged in retail or wholesale trade (tax rate of **0.475%**) or is it not (tax rate of **0.95%**)?
(2) Is the total revenue of the entire business of the taxable entity less than $10 million (tax rate of **0.575%**) or is it more (tax rate of **0.95%**)?

---

[6] All statutory references to Texas Tax Code chapter 171 refer to the version in effect during the period at issue (Report Year 2015). Texas Tax Code chapter 171

A taxable entity can calculate its franchise tax liability by applying the applicable tax rate to its taxable margin. Tex. Tax Code §§ 171.002 (2015) (App. 11), .0023 (2015) (App. 12), .1016 (2015) (App. 13); 4 RR 426 (DX 3), 428 (DX 4). Taxable margin is the amount that results from a taxable entity's apportioned margin minus any other permitted deductions. Tex. Tax Code § 171.101 (2015) (App. 7); 4 RR 429–30 (DX 5).

For Report Year 2015, a taxable entity's margin was the lowest amount that resulted from one of four possible calculations: (1) 70 percent of total revenue; (2) total revenue minus $1 million; (3) total revenue minus cost of goods sold; or (4) total revenue minus compensation. Tex. Tax Code § 171.101(a)(1)(A)–(B) (2015) (App. 7); 4 RR 429–30 (DX 5).

To calculate a taxable entity's apportioned margin for Texas franchise tax purposes, the margin is multiplied by the Texas apportionment factor, which is gross receipts from business done in the state divided by gross receipts from the entire business. Tex. Tax Code §§ 171.101(a)(2) (2015) (App. 7), .106(a) (2015) (App. 10); 4 RR 429–30 (DX 5), 433–34 (DX 8). If there are any other allowable deductions, those

provisions that were in effect during the period at issue but have since been amended are indicated by the section number followed by the parenthetical "(2015)."

6

are then applied. Tex. Tax Code § 171.101(a)(3) (2015) (App. 7); 4 RR 429–30 (DX 5). The apportioned margin, less any other allowable deductions, results in the entity's taxable margin. Tex. Tax Code § 171.101(a)(1)–(3) (2015) (App. 7); 4 RR 429–30 (DX 5).

Finally, the taxable margin is multiplied by a tax rate determined by (1) whether the taxable entity was primarily engaged in retail or wholesale trade, as determined by the total revenue of the entire business of the taxable entity, and (2) whether the total revenue of the entire business of the taxable entity was "not more than $10 million." Tex. Tax Code §§ 171.002 (2015) (App. 11), .0023 (2015) (App. 12), .1016 (2015) (App. 13); 4 RR 426 (DX 3), 428 (DX 4).

## SUMMARY OF ARGUMENT

The Texas franchise tax is not a "tax . . . on . . . gross receipts" as that term is used in the Anti-Head Tax Act. 49 U.S.C. § 40116(b) (App. 3). Therefore, American improperly excluded over $36 billion in revenue, and this Court should reverse the trial court's judgment and render judgment of $1,802,668.33 for additional franchise tax due to Texas.

The AHTA states in relevant part, that "a State . . . may not levy or collect a tax, fee, head charge, or other charge on . . . (4) the gross receipts

from . . . air commerce or transportation." *Id.* However, the AHTA specifically allows taxes not enumerated in subsection (b) "including property taxes, net income taxes, franchise taxes, and sales or use taxes on the sale of goods or services." *Id.* § 40116(e) (App. 3).

The AHTA does not define an impermissible "tax . . . on . . . gross receipts" or a permissible "franchise tax." *Id.* § 40116 (App. 3). And, the United States Supreme Court has not defined or differentiated the terms as they are used in the AHTA. But, the United States Supreme Court has noted that the AHTA is limited in its application to only those taxes expressly enumerated as preempted in the statute. *Aloha Airlines v. Director of Taxation of Hawaii*, 464 U.S. 7, 12, fn. 6 (1983) (App. 4). Further, "when the text of a pre-emption clause is susceptible of more than one plausible reading, courts ordinarily 'accept the reading that disfavors pre-emption.'" *CTS Corp. v. Waldburger*, 573 U.S. 1, 19 (2014) (quoting prior opinions).

American concedes that the Texas franchise tax is not a gross receipts tax for purposes of the AHTA. 3 RR 92 ("We're not challenging the franchise tax as a whole."). Instead, American asserts that, as applied to American, the Texas franchise tax becomes a tax on gross receipts, and

8

then only with regard to a specific revenue stream—transportation receipts. 2 RR 25; 3 RR 93.

The selective application of the AHTA to specific revenue streams included in the Texas franchise tax is a matter of first impression. But when other courts have reviewed different taxing statutes and found preemption pursuant to the AHTA, the courts looked to the nature of the tax. With this, the courts have found the nature of the tax could be measured by the gross receipts of the taxpayer—gross receipts multiplied by the tax rate equals a gross receipts tax. The same cannot be said for the Texas franchise tax in any application.

The Texas franchise tax is an annual tax on the annual privilege of doing business in the state, measured by taxable margin. *Hegar v. American Multi-Cinema, Inc.*, 605 S.W.3d 35, 38 (Tex. 2020); Tex. Tax Code §§ 171.002 (2015) (App. 11), .151 (App. 5); 4 RR 426 (DX 3). Hence, the tax is commonly called the "margin tax." 2 RR 240 (Bostick). Taxable margin and Texas's franchise tax on taxable margin can only be calculated from the entire business of the taxable entity and cannot be calculated on the gross receipts from individual revenue streams or transactions. 2 RR 242 (Bostick). There is a difference in a tax "on" gross

receipts and gross receipts being part of a tax calculation. 2 RR 240–41 (Bostick). "Gross receipts" for Texas franchise tax purposes are not the same as the actual gross receipts of a taxable entity.

American's gross receipts tax theory is that "[t]here are no deductions or exclusions from American's revenues from passenger ticket sales, passenger baggage fees, and freight transportation." 2 CR 547, 549 (FOF 8, COL 19) (App. 2). American is wrong both legally and factually.

American is wrong legally because the computations of revenue, margin, the apportionment factor, taxable margin, and even the tax rate are dependent on the taxpayer's entire business. American cannot single out an isolated revenue stream and claim that portion of the franchise tax is a gross receipts tax for purposes of the AHTA because there are no deductions or exclusions associated with that particular revenue stream.

American is wrong factually because there are deductions or exclusions associated with American's transportation revenue for Report Year 2015—compensation. 2 RR 92 (Smith); 2 RR 243 (Bostick); 3 RR 56 (Thayer). Compensation was an integral part of American's Texas franchise tax calculation in Report Year 2015, and the compensation deduction actually produces the lowest franchise tax if the tax is

calculated using the revenue that American claims is taxable. 3 RR 52, 54–55 (Thayer); 4 RR 97 (PX 7); *see* Tex. Tax Code § 171.101(a)(1)(B) (App. 7); 4 RR 429–30 (DX 5).

**STANDARD OF REVIEW**

## I. Preemption

This appeal presents a preemption issue concerning the application of the AHTA to the Texas franchise tax. Preemption is a question of law reviewed de novo. *Tex. Mut. Ins. v. PHI Air Med., LLC*, 610 S.W.3d 839, 846 (Tex. 2020). Additionally, "when the text of a pre-emption clause is susceptible of more than one plausible reading, courts ordinarily 'accept the reading that disfavors pre-emption.'" *Waldburger*, 573 U.S. at 19 (quoting prior opinions).

## II. Findings of Fact and Conclusions of Law

In addressing the question of preemption, the Comptroller challenges the legal and factual sufficiency of the evidence to support some of the trial court's findings of fact and seeks de novo review of some of the trial court's conclusions of law. The trial court states that its findings of fact and conclusions of law may be considered to be the other or, in the alternative, mixed findings of fact and conclusions of law. 2 CR 546 (App. 2).

Findings of fact entered in a case tried to the court have the same force and dignity as a jury's answer to jury questions. *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991). Therefore, the trial court's findings of fact are reviewable for legal and factual sufficiency of the evidence by the same standards that are applied in reviewing the legal and factual sufficiency of the evidence supporting a jury finding. *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996); *Catalina v. Blasdel*, 881 S.W. 2d 295, 297 (Tex. 1994).

A legal sufficiency challenge should be sustained when the record confirms: (1) a complete absence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence conclusively establishes the opposite of the vital fact. *Ford Motor Co. v. Castillo*, 444 S.W.3d 616, 620 (Tex. 2014).

When reviewing the record for factual sufficiency, the court must consider all evidence in the record—both the evidence in favor of and contrary to the challenged finding—and must set aside the finding if it is

contrary to the overwhelming weight of the evidence, as to be clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986)

A trial court's conclusions of law are reviewed de novo. *American Multi-Cinema, Inc.*, 605 S.W.3d at 40.

## ARGUMENT

**I.    The Texas franchise tax is a tax on the entire business of a taxable entity.**

**A.    The purpose and effect of the Texas franchise tax is not to impose a levy upon the gross receipts of airlines.**

The AHTA states that "a State . . . may not levy or collect a tax, fee, head charge, or other charge on . . . (4) the gross receipts from . . . air commerce or transportation." 49 U.S.C. § 40116(b) (App. 3). It does allow taxes not imposed upon gross receipts, "including property taxes, net income taxes, franchise taxes, and sales or use taxes on the sale of goods or services." *Id.* § 40116(e) (App. 3).

Congress enacted the AHTA in response to the United States Supreme Court's decision in *Evansville-Vanderburgh Airport Authority District v. Delta Airlines*, which held that state and local authorities could assess head taxes on air passengers boarding flights at state and local airports. 405 U.S. 707, 720–22 (1972); S. Rep. No. 93-12 (1973) (App. 14); *see also Northwest Airlines v. County of Kent*, 510 U.S. 355, 363 (1994).

13

The purpose of the AHTA was to prevent the placement of unreasonable burdens on interstate air transportation. S. Rep. No. 93-12 (1973) (App. 14); *see also Northwest Airlines*, 510 U.S. at 363.

In *Aloha Airlines v. Director of Taxation of Hawaii*, the United States Supreme Court considered whether Hawaii's personal property tax, measured as a percentage of the airline's annual gross income, violated the AHTA. 464 U.S. 7 (1983) (App. 4). The Court stated that the "manner in which the state legislature has described and categorized [the tax provision] cannot mask the fact that the purpose and effect of the [tax] provision is to impose a levy upon the gross receipts of airlines." *Id.* at 13–14.

The purpose and effect of the Texas franchise tax should be compared to the purpose and effect of the Hawaii tax that the Supreme Court considered in *Aloha Airlines*. The Hawaii tax stated:

> There shall be levied and assessed upon each airline a tax of four per cent of its gross income each year from the airline business. . . .

*Id.* at 10 (quoting Haw. Rev. Stat. § 239–6 (1976)). The application of the *Aloha Airlines* purpose and effect test to the present matter shows that

neither the purpose nor the effect of the Texas franchise tax is to impose a tax on the gross receipts of airlines.

The purpose of the Hawaii statute was to impose a special tax on "the airline business." *Id.* By contrast, the Texas franchise tax applies uniformly to all taxable entities. *See* Tex. Tax Code §§ 171.0002 (2015) (App. 8), .001(a) (2015) (App. 15); 4 RR 491 (DX 31). The purpose is to tax the entire annual Texas business activity of a taxable entity in exchange for the annual privilege (or franchise) of doing that business in Texas. *See* Tex. Tax Code §§ 171.001 (2015) (App. 15), .1532 (App. 6); 4 RR 491 (DX 31); *American Multi-Cinema, Inc.*, 605 S.W.3d at 38 (stating that the franchise tax "tax[es] the value of the privilege to transact business in Texas, which confers economic benefits, including the opportunity to realize gross income and the right to invoke the protection of local law" (internal citation omitted)); *see infra* Section III.

The effect of the Hawaii statute was to compute the tax on a percentage of the gross receipts of the airline's business. By comparison, as will be shown in Sections II and III, the Texas franchise tax cannot be computed as a percentage of gross transportation receipts, or a percentage of total gross receipts of a taxable entity. Instead, the Texas

franchise tax is a composite tax, consisting of 35 line items derived from many more elements than just gross receipts. 4 RR 20–21 (PX 4) (App. 25).

## B. Preemption must be read narrowly.

The Court in *Aloha Airlines* took care to note the limitations of the AHTA's preemption, stating:

> [Section] 1513(a) preempts a limited number of state taxes, including gross receipts taxes imposed on the sale of air transportation or the carriage of persons traveling in air commerce. [Section] 1513(b) clarifies Congress's view that the States are still free to impose on airlines and air carriers "taxes other than those enumerated in subsection (a)," such as property taxes, net income taxes, and franchise taxes. . . . [T]he statute is quite clear that Congress chose to make the distinction, and the courts are obliged to honor this congressional choice.

*Aloha Airlines*, 464 U.S. at 12, fn. 6.[7]

The Texas franchise tax is imposed on the taxable margin of all taxable entities transacting business in Texas. *See* Tex. Tax Code §§ 171.001 (2015) (App. 15), .1532 (App. 6); *American Multi-Cinema, Inc.*, 605 S.W.3d at 38. As expanded on in Sections II and III of this Argument,

---

[7] 49 U.S.C. § 1513 has been recodified as 49 U.S.C. § 40116. Act of July 5, 1994, Pub. L. No. 103-272, § 1, 108 Stat. 745 (1994) (current version at 49 U.S.C. § 40116). § 1513(a) has been recodified as § 40116(b) and § 1513(b) has been recodified at § 40116(e). *Id.*

taxable margin bears little resemblance to gross receipts. At most, gross receipts are an element of the taxable margin calculation for franchise tax purposes, not what the franchise tax is imposed on.

The trial court's conclusion that the "Texas franchise tax is a gross-receipts tax as applied to American's revenues from passenger ticket sales, baggage fees and freight transportation" runs afoul of § 40116(e). 2 CR 549 (COL 17) (App. 2). That section expressly allows for "taxes (except those taxes enumerated in subsection (b) of this section), including property taxes, net income taxes, franchise taxes, and sales or use taxes on the sale of goods or services." *See* 49 U.S.C. § 40116 (App. 3).

## C. American's contortion of the Texas franchise tax does not change the purpose or effect of the tax.

American disregards the requirement of the Texas franchise tax that different calculations and selections be made on the entire business; and American ignores the Texas franchise tax directive for a taxpayer to calculate the lowest margin based on the multiple revenue less deduction methods provided. *See* Tex. Tax Code § 171.001 (2015) *et seq*.

Instead, American chops up the franchise tax calculation by revenue stream and then cherry-picks a tax calculation method that it believes creates a tax on gross receipts with no deductions or exclusions.

17

*See* 2 RR 102:12–17 (Smith); 4 RR 82, 84 (PX 6) (App. 19, 20). In doing so, American ignores the computation rules for revenue, margin, apportionment, taxable margin, and the tax rate that all require an analysis of the taxpayer's entire business. Nor do they allow for deductions, exclusions, or calculations to be made by individual revenue streams. *See infra* Section II and III.

The question of whether the franchise tax is a gross receipts tax as applied to American's receipts from ticket sales, freight transportation, and baggage fees is not determinable. *See* 2 RR 15; 2 CR 549–50 (COL 17, COL 20, COL 23) (App. 2). As applied to American for Report Year 2015, the Texas franchise tax calculation requires an analysis of American's entire business to determine the amount of Texas franchise tax due. This is shown by the fact that when American excludes its transportation revenues, the resulting Texas franchise tax calculation still looks to the taxpayer's entire business and results in a direct deduction based on American's transportation revenues—compensation. *See infra* Section II.

**II.** **There is no evidence or insufficient evidence to support Finding of Fact 8, and the record conclusively proves there are deductions or exclusions from American's revenues from passenger ticket sales, passenger baggage fees, and freight transportation in American's Texas franchise tax calculations for Report Year 2015.**

This case can be resolved on the evidentiary issue of there being no evidence or insufficient evidence to support Finding of Fact 8, and the record conclusively proves the reverse of the finding. The premise of American's case is that the franchise tax is a gross receipts tax on transportation receipts because there are no deductions specifically related to transportation expenses. 2 CR 547, 549 (FOF 8, COL 19) (App. 2). That premise is incorrect. Even if transportation receipts could be isolated and considered separately from American's business as a whole, the tax would not be on the *gross* amount of transportation receipts because there is a relevant deduction—compensation.

Texas Franchise Tax Report form line items 19–23 show American's dilemma in claiming that there are no deductions or exclusions associated with its transportation receipts for Report Year 2015:

**MARGIN** *(Whole dollars only)*

19. **70% revenue** *(item 10 x .70)*

20. **Revenue less COGS** *(item 10 - item 14)*

21. **Revenue less compensation** *(item 10 - item 18)*

22. **Revenue less $1 million** *(item 10 - $1,000,000)*

23. **MARGIN** *(see instructions)*

4 RR 21 (PX 4) (App. 25).

These line items make the Texas franchise tax a "margin" tax. For Texas franchise tax purposes, "margin" is determined by computing the lesser of: 70 percent of the taxable entity's total revenue under section 171.1011 (the "**70 percent adjustment method**"); or an amount computed by determining the taxable entity's total revenue under section 171.1011 and subtracting the greater of $1 million, cost of goods sold (the "**cost of goods sold deduction method**"), or compensation (the "**compensation deduction method**"). Tex. Tax Code § 171.101(a)(1) (2015) (App. 7); 4 RR 429–30 (DX 5).

As shown in the preceding graphic on this page, a taxpayer reports these computations on Lines 19, 20, 21, and 22 of the Texas Franchise Tax Report. The lesser of these items is reported as margin on Line 23. Tex. Tax Code § 171.101(a)(1) (2015) (App. 7); 4 RR 21 (PX 4, Line 23) (App. 25).

The trial court found that "[t]here are no deductions or exclusions from American's revenues from passenger ticket sales, passenger baggage fees, and freight transportation" based on American's claims that the 70 percent adjustment to revenue produced a lower "margin" than the alternatives, including the cost of goods sold deduction method and the compensation deduction method. 2 CR 547, 549 (FOF 8, COL 19) (App. 2); 2 RR 23. However, there is insufficient or no evidence to support this claim, and the evidence conclusively proves otherwise.

First, there was no or insufficient evidence to support the finding. Despite repeated requests, American's witness never stated that American actually made the comparison between the margin computation methods to confirm that the 70 percent adjustment method resulted in a lower taxable margin than the compensation deduction method for Report Year 2015. 2 RR 93–102 (Smith). American's witness ultimately concluded:

> Q: . . . You had to make the determination that 70 percent of revenue was less than the revenue less compensation. Right?
>
> A: 70 percent was the percentage that's been used by American Airlines for a large number of years. So, that's what was used for Report Year 2015.

2 RR 102:12–17 (Smith).

Second, the evidence conclusively proves the reverse of the finding. American failed to account for the mechanics of the margin tax that requires a comparison of the four computation methods. If revenue is reduced, the margin value obtained from the 70 percent adjustment method is also reduced, and a new comparison is required. 2 RR 244 (Bostick).

American claims that AHTA preemption should shrink its reported federal revenue of approximately $40 billion ($40,812,087,075) to approximately $2.5 billion ($2,507,787,139) for Texas margin tax purposes. RR PX 001, (Tab 1, Tab 5) (App. 27); 2 RR 166–67 (Smith). If, as American claims, its transportation revenue is excluded, the remaining $2,507,787,139 in revenue must be put through the Texas franchise tax margin calculation and compared with the other methods. Then, margin is determined by the lowest amount.

With this smaller amount of revenue, the 70 percent adjustment method results in a margin of approximately $1.75 billion (to be precise: $2,507,787,139 x 70% = $1,755,450,997). *See* 2 RR 244 (Bostick); 3 RR 50 (Thayer). Said differently, under the 70 percent adjustment method, based on American's claimed revenue, its franchise tax margin was

reduced by 30%, or approximately $750 million (to be precise: $2,507,787,139 x 30% = $752,336,142). *See* 2 RR 97–98 (Smith); 2 RR 244 (Bostick); 3 RR 50 (Thayer).

By comparison, American's Federal Form 1120 shows the compensation expenses that are used in the Texas franchise tax compensation deduction method:

| | | | |
|---|---|---|---|
| 12 | Compensation of officers (see instructions--attach Form 1125-E) | 12 | 197,822,601 |
| 13 | Salaries and wages (less employment credits) | 13 | 7,163,425,858 |
| 14 | Repairs and maintenance | 14 | 2,156,830,472 |
| 15 | Bad debts | 15 | 35,162,913 |
| 16 | Rents | 16 | 3,358,232,206 |
| 17 | Taxes and licenses STATEMENT 2 | 17 | 666,501,557 |
| 18 | Interest | 18 | 673,127,966 |
| 19 | Charitable contributions | 19 | 0 |
| 20 | Depreciation from Form 4562 not claimed on Form 1125-A or elsewhere on return (attach Form 4562) | 20 | 2,017,734,331 |
| 21 | Depletion | 21 | 0 |
| 22 | Advertising | 22 | 146,150,145 |
| 23 | Pension, profit-sharing, etc., plans | 23 | 1,386,563,917 |
| 24 | Employee benefit programs | 24 | 1,568,722,723 |

4 RR 97 (PX 7).

Lines 23 and 24 of American's Federal Form 1120 alone, which go directly into the compensation calculation, total almost $3 billion ($2,955,286,640 to be exact). 3 RR 52 (Thayer).[8] A substantial portion of Lines 12 and 13 would also go into the compensation calculation, pushing the number even higher. 3 RR 52, 54–55 (Thayer).[9] The compensation deduction method produces a margin reduction in multiple billions of

---

[8] Highlighted for reference in dark yellow on the proceeding 4 RR 97 (PX 7).
[9] Highlighted for reference in light yellow on the proceeding 4 RR 97 (PX 7).

dollars, far in excess of the $750 million reduction resulting from the 70 percent adjustment method. *See* Tex. Tax Code § 171.101(a)(1)(A)–(B) (2015) (App. 7); 4 RR 429–30 (DX 5).

In fact, if American's revenue is only $2,507,787,139, the subtraction of compensation would result in zero margin. 3 RR 55 (Thayer). Zero margin using the compensation deduction method is far less than the $1,755,450,997 margin that results from the 70 percent adjustment method. Thus, compensation tied to transportation revenue plays a role in American's franchise tax determination of which computation method results in the lowest margin.

American is in a Catch-22.[10] If American excludes transportation revenue under the AHTA on the theory that the transportation revenue has no associated deductions, then the 70 percent adjustment on the remaining revenue is reduced in value such that the compensation deduction method produces a lower margin. But, if the 70 percent adjustment to revenue is reduced in value such that the compensation deduction method produces the lower margin, then American

---

[10] "A catch-22 is a paradoxical situation from which an individual cannot escape because of contradictory rules or limitations. The term was coined by Joseph Heller, who used it in his 1961 novel Catch-22." Wikipedia, *Catch-22 (logic)*, https://en.wikipedia.org/wiki/Catch-22_(logic) (last accessed February 2, 2025).

indisputably has compensation deductions associated with the transportation revenue and it cannot exclude the transportation revenue under the AHTA preemption.

Here, the answer is that American, like Yossarian in the Catch-22 novel, has to keep flying. Compensation is always an element of the margin tax computation. 2 RR 243 (Bostick); 3 RR 56 (Thayer). The Texas franchise tax cannot be a tax on gross receipts of any one revenue stream. The Texas franchise tax, in all instances, is a tax on a taxpayer's entire business activities.

In sum, as applied to American for Report Year 2015, because compensation and cost of goods sold are necessary elements of the franchise tax taxable margin calculation, the Texas franchise tax is not a "tax . . . on . . . gross receipts" for purposes of AHTA preemption. 49 U.S.C. § 40116(b) (App. 3). Instead, as applied to American for Report Year 2015, the Texas franchise tax is an allowable tax. *See id.* § 40116(e) (App. 3).

**III.** **Because the franchise tax is a composite tax based on the entire business of a taxable entity and is not calculated on the gross receipts from individual transactions, American cannot single out a particular revenue stream for preemption.**

American's refund calculation tries to make the margin tax a transaction tax:

| | | |
|---|---|---|
| Excess Baggage | A | 1,085,704,641 |
| Times 70% | | 70.0000% |
| Taxable Margin | | 759,993,249 |
| Times Apportionment Factor | | 0.0149 |
| Apportioned Taxable Margin | | 11,323,899 |
| Times Tax Rate | | 0.9500% |
| Total Tax | | 107,577.04 |

4 RR 84 (PX 6) (App. 20). But, that is not how the Texas margin tax is calculated. 2 RR 240–41 (Bostick). The Texas Franchise Tax Report has 35 line items in the tax calculation. 4 RR 20–21 (PX 4) (App. 25). Each of these line items is based on the entire business of the taxable entity. The following subsections will discuss the different segments of the Texas Franchise Tax Report.

**A.** **"Total revenue" is determined from the "entire business" of a taxable entity and is not the sum of gross receipts from individual transactions.**

**1.** **"Entire business."**

The first segment of the Texas Franchise Tax Report determines "revenue":

REVENUE *(Whole dollars only)*
1. Gross receipts or sales
2. Dividends
3. Interest
4. Rents *(can be negative amount)*
5. Royalties
6. Gains/losses *(can be negative amount)*
7. Other income *(can be negative amount)*
8. Total gross revenue *(Add items 1 thru 7)*
9. Exclusions from gross revenue *(see instructions)*
10. TOTAL REVENUE *(item 8 minus item 9 if less than zero, enter 0)*

*See* 4 RR 20 (PX 4) (App. 25).

Under Tax Code section 171.101, the starting point for determining taxable margin is the taxable entity's "total revenue." Tex. Tax Code § 171.101 (2015) (App. 7). And, under Tax Code section 171.1011, "total revenue" of a taxable entity is determined from the "entire business" of a taxable entity. *Id.* § 171.1011 (2015) (App. 16); 4 RR 435–44 (DX 9).

### 2. Total revenue is not the same as "gross receipts."

#### a. Texas Franchise Tax Report Line 1—Gross Receipts or Sales.

Tax Code section 171.1011(c)(1)(A) provides that "total revenue" includes the amount reportable as income on Line 1c of Internal Revenue Service ("**IRS**") Form 1120. Tex. Tax Code § 171.1011(c)(1)(A)(i) (2015) (App. 16); 4 RR 435–44 (DX 9). Line 1c of the IRS form is reported on Line 1 of the Texas Franchise Tax Report, which is labeled "Gross receipts or sales." 4 RR 20 (PX 4, Line 1) (App. 25). Despite the label, Line 1 of American's Texas Franchise Tax Report did not represent the actual gross receipts of American in the ordinary sense of the word—it was a net number that was adjusted by some contra-expenses.

Plaintiff's Exhibit 6 shows the detail of the receipts reported as "gross receipts" for federal income tax purposes and state margin tax purposes. 4 RR 81–96 (PX 6); 2 RR 140–44 (Smith). The receipts for American Airlines are on pages AA_00058 to AA_00064, and the receipts for America's affiliate, US Airways, Inc., are on pages AA_00066 to AA_00068. 4 RR 84–91, 93–95 (App. 20). The receipts reported combine positive numbers with negative numbers, such that the total revenue on Line 1 of American's Texas Franchise Tax Report is a net number rather

than a gross number. *See* 2 RR 143–52 (Smith). A net total revenue number used for a tax calculation cannot create a tax on gross receipts.

### b. Texas Franchise Tax Report Lines 4, 6, and 7— Rents, Gains/Losses, and Other Income.

Tax Code section 171.1011(c)(1)(A) provides that "total revenue" includes amounts reportable as income on Lines 4 through 10 of IRS Form 1120. Those IRS line items are reported on Lines 2 through 8 on the Texas Franchise Tax Report. Tex. Tax Code § 171.1011(c)(1)(A)(ii) (2015) (App. 16); 4 RR 435–44 (DX 9). The Texas Franchise Tax Report form states that Lines 4 (rents), 6 (gains/losses), and 7 (other income) can be negative amounts, indicating that the line items are net numbers and not gross numbers. 4 RR 20 (PX 4) (App. 25). Expenses or losses may even exceed receipts such that the netting results in a negative total revenue number.

American originally reported a "net" negative number for "Gains/losses" on its 2015 Texas Franchise Tax Report. 4 RR 20 (PX 4, Line 6) (App. 25); 2 RR 106 (Smith). Additionally, American's revised calculation shows "other income" in a negative amount of $83,467,780 because American had a net loss for that year. 4 RR 82 (PX 6) (App. 19); RR PX 001 (Tab 5); 2 RR 114–16 (Smith); *see,* 4 RR 97 (PX 7, Line 10)

and RR PX 19 (Tab 2_TSA-Margin, Tab 4_Exam 1, Tab 5_Exam 1A, Tab 6_Exam 3) (App. 21, 22, 23, 24).

Positive numbers can be net numbers also. For example, American had a short-term capital gain of approximately $1 million, but it was a net gain on approximately $20 billion in gross receipts, and American had a long-term capital gain of approximately $4 million, but it was a net gain on approximately $5 billion in gross receipts. 4 RR 359 (PX 29) (App. 26); 2 RR 126–30 (Smith).

Thus, when expenses or losses are included in the "total revenue" calculation for Texas franchise tax purposes, the "total revenue" is a net number, and actual gross receipts of a taxable entity are more than the amounts reportable as part of "total revenue." Therefore, the Texas franchise tax is not a tax on gross receipts.

### c. Texas Franchise Tax Report Line 9— Exclusions from Gross Revenue.

Under Tax Code section 171.1011 (f), (g), (g-1), (g-3), (g-4), (k), (m), (m-1), (n), (o), (q), (r), and (x), the receipts from various individual transactions are excluded from the "taxable margin" tax base. Tex. Tax Code § 171.1011 (2015) (App. 16); 4 RR 435–44 (DX 9).

Under Tax Code section 171.1011 (g-2), (g-5), (g-6), (g-7), (g-8), (g-

30

10), (g-11), (g-12), (u), (v), and (w-1), the receipts from various individual transactions are offset by costs that are excluded from the "taxable margin" tax base. Tex. Tax Code § 171.1011 (2015) (App. 16); 4 RR 435–44 (DX 9).

These exclusions are reported on Line 9 of the Texas Franchise Tax Report and subtracted from "total gross revenue." 4 RR 20 (PX 4, Line 9) (App. 25). Thus, the "total revenue" of a taxable entity for margin tax purposes is not the same as the actual revenue of the taxable entity and is not the same as the actual gross receipts of the taxable entity. 2 RR 107–12 (Smith).

### d. Texas Franchise Tax Report Line 10—Total Revenue.

Because "net" numbers can be negative, the expenses or losses from one line item can offset the receipts from another line item. The netting of line items can result in total revenue being less than zero. If that situation occurs, Line 10 of the Texas Franchise Tax Report form instructs the taxpayer to "enter 0." 4 RR 20 (PX 4, Line 10) (App. 25).

The netting of different transactions means that the franchise tax cannot be determined for individual transactions—the tax can only be

determined from the entire business of the taxable entity. 2 RR 242 (Bostick).

**B.** **In calculating "margin," the adjustments to "revenue" can only be determined from the entire business of a taxable entity, and not from the gross receipts of individual transactions.**

As expanded on in Section II of this Argument, under Tax Code section 171.101(a)(1), "margin" is determined by computing the lesser of: 70 percent of the taxable entity's total revenue from its entire business under section 171.1011; or an amount computed by determining the taxable entity's total revenue from its entire business under section 171.1011 and subtracting the greater of $1 million, cost of goods sold, or compensation. The 70 percent adjustment method to margin can only be determined to be the "lesser" amount by examining the entire business of American, including cost of goods sold and compensation. 2 RR 242–43 (Bostick); 3 RR 48 (Thayer). Because each margin adjustment method must be calculated to determine what results in the lowest amount, "margin" cannot be determined from the gross receipts of a taxable entity.

C. **The apportionment of margin to Texas can only be determined from the entire business of the taxable entity, and not from the receipts of individual transactions.**

The apportionment factor is determined for the entire business on Lines 24–26 of the Texas Franchise Tax Report:

**APPORTIONMENT FACTOR**
24. **Gross receipts in Texas** *(Whole dollars only)*     24. ▪
25. **Gross receipts everywhere** *(Whole dollars only)*     25. ▪
26. **APPORTIONMENT FACTOR** *(Divide item 24 by item 25, round*

*See* 4 RR 20 (PX 4, Lines 24–26) (App. 25). Under Tax Code section 171.101(a), "taxable margin" is the taxable entity's "margin" that has been apportioned to Texas. Tax Code section 171.101(a)(2) further provides that a taxable entity's margin must be apportioned as provided by section 171.106.

Tax Code section 171.106 provides that a taxable entity's margin is apportioned to Texas by the ratio of the taxable entity's "gross receipts from business done in this state," as determined under Tax Code section 171.103, to the taxable entity's "gross receipts from its entire business," as determined under Tax Code section 171.105. Tex. Tax Code §§ 171.106(a) (2015) (App. 10), .103 (App. 17), .105 (App. 18); 4 RR 433–34 (DX 8), 431 (DX 6), 432 (DX 7). To be clear, the "gross receipts" are

being used to apportion the tax base to Texas, not to determine what is in the tax base.

With regard to apportionment, Tax Code section 171.103 provides that the "gross receipts of a taxable entity from its business done in this state" are "the sum" of the taxable entity's receipts from business done in the state. Tex. Tax Code § 171.103 (App. 17); 4 RR 431 (DX 6). And Tax Code section 171.105 further provides that the "gross receipts of a taxable entity from its entire business" are "the sum" of the taxable entity's receipts from its entire business. Tex. Tax Code § 171.105 (App. 18); 4 RR 432 (DX 7).

Thus, for franchise tax purposes, revenue from an individual transaction is not apportioned to Texas based on the extent to which the revenue from the individual transaction is attributable to Texas. Rather, the revenue from an individual transaction is included in the "total revenue" of the taxable entity, which is then apportioned to Texas based on the ratio of the taxable entity's "gross receipts from business done in this state" to the taxable entity's "gross receipts from its entire business." 2 RR 246 (Bostick).

When a revenue stream is removed from the franchise tax calculation, it changes the apportionment factor and the franchise tax calculation for the entity as a whole. 2 RR 105, 158, 164–65 (Smith); 3 RR 46–47 (Thayer). For this reason alone, the franchise tax cannot be calculated on individual revenue streams, as American attempted to do for transportation revenue. 4 RR 84 (PX 6) (App. 20).

### D. The tax rate can only be determined from the entire business of the taxable entity.

American's refund calculation applied a tax rate of 0.95%. 4 RR 84 (PX 6) (App. 20). Even with regard to the tax rate, the only way to know the correct tax rate was to examine American's entire business. 2 RR 252 (Bostick); 3 RR 45–46 (Thayer).

First, under Tax Code §§ 171.002 and 171.0023 in effect for Report Year 2015, the tax rate of the franchise tax varied from 0.95% to 0.475%, depending upon whether the taxable entity was primarily engaged in retail or wholesale trade, as determined by the total revenue from the entire business of the taxable entity. Tex. Tax Code §§ 171.002 (2015) (App. 11), .0023 (2015) (App. 12); 4 RR 426 (DX 3), 428 (DX 4).

Second, under Tax Code section 171.1016 in effect for Report Year 2015, the tax rate of the franchise tax varied from 0.95% to 0.575%,

depending upon whether the total revenue from the entire business of the taxable entity was "not more than $10 million." Tex. Tax Code §§ 171.1016 (2015) (App. 13), .0023(a) (2015) (App. 12); 4 RR 428 (DX 4). Thus, the nature and the size of the entire business must be determined before the franchise tax rate can be determined.

## IV. This Court should render judgment of $1,802,668.33 for additional franchise tax due.

In originally reporting its "total revenue" and its "gross receipts," and paying its tax for Texas franchise tax Report Year 2015, American excluded over $36 billion ($35,461,940,269 + $874,657,698 = $36,336,597,967) in passenger revenue and freight revenue on the theory that these isolated revenue streams were nontaxable under the AHTA:

|  | Per Filed TX Return |
|---|---|
| Passenger Revenue | 35,461,940,269 |
| Freight Revenue | 874,657,698 |
| Other Revenue | 4,475,489,108 |
| 1A  GROSS RECEIPTS | 40,812,087,075 |
| Less Passenger Revenue | (35,461,940,269) |
| Less Freight Revenue | (874,657,698) |
| Gross Rec. (Excluding Transportation) (line 1a) | 4,475,489,108 |

4 RR 82 (PX 6) (App. 19),[11] 2 RR 104 (Smith). When the Texas franchise tax calculation for Report Year 2015 includes this transportation revenue, American owes additional tax in the amount of $1,802,668.33:

---

[11] Highlighted for reference in dark yellow on the proceeding 4 RR 82 (PX 6).

| American Airlines, Inc. | | | Original Audit | Preparer/Date: | PAGE 1 OF 1 P. Thayer - 03/14/2023 |
|---|---|---|---|---|---|
| Fort Worth, TX | | | | TP#: | 1-13-1502798-4 |
| TAX ADJUSTMENT SUMMARY | | | | | |
| FOR REPORT YEAR: | 2015 | | | | |
| **Original Audit Results** | | | FROM: Prior Data Per Last Report | Adjusted Amounts per Verification | Verification Results - From: Col. C or Col. D |
| ( A ) | ( B ) | | ( C ) | ( D ) | ( E ) |
| | REPORT TYPE: | | Annual | | Annual |
| | REPORT YEAR: | | 2015 | | 2015 |
| METHOD ELECTED: | 70%/EZ/COGS/COMP: | | 70% | | 70% |
| **REVENUE** | COL.D & COL.E | | | | |
| ACCOUNTING PERIOD | FORWARDED FROM | | 01/01/2014 - 12/31/2014 | | 01/01/2014 - 12/31/2014 |
| 1. GROSS RECEIPTS OR SALES | Col. C | | 4,475,489,108 | 40,812,087,074 | 40,812,087,074 |
| 2. DIVIDENDS | Col. C | | 2,129,809 | 2,129,809 | 2,129,809 |
| 3. INTEREST | Col. C | | 32,486,152 | 43,513,362 | 43,513,362 |
| 4. RENTS | Col. C | | 17,320,180 | 34,325,796 | 34,325,796 |
| 5. ROYALTIES | Col. C | | 0 | 0 | 0 |
| 6. GAINS/LOSSES | Col. C | | (1,225,565) | 451,141,861 | 451,141,861 |
| 7. OTHER INCOME | Col. C | | 54,993,892 | (83,467,780) | (83,467,780) |
| 8. TOTAL GROSS REVENUE | SUM #1 - #7 | | 4,581,193,576 | | 41,259,730,122 |
| 9. DEDUCTIONS FROM GROSS REVENUE | Col. C | | 87,391,913 | 38,490,987 | 38,490,987 |
| 10. TOTAL REVENUE | #8 - #9 | | $4,493,801,663 | | $41,221,239,135 |
| 10.a. Annualized Total Revenue (# of Days) | 365 | | $4,493,801,663 | | $41,221,239,135 |
| **COST OF GOODS SOLD** | | | | | |
| 11. COST OF GOODS SOLD | Col. C | | 0 | | 0 |
| 12. INDIRECT OR ADMIN COSTS | Col. C | | 0 | | 0 |
| 13. OTHER | Col. C | | 0 | | 0 |
| 14. TOTAL COST OF GOODS SOLD | SUM #11 - #13 | | $0 | | $0 |
| **COMPENSATION** | | | | | |
| 15. WAGES AND CASH COMPENSATION | Col. C | | 0 | | 0 |
| 16. EMPLOYEE BENEFITS | Col. C | | 0 | | 0 |
| 17. OTHER | Col. C | | 0 | | 0 |
| 18. TOTAL COMPENSATION | SUM #15 - #17 | | $0 | | $0 |
| **MARGIN** | | | | | |
| 19. REVENUE (#10 X 70%) | #10 X 70% | | 3,145,661,164 | | 28,854,867,395 |
| 20. REVENUE (#10 - COGS) | #10 - #14 | | N/A | | 41,221,239,135 |
| 21. REVENUE (#10 - COMPENSATION) | #10 - #18 | | N/A | | 41,221,239,135 |
| | LOWEST 19,20,21 | | $3,145,661,164 | | $28,854,867,395 |
| 22. MARGIN | (Not Less Than Zero) | | $3,145,661,164 | | $28,854,867,395 |
| **APPORTIONMENT FACTOR** | | | | | |
| 23. GROSS RECEIPTS IN TEXAS | Col. C | | 67,155,756 | 337,395,961 | 337,395,961 |
| 24 GROSS RECEIPTS EVERYWHERE | Col. C | | 4,493,801,663 | 41,221,239,135 | 41,221,239,135 |
| 25. APPORTIONMENT FACTOR | #23 / #24 | | 0.0149 | | 0.0082 |
| **TAXABLE MARGIN or EZ REVENUE** | | | | | |
| 26. APPORTIONED: MARGIN or EZ | Margin: #22 X #25 | | 46,870,351 | | 236,609,913 |
| 27. ALLOWABLE DEDUCTIONS | Col. C | | 0 | | 0 |
| 28. TAXABLE AMOUNT | #26 - #27 | | $46,870,351 | | $236,609,913 |
| **TAX DUE** | | | | | |
| 29. TAX RATE (If Rate Changed, See Note Below.) | Col. C | | 0.009500 | | 0.00950 |
| 30. TAX DUE | #28 X #29 | | 445,268.33 | | 2,247,794.17 |
| **TAX ADJUSTMENTS** | | | | | |
| 31. TAX CREDITS | Exam 5B | | 149,995.55 | 149,853.06 | 149,853.06 |
| 32. TAX DUE BEFORE DISCOUNT | #30 - #31 | | 295,272.78 | | 2,097,941.11 |
| 33. DISCOUNT | | | 0.00 | | 0.00 |
| 34. TAX DUE | #32-#33 | | $295,272.78 | | $2,097,941.11 |
| 35. TAX DUE BASED ON: | | | 70% | | 70% |
| 36. LESS TAX REPORTED | Tax Reports | | 295,272.78 | | 295,272.78 |
| 37. TAX ADJUSTMENT | #34 - #36 | | $0.00 | | $1,802,668.33 |
| 38. REFUNDS ISSUED | Per Refunds | | 0.00 | | 0.00 |
| 39. FVAR ASGNs (REFUNDS OR ASSESSMENTS) | Per FVAR ASGNs | | 0.00 | | 0.00 |
| 40.BART ASGNs (REFUNDS OR ASSESSMENTS) | Per BART ASGNs | | 0.00 | | 0.00 |
| 41.AUDIT ADJUSTMENTS | Per Audit | | 0.00 | | 0.00 |
| 42. NET TAX ADJUSTMENT | #37-#38-#39-#40-#41 | | 0.00 | | 1,802,668.33 |

RR PX 19 (Tab 2, TAS-Margin, Column E) (App. 21); 3 RR 39–41

(Thayer).

Since the AHTA does not preempt the inclusion of American's passenger revenue and freight revenue in Texas franchise tax calculations, American improperly excluded this transportation revenue from its Report Year 2015 calculations. Therefore, the trial court erred in excluding this transportation revenue and should have awarded the Comptroller a judgment of $1,802,668.33.

## PRAYER

The purpose and effect of the Texas franchise tax is to provide an annual privilege period based on a taxpayer's entire annual business activities, not to tax a percentage of isolated gross revenue streams. American cannot single out transportation receipts and claim that portion of the franchise tax is a gross receipts tax for purposes of the Anti-Head Tax Act under the theory that there are no deductions or exclusions associated with that particular revenue stream. In any event, there were deductions or exclusions associated with transportation revenue in American's franchise tax calculations—compensation. The planes didn't fly themselves.

American is not entitled to the $107,577.04 refund that it seeks, calculated solely on approximately $1 billion of baggage receipts that

American included on its original return. 4 RR 84 (PX 6) (App. 20). Thus, this Court should reverse the trial court's judgment. Furthermore, this Court should grant the Comptroller's counterclaim and render judgment of $1,802,668.33 (RR PX 19 (App. 21)) for additional franchise tax due to Texas because American improperly excluded from revenue over $36 billion in passenger and freight revenue when it filed its original return. 4 RR 82 (PX 6) (App. 19); 2 RR 104 (Smith).

Respectfully submitted.

| | |
|---|---|
| KEN PAXTON<br>Attorney General | */s/ Deborah J. Rao*<br>**DEBORAH J. RAO**<br>Assistant Attorney General<br>State Bar No. 24131915 |
| BRENT WEBSTER<br>First Assistant Attorney General | deborah.rao@oag.texas.gov<br>**RAY LANGENBERG**<br>Specially Deputized Assistant<br>Attorney General |
| RALPH MOLINA<br>Deputy First Assistant Attorney<br> General | State Bar No. 11911200<br>ray.langenberg@cpa.texas.gov<br>**ALYSON "ALLY" THOMPSON**<br>Assistant Attorney General<br>State Bar No. 24143794 |
| JAMES LLOYD<br>Deputy Attorney General for Civil<br> Litigation | ally.thompson@oag.texas.gov<br>Office of the Attorney General<br>Tax Litigation Division MC 029<br>P.O. Box 12548<br>Austin, Texas 78711-2548 |
| STEVEN ROBINSON<br>Division Chief, Tax Litigation<br> Division | Tel: 512-475-3503<br>Fax: (512) 478-4013<br>*Counsel for Appellants* |

# CERTIFICATE OF COMPLIANCE

In compliance with Texas Rule of Appellate Procedure 9.4(i)(2), this brief is computer-generated containing 8,742 words, excluding the portions of the brief exempted by Rule 9.4(i)(1).

/s/ Deborah J. Rao
DEBORAH J. RAO
Assistant Attorney General

**CERTIFICATE OF SERVICE**

I certify that on February 5, 2025, a copy of the foregoing document was served on all parties or attorneys of record via the service methods listed below.

***Via Electronic Service and/or email:***

Mary A. McNulty
Mary.McNulty@hklaw.com
Leonora Meyercord
Lee.Meyercord@hklaw.com
J. Meghan McCaig
Meghan.McCaig@hklaw.com
Richard B. Phillips, Jr.
Rich.Phillips@hklaw.com

Holland & Knight, LLP
One Arts Plaza
1722 Routh Street, Suite 1500
Dallas, Texas 75201
Tel: 214-964-9500
Fax: 214-964-9501

*Counsel for Appellee*

/s/ Deborah J. Rao
DEBORAH J. RAO
Assistant Attorney General

# INDEX OF APPENDICES

1.    Final Judgment (2 CR 232–33)

2.    Findings of Fact and Conclusions of Law (2 CR 546–50)

3.    49 U.S.C. § 40116

4.    *Aloha Airlines v. Director of Taxation of Hawaii*, 464 U.S. 7 (1983)

5.    Tex. Tax Code § 171.151

6.    Tex. Tax Code § 171.1532

7.    Tex. Tax Code § 171.101 (2015)

8.    Tex. Tax Code § 171.0002 (2015)

9.    Tex. Tax Code § 171.1014

10.   Tex. Tax Code § 171.106 (2015)

11.   Tex. Tax Code § 171.002 (2015)

12.   Tex. Tax Code § 171.0023 (2015)

13.   Tex. Tax Code § 171.1016 (2015)

14.   Senate Report No. 93-12 (1973)

15.   Tex. Tax Code § 171.001 (2015)

16.   Tex. Tax Code § 171.1011 (2015)

17.   Tex. Tax Code § 171.103

18.   Tex. Tax Code § 171.105

19.    Plaintiff's Exhibit 6_American's Calculations (4 RR 82)

20.    Plaintiff's Exhibit 6_Receipts of American and US Airways (4 RR 84–91, 93–95)

21.    Plaintiff's Exhibit 19_Excel Spreadsheet Tab 2_TAS-Margin (RR PX 19)

22.    Plaintiff's Exhibit 19_Excel Spreadsheet Tab 4_Exam 1 (RR PX 19)

23.    Plaintiff's Exhibit 19_Excel Spreadsheet Tab 5_Exam 1A (RR PX 19)

24.    Plaintiff's Exhibit 19_Excel Spreadsheet Tab 6_TAS-Exam 3 (RR PX 19)

25.    Plaintiff's Exhibit 4_American's Texas Franchise Tax Report (4 RR 20–21)

26.    Plaintiff's Exhibit 29_American's Capital Gains and Losses 2014 (4 RR 359)

27.    Plaintiff's Exhibit 1_PX 001_Tab 1

# Appendix 1:
# Final Judgment (2 CR 232-33)

**NO. D-1-GN-16-000621**

| AMERICAN AIRLINES, INC., | § | IN THE DISTRICT COURT OF |
|---|---|---|
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| GLENN HEGAR, | § | TRAVIS COUNTY, TEXAS |
| Texas Comptroller of Public Accounts, | § | |
| and KEN PAXTON, | § | |
| Attorney General of Texas, | § | |
| | § | |
| Defendants. | § | 98th JUDICIAL DISTRICT |

**CONSOLIDATED WITH NO. D-1-GN-15-003101**

| AMERICAN AIRLINES, INC., | § | IN THE DISTRICT COURT OF |
|---|---|---|
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| GLENN HEGAR, | § | TRAVIS COUNTY, TEXAS |
| Texas Comptroller of Public Accounts, | § | |
| and KEN PAXTON, | § | |
| Attorney General of Texas, | § | |
| | § | |
| Defendants. | § | 98th JUDICIAL DISTRICT |

**FINAL JUDGMENT**

On June 17, 2024, this case was called for trial. All matters in controversy, legal and factual, were submitted to the Court for its determination. The Court heard the evidence and arguments of counsel.

The Court GRANTS Plaintiff American Airlines, Inc. a refund of the amounts paid under protest of franchise taxes imposed on gross receipts from baggage fees because such taxes are prohibited by the Anti-Head Tax Act.

The Court RENDERS JUDGMENT for American Airlines, Inc., in the amount of $107,577.04 plus interest as set forth in Texas Tax Code § 112.155(c).

The Court further ORDERS that Defendants take nothing on their counterclaim and that each party will bear its own costs.

Final Judgment — Page 1

This judgment finally disposes of all claims and all parties, and is appealable.

Signed this _____7th day of August_____, 2024

_Jessica Mangrum_

Judge Presiding
Jessica Mangrum

I, VELVA L. PRICE, District Clerk, Travis County,
Texas, do hereby certify that this is a true and
correct copy as same appears of record in my
office. Witness my hand and seal of office

On 11/18/2024 11:10:53_____

VELVA L. PRICE
DISTRICT CLERK
By Deputy: SH

Final Judgment — Page 2

# Appendix 2:
# Findings of Fact and Conclusions of Law
# (2 CR 546-50)

**NO. D-1-GN-16-000621**

| | | |
|---|---|---|
| **AMERICAN AIRLINES, INC.,** | § | **IN THE DISTRICT COURT OF** |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **GLENN HEGAR,** | § | **TRAVIS COUNTY, TEXAS** |
| **Texas Comptroller of Public Accounts,** | § | |
| **and KEN PAXTON,** | § | |
| **Attorney General of Texas,** | § | |
| | § | |
| **Defendants.** | § | **98th JUDICIAL DISTRICT** |

**CONSOLIDATED WITH NO. D-1-GN-15-003101**

| | | |
|---|---|---|
| **AMERICAN AIRLINES, INC.,** | § | **IN THE DISTRICT COURT OF** |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **GLENN HEGAR,** | § | **TRAVIS COUNTY, TEXAS** |
| **Texas Comptroller of Public Accounts,** | § | |
| **and KEN PAXTON,** | § | |
| **Attorney General of Texas,** | § | |
| | § | |
| **Defendants.** | § | **98th JUDICIAL DISTRICT** |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Court submits the following Proposed Findings of Fact and Conclusions of Law. To the extent that any of the proposed findings of fact are conclusions of law or mixed findings of fact and conclusions of law, the Court submits them as such. To the extent that any of the proposed conclusions of law to be findings of fact or mixed findings of fact and conclusions of law, the Court submits them as such.



**FINDINGS OF FACT AND CONCLUSIONS OF LAW – Page 1**

1.       American is an air carrier based in Fort Worth, Texas.  It operates a fleet of approximately 1,000 aircraft and transports people and baggage to destinations in North America, the Caribbean, Latin America, Europe, and the Asia-Pacific Region.

2.       This lawsuit concerns American's Texas franchise tax for report year 2015.[1]

3.       American and its affiliates operate and earn revenue in Texas and other states and countries.

4.       Included in American's total revenue for fiscal year 2014 are amounts attributable to baggage fees and passenger ticket sales collected from passengers on flights operating in the federal airways and amounts attributable to transporting freight by air in the federal airways.

5.       American contends that its revenue from baggage fees, passenger fees, and freight transported by air cannot be subject to the Texas franchise tax because that tax is preempted by the federal Anti-Head Tax Act, 49 U.S.C. § 40116 (the "AHTA"), which prohibits states from imposing any tax on gross receipts from air commerce or air transportation.

6.       Transporting people, baggage, and freight by air constitutes air commerce and air transportation under the AHTA.

7.       American computes its Texas franchise tax liability by (1) taking its total revenue and multiplying that amount by seventy percent; (2) determining the amount of its total revenue that is apportioned to its Texas business; and (3) multiplying that amount by the franchise tax rate.

8.       There are no deductions or exclusions from American's revenues from passenger ticket sales, passenger baggage fees, and freight transportation.  American would pay the franchise tax on 70% of the gross receipts from those sources that are apportioned to the State of Texas.

---

[1]    The term "report year 2015" refers to the year in which the franchise tax return was filed. The report year 2015 franchise tax return covered fiscal year 2014.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW – Page 2**

9. With respect to report years 2009–2014, the Texas Comptroller of Public Accounts (the "Comptroller") agreed with American's position that the AHTA preempted Texas's ability to tax American's revenue from passenger ticket sales, baggage fees, and freight transportation. The Comptroller later changed course and informed American that it no longer agreed with American's preemption argument. The Comptroller subsequently refunded the Texas franchise tax paid on passenger ticket sales, baggage fees, and freight transportation for report year 2014.

10. In early 2014, the Comptroller requested an opinion from the United States Department of Transportation (the "DOT")—the federal agency responsible for administering the AHTA—that the AHTA did not preempt the Texas franchise tax as applied to revenues received from air commerce or transportation. The DOT disagreed with the Comptroller's position.

11. Before American filed its 2015 franchise tax report, Comptroller staff encouraged American to pay its franchise tax under protest for report year 2015 and file suit to expedite resolution of its franchise tax dispute for that year. In May 2015, American filed its franchise tax return under protest and paid the amount due under protest. American then timely filed suit (Dkt. No. D-1-GN-15-003101).

12. The Comptroller later refunded to American $107,577.04 and subsequently issued a jeopardy determination (the "Determination"), demanding payment of $107,577.04. On January 12, 2016, American paid under protest the amount indicated on the Determination. It timely filed this suit (Dkt. No. D-1-GN-16-000621) to obtain a final confirmation that the Comptroller is prohibited by the AHTA from imposing franchise tax on American's gross receipts from air commerce or transportation, as well as to obtain a refund of the amount of franchise tax it overpaid for report year 2015.

13. Defendants timely filed a counterclaim in this litigation raising, among other things, computational arguments, as well as claiming that American should pay the franchise tax on revenues from passenger ticket sales and freight transportation.

14. American timely filed its tax-refund suits[2] within 90 days of the date it made its payments under protest.

15. American proved its entitlement to a refund of $107,577.04 in franchise tax paid on baggage fees for report year 2015.

## II. CONCLUSIONS OF LAW

16. American is a transportation company within the meaning of section 3.591(e)(32) of the Texas Administrative Code (34 TAC § 3.591(e)(32)) as in effect for report year 2015.

17. The Texas franchise tax is a gross-receipts tax as applied to American's revenues from passenger ticket sales, baggage fees, and freight transportation.

18. American is required to compute its Texas franchise tax liability by (1) taking its total revenue and multiplying that amount by seventy percent; (2) determining the amount of its total revenue that is apportioned to its Texas business; and (3) multiplying that amount by the franchise tax rate. *See* TEX. TAX CODE §§ 171.101(a)(1)–(3).

19. There are no deductions or exclusions from American's revenues from passenger ticket sales, passenger baggage fees, and freight transportation.

20. The AHTA preempts Texas's franchise tax as applied to American's baggage fees, passenger ticket sales, and freight transportation because it is an impermissible tax on "gross receipts" from "air commerce or air transportation." 49 U.S.C. § 40116(b)(4); *see also Aloha*

---

[2] The two suits have been consolidated into Docket No. D-1-GN-16-000621. American does not seek to recover twice; it only seeks a refund of the portion of its franchise tax attributable to report year 2015 that American overpaid.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW – Page 4**

*Airlines, Inc. v. Dir. Of Tax'n of Hawaii*, 464 U.S. 7, 13–14 (1983) (rejecting Hawaii's attempt to impose a "property tax" on airline revenues because the tax was measured by gross receipts); *Balloons Over the Rainbow, Inc. v. Dir. of Revenue*, 427 S.W. 3d 815, 824 (Mo. 2014) (en banc) (AHTA preempted Missouri sales tax on gross receipts from hot air balloon rides); *Air Transp. Ass'n of Am. v. N.Y.*, 91 A.D.2d 169, 170–71 (N.Y. App. Div. 1983) (AHTA preempted New York franchise tax on gross earnings in the state to the extent it included gross receipts from air carriage); State Office of Admin. Hearings Dkt. No. 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.26, Comptroller of Public Accounts, 2017 WL 3842067, at *7 (May 3, 2017) (imposition of sales tax on skydiving revenue preempted by AHTA); *Kamikawa v. Lynden Air Freight, Inc.*, 968 P.2d 653, 657 (Hawaii 1998) (Hawaii's excise tax was preempted by federal law to the extent it taxed revenue from air, but not ground, transportation).

21.     American properly excluded passenger, freight, and baggage revenues, pursuant to the AHTA, from its total revenue when re-calculating its franchise tax liability for report year 2015.

22.     American is owed a refund of $107,577.04, together with statutory interest on that amount and costs of court.

23.     Because the Court agrees that the AHTA preempts the Texas franchise tax as applied to American's revenue from air commerce and air transportation, Defendants take nothing on their Counterclaim.

Signed on          September 3          , 2024.

_____
JUDGE PRESIDING
JESSICA MANGRUM

I, VELVA L. PRICE, District Clerk, Travis County, Texas, do hereby certify that this is a true and correct copy as same appears of record in my office. Witness my hand and seal of office

On 11/18/2024 11:10:55

VELVA L. PRICE
DISTRICT CLERK
By Deputy: SH

**FINDINGS OF FACT AND CONCLUSIONS OF LAW – Page 5**

Page 550

# Appendix 3:
# 49 U.S.C. § 40116

United States Code Annotated
    Title 49. Transportation (Refs & Annos)
        Subtitle VII. Aviation Programs
            Part A. Air Commerce and Safety (Refs & Annos)
                Subpart I. General
                    Chapter 401. General Provisions (Refs & Annos)

49 U.S.C.A. § 40116

§ 40116. State taxation

Currentness

**(a) Definition.**--In this section, "State" includes the District of Columbia, a territory or possession of the United States, and a political authority of at least 2 States.

**(b) Prohibitions.**--Except as provided in subsection (c) of this section and section 40117 of this title, a State, a political subdivision of a State, and any person that has purchased or leased an airport under section 47134 of this title may not levy or collect a tax, fee, head charge, or other charge on--

   **(1)** an individual traveling in air commerce;

   **(2)** the transportation of an individual traveling in air commerce;

   **(3)** the sale of air transportation; or

   **(4)** the gross receipts from that air commerce or transportation.

**(c) Aircraft taking off or landing in State.**--A State or political subdivision of a State may levy or collect a tax on or related to a flight of a commercial aircraft or an activity or service on the aircraft only if the aircraft takes off or lands in the State or political subdivision as part of the flight.

**(d) Unreasonable burdens and discrimination against interstate commerce.--(1)** In this subsection--

   **(A)** "air carrier transportation property" means property (as defined by the Secretary of Transportation) that an air carrier providing air transportation owns or uses.

   **(B)** "assessment" means valuation for a property tax levied by a taxing district.

**(C)** "assessment jurisdiction" means a geographical area in a State used in determining the assessed value of property for ad valorem taxation.

**(D)** "commercial and industrial property" means property (except transportation property and land used primarily for agriculture or timber growing) devoted to a commercial or industrial use and subject to a property tax levy.

**(2)(A)** A State, political subdivision of a State, or authority acting for a State or political subdivision may not do any of the following acts because those acts unreasonably burden and discriminate against interstate commerce:

**(i)** assess air carrier transportation property at a value that has a higher ratio to the true market value of the property than the ratio that the assessed value of other commercial and industrial property of the same type in the same assessment jurisdiction has to the true market value of the other commercial and industrial property.

**(ii)** levy or collect a tax on an assessment that may not be made under clause (i) of this subparagraph.

**(iii)** levy or collect an ad valorem property tax on air carrier transportation property at a tax rate greater than the tax rate applicable to commercial and industrial property in the same assessment jurisdiction.

**(iv)** levy or collect a tax, fee, or charge, first taking effect after August 23, 1994, exclusively upon any business located at a commercial service airport or operating as a permittee of such an airport other than a tax, fee, or charge wholly utilized for airport or aeronautical purposes.

**(v)** except as otherwise provided under section 47133, levy or collect a tax, fee, or charge, first taking effect after the date of enactment of this clause, upon any business located at a commercial service airport or operating as a permittee of such an airport that is not generally imposed on sales or services by that State, political subdivision, or authority unless wholly utilized for airport or aeronautical purposes.

**(B)** Subparagraph (A) of this paragraph does not apply to an in lieu tax completely used for airport and aeronautical purposes.

**(e) Other allowable taxes and charges.**--Except as provided in subsection (d) of this section, a State or political subdivision of a State may levy or collect--

**(1)** taxes (except those taxes enumerated in subsection (b) of this section), including property taxes, net income taxes, franchise taxes, and sales or use taxes on the sale of goods or services; and

**(2)** reasonable rental charges, landing fees, and other service charges from aircraft operators for using airport facilities of an airport owned or operated by that State or subdivision.

**(f) Pay of air carrier employees.--(1)** In this subsection--

**(A)** "pay" means money received by an employee for services.

**(B)** "State" means a State of the United States, the District of Columbia, and a territory or possession of the United States.

**(C)** an employee is deemed to have earned 50 percent of the employee's pay in a State or political subdivision of a State in which the scheduled flight time of the employee in the State or subdivision is more than 50 percent of the total scheduled flight time of the employee when employed during the calendar year.

**(2)** The pay of an employee of an air carrier having regularly assigned duties on aircraft in at least 2 States is subject to the income tax laws of only the following:

**(A)** the State or political subdivision of the State that is the residence of the employee.

**(B)** the State or political subdivision of the State in which the employee earns more than 50 percent of the pay received by the employee from the carrier.

**(3)** Compensation paid by an air carrier to an employee described in subsection (a) in connection with such employee's authorized leave or other authorized absence from regular duties on the carrier's aircraft in order to perform services on behalf of the employee's airline union shall be subject to the income tax laws of only the following:

**(A)** The State or political subdivision of the State that is the residence of the employee.

**(B)** The State or political subdivision of the State in which the employee's scheduled flight time would have been more than 50 percent of the employee's total scheduled flight time for the calendar year had the employee been engaged full time in the performance of regularly assigned duties on the carrier's aircraft.

### CREDIT(S)

(Pub.L. 103-272, § 1(e), July 5, 1994, 108 Stat. 1111; Pub.L. 103-305, Title I, § 112(e), Title II, § 208, Aug. 23, 1994, 108 Stat. 1576, 1588; Pub.L. 104-264, Title I, § 149(b), Oct. 9, 1996, 110 Stat. 3226; Pub.L. 104-287, § 5(66), Oct. 11, 1996, 110 Stat. 3395; Pub.L. 115-254, Div. B, Title I, § 159(a), Oct. 5, 2018, 132 Stat. 3220.)

49 U.S.C.A. § 40116, 49 USCA § 40116
Current through P.L. 118-158. Some statute sections may be more current, see credits for details.

**Appendix 4:**

*Aloha Airlines, Inc. v Director of Taxation of Hawaii, 464 U.S. 7 (1983)*

104 S.Ct. 291
Supreme Court of the United States

ALOHA AIRLINES, INC., Appellant

v.

DIRECTOR OF TAXATION OF HAWAII.

HAWAIIAN AIRLINES, INC., Appellant

v.

DIRECTOR OF TAXATION OF HAWAII.

Nos. 82–585, 82–586.
|
Argued Oct. 4, 1983.
|
Decided Nov. 1, 1983.

**Synopsis**

Hawaiian airlines brought action challenging state's imposition of public service company tax on their gross incomes. The Tax Appeal Court, City and County of Honolulu, Yasutaka Fukushima, J., ruled against the airlines, and they appealed. The Supreme Court of Hawaii, Nakamura, J., 🚩 647 P.2d 263, affirmed, and certiorari was granted. The Supreme Court, Justice Marshall, held that Hawaii statute which imposed a tax on the annual gross income of airlines operating within state and which declared that the tax was a means of taxing airline's personal property was preempted by section of Airport Development Acceleration Act which prohibited state from levying a tax on the gross receipts derived from sale of air transportation but which provided that property taxes were not included in the prohibition, because nothing in federal statute's legislative history suggested that Congress intended to limit its preemptive effect to taxes on airline passengers or to save gross receipts taxes such as the one imposed by Hawaii, and fact that Hawaii tax was styled as a property tax measured by gross receipts rather than a straight-forward gross receipts tax did not entitle the tax to escape preemption.

Reversed and remanded.

**Procedural Posture(s):** On Appeal.

West Headnotes (2)

**[1]** **Commerce** 🔑 Particular Subjects and Taxes

When a federal statute unambiguously forbids the states to impose a particular kind of tax on an industry affecting interstate commerce, courts need not look behind the plain language of the federal statute to determine whether a state statute that imposes such a tax is pre-empted.

38 Cases that cite this headnote

**[2]** **Commerce** 🔑 Gross Receipts Taxes

**Taxation** 🔑 Validity of Acts and Ordinances

Hawaii statute which imposed a tax on annual gross income of airlines operating within state and which declared that the tax was a means of taxing an airline's personal property was pre-empted by section of Airport Development Acceleration Act which prohibited a state from levying tax on gross receipts derived from sale of air transportation but which provided that property taxes were not included in the prohibition, because nothing in federal statute's legislative history suggested that Congress intended to limit its pre-emptive effect to taxes on airline passengers or to save gross receipts taxes such as the one imposed by Hawaii, and fact that Hawaii tax was styled as a property tax measured by gross receipts rather than a straight-forward gross receipts tax did not entitle the tax to escape pre-emption. Federal Aviation Act of 1958, § 1113(a), as amended, 49 U.S.C.A. § 1513(a); HRS § 239–6.

55 Cases that cite this headnote

**\*\*291** *Syllabus* [*]

**\*7** A Hawaii statute imposes a tax on the annual gross income of airlines operating within the State, and declares that such tax is a means of taxing an airline's personal property. Section 7(a) of the Airport Development Acceleration Act of 1973 (ADAA) prohibits a State from levying a tax, "directly or indirectly, on persons traveling in air commerce or on the carriage of persons traveling in air commerce or on the sale of air transportation or on the gross receipts derived therefrom," but provides **\*\*292** that property taxes are not included in this prohibition. Appellant airlines each brought an action for

refund of taxes assessed under the Hawaii statute, claiming that the statute was pre-empted by § 7(a). The Hawaii Tax Appeal Court rejected this pre-emption argument, and the Hawaii Supreme Court affirmed.

*Held:* Section 7(a) pre-empts the Hawaii statute. Pp. 294 – 295.

(a) When a federal statute unambiguously forbids a State to impose a particular kind of tax on an industry affecting interstate commerce, as § 7(a) does here by its plain language, courts need not look beyond the federal statute's plain language to determine whether a state statute that imposes such a tax is pre-empted. P. 294.

(b) Moreover, nothing in the ADAA's legislative history suggests that Congress intended to limit § 7(a)'s pre-emptive effect to taxes on airlines passengers or to save gross receipts taxes such as the one Hawaii imposes. Although § 7(a) was enacted to deal primarily with local head taxes on airline passengers, the legislative history contains many references to the fact that § 7(a) pre-empts state taxes on gross receipts of airlines. Pp. 294 – 295.

(c) The fact that the Hawaii tax is styled as a property tax measured by gross receipts rather than as a straightforward gross receipts tax does not entitle the tax to escape pre-emption under § 7(a)'s property tax exemption. Such styling of the tax does not mask the fact that the purpose and effect of the tax are to impose a levy upon the gross receipts **\*8** of airlines, thus making it at least an "indirect" tax on such receipts. P. 295.

⚑ 65 Haw. 1, 647 P.2d 263, reversed and remanded.

**Attorneys and Law Firms**

*Richard L. Griffith* argued the cause for appellants in both cases. With him on the briefs were *Michael A. Shea, Richard R. Clifton, Hugh Shearer,* and *H. Mitchell D'Olier.*

*William D. Dexter* argued the cause for appellee. With him on the brief was *Kevin T. Wakayama.*†

† Briefs of *amici curiae* urging affirmance were filed for the State of Alaska et al. by *Kenneth O. Eikenberry,* Attorney General of Washington, and *Jeffrey D. Goltz,* Assistant Attorney General, *Norman C. Gorsuch,* Attorney General of Alaska, and *Diane T. Colvin,* Assistant Attorney General,

*Robert K. Corbin,* Attorney General of Arizona, *Michael C. Turpen,* Attorney General of Oklahoma, *Chauncey H. Browning,* Attorney General of West Virginia, and *Jack C. McClung,* Deputy Attorney General; and for the Multistate Tax Commission et al. by *Eugene F. Corrigan.*

Briefs of *amici curiae* were filed for the State of New York by *Robert Abrams,* Attorney General, *Peter H. Schiff,* and *Francis V. Dow,* Assistant Attorney General; and for the Air Transport Association of America by *Andrew C. Hartzell, Jr.*

**Opinion**

Justice MARSHALL delivered the opinion of the Court.

These appeals present the question whether 49 U.S.C. § 1513(a) preempts a Hawaii statute that imposes a tax on the gross income of airlines operating within the State. We conclude that the Hawaii tax is preempted.

I

In 1970, Congress committed the federal government to assisting States and localities in expanding and improving the nation's air transportation system. See Airport and Airway Development Act of 1970, Pub.L. 91–258, 84 Stat. 219. In the same session, Congress established the Airport and Airway Trust Fund to funnel federal resources to local airport expansion and improvement projects. See Airport and Airway **\*9** Revenue Act of 1970, Pub.L. 91–258, § 208, 84 Stat. 236, 250–252. As originally devised, the Trust Fund received its revenues from several federal aviation taxes, including an 8% tax on domestic airline tickets, a $3 head tax on international flights out of the United States, and a 5% tax on air freight. See §§ 203, 204, 84 Stat. 238–240 (codified as amended, at ⚑ 26 U.S.C. §§ 4261, ⚑ 4271 (1976 ed. and Supp.1981)). See generally ⚑ *Massachusetts v. United States,* 435 U.S. 444, 98 S.Ct. 1153, 55 L.Ed.2d 403 (1978).

Once the Airport and Airway Development Act was passed and the Trust Fund established, the question arose whether States and municipalities were still free to impose additional taxes on airlines and air travelers. In ⚑⚠ *Evansville-Vanderburgh Airport Authority Dist. v. Delta Airlines,* 405 U.S. 707, 92 S.Ct. 1349, 31 L.Ed.2d 620 (1972), this Court ruled that neither the Commerce Clause nor the Airport and Airway Development Act precluded state or local authorities from assessing head taxes on passengers boarding flights at

state or local airports. In particular the Court noted, "No federal statute or specific congressional action or declaration evidences a congressional purpose to deny or pre-empt state and local power to levy charges designed **\*\*293** to help defray the costs of airport construction and maintenance." *Id.,* at 721, 92 S.Ct., at 1357.

Following the *Evansville-Vanderburgh Airport* decision, Committees in both Houses of Congress held hearings on local taxation of air transportation. [1] Both Committees concluded that the proliferation of local taxes burdened interstate air transportation, and, when coupled with the federal Trust Fund levies, imposed double taxation on air travelers. [2] To deal with these problems, Congress passed § 7(a) of the **\*10** Airport Development Acceleration Act of 1973 (ADAA), the provision at issue in these appeals. See Pub.L. 93–44, § 7(a), 87 Stat. 88, 90. That section, which is currently codified at 49 U.S.C. § 1513, [3] reads:

> "(a) No State ... shall levy or collect a tax, fee, head charge, or other charge, directly or indirectly, on persons traveling in air commerce or on the carriage of persons traveling in air commerce or on the sale of air transportation or on the gross receipts derived therefrom....
>
> > "(b) Nothing in this section shall prohibit a State ... from the levy or collection of taxes other than those enumerated in subsection (a) of this section, including property taxes, net income taxes, franchise taxes, and sales or use taxes on the sale of goods or services."

For States with taxes that were in effect prior to May 21, 1970, and would be preempted by § 1513(a), Congress postponed the effective date of the section until December 31, 1973. *Ibid.*

## II

Appellants Aloha Airlines, Inc., and Hawaiian Airlines, Inc., are both commercial airlines that carry passengers, freight, and mail among the islands of Hawaii. Throughout the periods relevant to these appeals, Appellants have been Hawaii public service companies, see Haw.Rev.Stat. §§ 239–2, 269–1 (1976 ed. and Supp.1982), and subject to the State's public service company tax, which provides:

> "There shall be levied and assessed upon each airline a tax of four per cent of its gross income each year from

the airline business.... The tax imposed by this section is a means of taxing the personal property of the airline or other carrier, tangible and intangible, including **\*11** going concern value, and is in lieu of the [general excise] tax imposed by chapter 237 but is not in lieu of any other tax." § 239–6 (1976).

In 1978, Appellant Aloha Airlines sought refunds for taxes assessed under this provision for the carriage of passengers between 1974 and 1977 on the ground that 49 U.S.C. § 1513(a) had preempted Haw.Rev.Stat. § 239–6 as of December 31, 1973. In 1979, Appellant Hawaiian Airlines filed a similar action seeking a refund for taxes paid between 1974 and 1978. In separate decisions, the Tax Appeal Court of the State of Hawaii rejected Appellants' preemption arguments, *In re Aloha Airlines, Inc.,* No. 1772 (Haw.Ct.Tax App.1978); *In re Hawaiian Airlines, Inc.,* Nos. 1853, 1868 (Haw.Ct.Tax App.1980). On consolidated appeal, the Hawaii Supreme Court affirmed, one Justice dissenting, *In re Aloha Airlines, Inc.,* 65 Haw. 1, 647 P.2d 263 (1982). Appellants then filed timely notices of appeal, this Court noted probable jurisdiction, **\*\*294** 459 U.S. 1101, 103 S.Ct. 721, 74 L.Ed.2d 948 (1983), and we now reverse.

## III

The plain language of 49 U.S.C. § 1513(a) would appear to invalidate Haw.Rev.Stat. § 239–6. § 1513(a) expressly preempts gross receipts taxes on the sale of air transportation or the carriage of persons traveling in air commerce, and Haw.Rev.Stat. § 239–6 is a state tax on the gross receipts [4] of airlines selling air transportation and carrying persons traveling in air commerce. The Hawaii Supreme Court sought to avoid this direct conflict by looking beyond the language of § 1513(a) to Congress's purpose in enacting the statute. The Court concluded that Congress passed the ADAA to deal with the proliferation of local and state head taxes on airline passengers in the early 1970's. Since Haw.Rev.Stat. § 239–6 is imposed upon air carriers **\*12** as opposed to air travelers, the Hawaii Court reasoned that the provision did not come within the ambit of § 1513(a)'s prohibitions.

 **[1]** We cannot agree with the Hawaii Supreme Court's analysis. First, when a federal statute unambiguously forbids the States to impose a particular kind of tax on an industry affecting interstate commerce, courts need not look beyond the plain language of the federal statute to determine whether

a state statute that imposes such a tax is preempted.[5] Thus, the Hawaii Supreme Court erred in failing to give effect to the plain meaning of § 1513(a).[6]

**[2]** Second, even if the absence of an express proscription made it necessary to go beyond the plain language of § 1513(a), **\*13** nothing in the legislative history of the ADAA suggests that Congress intended to limit § 1513(a)'s preemptive effect to taxes on airline passengers or to save gross receipts taxes like § 239–6.[7] Although Congress **\*\*295** passed § 1513(a) to deal primarily with local head taxes on airline passengers, the legislative history abounds with references to the fact that § 1513(a) also preempts state taxes on the gross receipts of airlines.[8] For example, Senator Cannon, one of the ADAA's sponsors, clearly stated in floor debate: "The bill prohibits the levying of State or local head taxes, fees, gross receipts taxes or other such charges either on passengers or on the carriage of such passengers in interstate commerce." 119 Cong.Rec. 3349 (1973).

Finally, we are unpersuaded by Appellee's contention that, because the Hawaii legislature styled § 239–6 as a property tax measured by gross receipts rather than a straight-forward gross receipts tax, the provision should escape preemption under § 1513(b)'s exemption for property taxes. The manner in which the state legislature has described and categorized § 239–6[9] cannot mask the fact that the purpose **\*14** and effect of the provision is to impose a levy upon the gross receipts of airlines. § 1513(a) expressly prohibits States from taxing "directly or indirectly" gross receipts derived from air transportation. Beyond question, a property tax that is measured by gross receipts constitutes at least an "indirect" tax on the gross receipts of airlines. A state statute that imposes such a tax is therefore preempted.[10]

IV

In conclusion, we join with state courts of Alaska and New York[11] in the view that § 1513(a) proscribes the imposition of **\*15** state and local taxes on gross receipts derived from air transportation or the carriage of persons in air commerce. The judgment of the Supreme Court of the State of Hawaii is reversed, and the cases are remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

**All Citations**

464 U.S. 7, 104 S.Ct. 291, 78 L.Ed.2d 10

---

**Footnotes**

\*     The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

1     See Hearings on S. 2397 et al. before the Subcommittee on Aviation of the Senate Committee on Commerce, 92d Cong., 2d Sess., 129–198 (1972); Hearings on H.R. 2337 et al. before the Subcommittee on Transportation and Aeronautics of the House Committee on Interstate and Foreign Commerce, 92d Cong., 2d Sess. (1972).

2     See S.Rep. No. 93–12, pp. 17, 20–21 (1973) U.S.Code Cong. & Admin.News 1973, p. 1434; H.R.Rep. No. 93–157, pp. 4–5 (1973).

3     In 1982, Congress amended 49 U.S.C. § 1513 to prohibit discriminatory property taxes imposed on air carriers. See Airport and Airway Improvement Act of 1982, Pub.L. 97–248, § 532, 96 Stat. 701 (codified at 49 U.S.C. § 1513(d)). Being enacted after the relevant periods, this amendment has no bearing on these appeals.

4    Appellee concedes that the phrase "gross income," under Haw.Rev.Stat. § 239–6, is synonymous the phrase "gross receipts," used in 49 U.S.C. § 1513(a). See Brief for Appellee 7, n. 2.

5    The Hawaii Supreme Court apparently considered itself obliged by *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947), and its progeny to examine thoroughly Congress's intentions before declaring Haw.Rev.Stat. § 239–6 preempted. *In re Aloha Airlines, Inc.,* 65 Haw. 1, 13–16, 647 P.2d 263, 272–273 (1982). *Rice* and its progeny, however, involved the implicit preemption of state statutes. Rules developed in these cases apply when a court must decide whether a state law should be preempted even though Congress has not expressly legislated preemption. These rules, therefore, have little application when a court confronts a federal statute like § 1513(a) that explicitly preempts state laws.

6    The Hawaii Supreme Court professed confusion over the "paradox" between § 1513(a)'s prohibition on certain state taxes on air transportation and § 1513(b)'s reservation of the States' primary sources of revenue, such as property taxes, net income taxes, franchise taxes, and sale or use taxes. *In re Aloha Airlines, Inc., supra,* at 16, 647 P.2d, at 273. We find no paradox between § 1513(a) and 1513(b). § 1513(a) preempts a limited number of state taxes, including gross receipts taxes imposed on the sale of air transportation or the carriage of persons traveling in air commerce. § 1513(b) clarifies Congress's view that the States are still free to impose on airlines and air carriers "taxes other than those enumerated in subsection (a)," such as property taxes, net income taxes, and franchise taxes. While neither the statute nor its legislative history explains exactly why Congress chose to distinguish between gross receipts taxes imposed on airlines and the taxes reserved in § 1513(b), the statute is quite clear that Congress chose to make the distinction, and the courts are obliged to honor this congressional choice.

7    Indeed, Congress was presented an opportunity to exempt gross receipts taxes from § 1513(a), and declined to grant the exemption. During House hearings on the ADAA, a representative of the Ohio Tax Commission asked the Subcommittee responsible for the bill to expand section 1513(b) to permit state "gross receipts taxes fairly apportioned to a State," so that Ohio could maintain a gross receipts tax similar to Hawaii's § 239–6. See Hearings on H.R. 4082 before the Subcommittee on Transportation and Aeronautics of the House Committee on Interstate and Foreign Commerce, 93d Cong., 1st Sess., 246–253 (1973). When Congress enacted the ADAA without Ohio's proposed amendment, the State Attorney General issued an opinion concluding that Ohio's gross receipts tax was preempted. See Ohio Op.Atty.Gen. 73–117 (Nov. 20, 1973).

8    See, *e.g.,* S.Rep. No. 93–12, p. 6 (1973); H.R.Conf.Rep. No. 93–225, p. 5 (1973) U.S.Code Cong. & Admin.News 1973, p. 1434; 119 Cong.Rec. 18,045 (1973) (statement of Sen. Cannon); 119 Cong.Rec. 17,345 (1973) (statement of Rep. Devine).

9    The most likely explanation for the seemingly curious way in which the legislature characterized § 239–6 is that, at one time, this Court distinguished between the manner in which a state statute was measured and the subject matter of the tax when assessing the validity of the tax under the Commerce Clause. Compare *Railway Express Agency v. Virginia,* 358 U.S. 434, 73 S.Ct. 411, 3 L.Ed.2d 450 (1959) (upholding a property tax measured by gross receipts), with *Railway Express Agency v. Virginia,* 347 U.S. 359, 74 S.Ct. 558, 98 L.Ed. 337 (1954) (striking down a functionally equivalent business privilege tax). But cf. *Complete Auto Transit, Inc. v. Brady,* 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977). The constitutionality of § 239–6 is of course not at issue in these appeals.

10   The unambiguous proscription contained in § 1513(a) compels us to conclude that it preempts Haw.Rev.Stat. § 239–6 as well as other state taxes imposed on or measured by the gross receipts of airlines. Amici point out that several states have taxation statutes similar to § 239–6 and that the ability of those states to retain revenues collected from airlines during the past decade will be affected by our decision today. We

acknowledge that our interpretation of § 1513(a) may result in the disruption of state systems of taxation; we are, however, bound by the plain language of the statute. Congress clearly has the authority to regulate state taxation of air transportation in interstate commerce, see *Arizona Public Service Co. v. Snead,* 441 U.S. 141, 150, 99 S.Ct. 1629, 1634, 60 L.Ed.2d 106 (1979), and we trust that Congress will amend § 1513(a) if it concludes, upon reconsideration, that the preemptive sweep of the current version is too great.

11    *Wein Air Alaska, Inc. v. State,* No. 3AN 81–8582 Civil (Alaska Sup.Ct.1983), appeal docketed, No. —— (Alaska S.Ct.); *Air Transport Association of America v. New York State Department of Taxation and Finance,* 91 A.D.2d 169, 458 N.Y.S.2d 709 (App.Div.), aff'd, 59 N.Y.2d 917, 466 N.Y.S.2d 319, 453 N.E.2d 548 (1983), cert. pending, No. 83–162; cf. *State ex rel. Arizona Dept. of Revenue v. Cochise Airlines,* 128 Ariz. 432, 626 P.2d 596 (App.1980) (§ 1513(a) preempts state gross receipts taxes on the carriage of passengers, but not freight, in air commerce); see also *Allegheny Airlines, Inc. v. City of Philadelphia,* 453 Pa. 181, 309 A.2d 157 (1973) (finding a Philadelphia head tax on air passengers preempted).

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# Appendix 5:
# Tex. Tax Code § 171.151

Vernon's Texas Statutes and Codes Annotated
  Tax Code (Refs & Annos)
    Title 2. State Taxation (Refs & Annos)
      Subtitle F. Franchise Tax; Credits (Refs & Annos)
        Chapter 171. Franchise Tax (Refs & Annos)
          Subchapter D. Payment of Tax (Refs & Annos)

V.T.C.A., Tax Code § 171.151

§ 171.151. Privilege Period Covered by Tax

Currentness

The franchise tax shall be paid for each of the following:

(1) an initial period beginning on the taxable entity's beginning date and ending on the day before the first anniversary of the beginning date;

(2) a second period beginning on the first anniversary of the beginning date and ending on December 31 following that date; and

(3) after the initial and second periods have expired, a regular annual period beginning each year on January 1 and ending the following December 31.

**Credits**

Acts 1981, 67th Leg., p. 1699, ch. 389, § 1, eff. Jan. 1, 1982. Amended by Acts 1985, 69th Leg., ch. 31, § 5, eff. Aug. 26, 1985; Acts 1991, 72nd Leg., 1st C.S., ch. 5, § 8.11, eff. Jan. 1, 1992; Acts 1995, 74th Leg., ch. 1002, § 14, eff. Jan. 1, 1996; Acts 2006, 79th Leg., 3rd C.S., ch. 1, § 6, eff. Jan. 1, 2008.

V. T. C. A., Tax Code § 171.151, TX TAX § 171.151
Current through the end of the 2023 Regular, Second, Third and Fourth Called Sessions of the 88th Legislature, and the Nov. 7, 2023 general election.

---

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Appendix 6:**

**Tex. Tax Code § 171.1532**

Vernon's Texas Statutes and Codes Annotated
  Tax Code (Refs & Annos)
    Title 2. State Taxation (Refs & Annos)
      Subtitle F. Franchise Tax; Credits (Refs & Annos)
        Chapter 171. Franchise Tax (Refs & Annos)
          Subchapter D. Payment of Tax (Refs & Annos)

V.T.C.A., Tax Code § 171.1532

§ 171.1532. Business on Which Tax on Net Taxable Margin Is Based

Currentness

(a) The tax covering the privilege periods included on the initial report is based on the business done by the taxable entity during the period beginning on the taxable entity's beginning date and:

(1) ending on the last accounting period ending date that is at least 60 days before the original due date of the initial report; or

(2) if there is no such period ending date in Subdivision (1), then ending on the day that is the last day of a calendar month and that is nearest to the end of the taxable entity's first year of business.

(b) The tax covering the regular annual period, other than a regular annual period included on the initial report, is based on the business done by the taxable entity during the period beginning with the day after the last date upon which taxable margin or net taxable earned surplus on a previous report was based and ending with its last accounting period ending date for federal income tax purposes in the year before the year in which the report is originally due.

**Credits**
Added by Acts 1991, 72nd Leg., 1st C.S., ch. 5, § 8.14, eff. Jan. 1, 1992. Amended by Acts 1995, 74th Leg., ch. 1002, § 18, eff. Jan. 1, 1996; Acts 2006, 79th Leg., 3rd C.S., ch. 1, § 6, eff. Jan. 1, 2008; Acts 2007, 80th Leg., ch. 1282, § 25, eff. Jan. 1, 2008.

V. T. C. A., Tax Code § 171.1532, TX TAX § 171.1532
Current through the end of the 2023 Regular, Second, Third and Fourth Called Sessions of the 88th Legislature, and the Nov. 7, 2023 general election.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

# Appendix 7:

# Tex. Tax Code § 171.101 (2015)

Vernon's Texas Statutes and Codes Annotated
　Tax Code (Refs & Annos)
　　Title 2. State Taxation (Refs & Annos)
　　　Subtitle F. Franchise Tax; Credits (Refs & Annos)
　　　　Chapter 171. Franchise Tax (Refs & Annos)
　　　　　Subchapter C. Determination of Taxable Margin; Allocation and Apportionment

This section has been updated. Click here for the updated version.

V.T.C.A., Tax Code § 171.101

§ 171.101. Determination of Taxable Margin

Effective: January 1, 2014 to December 31, 2019

(a) The taxable margin of a taxable entity is computed by:

　(1) determining the taxable entity's margin, which is the lesser of:

　　(A) the amount provided by this paragraph, which is the lesser of:

　　　(i) 70 percent of the taxable entity's total revenue from its entire business, as determined under Section 171.1011; or

　　　(ii) an amount equal to the taxable entity's total revenue from its entire business as determined under Section 171.1011 minus $1 million; or

　　(B) an amount computed by determining the taxable entity's total revenue from its entire business under Section 171.1011 and subtracting the greater of:

　　　(i) $1 million; or

　　　(ii) an amount equal to the sum of:

　　　　(a) at the election of the taxable entity, either:

　　　　　(1) cost of goods sold, as determined under Section 171.1012; or

　　　　　(2) compensation, as determined under Section 171.1013; and

(b) any compensation, as determined under Section 171.1013, paid to an individual during the period the individual is serving on active duty as a member of the armed forces of the United States if the individual is a resident of this state at the time the individual is ordered to active duty and the cost of training a replacement for the individual;

(2) apportioning the taxable entity's margin to this state as provided by Section 171.106 to determine the taxable entity's apportioned margin; and

(3) subtracting from the amount computed under Subdivision (2) any other allowable deductions to determine the taxable entity's taxable margin.

(b) Notwithstanding Subsection (a)(1)(B)(ii)(a), a professional employer organization may subtract only the greater of $1 million as provided by Subsection (a)(1)(B)(i) or compensation as determined under Section 171.1013.

(c) In making a computation under this section, an amount that is zero or less is computed as a zero.

(d) An election under Subsection (a)(1)(B)(ii) shall be made by the taxable entity on its annual report and is effective only for that annual report. A taxable entity shall notify the comptroller of its election not later than the due date of the annual report.

**Credits**

Acts 1981, 67th Leg., p. 1697, ch. 389, § 1, eff. Jan. 1, 1982. Amended by Acts 1991, 72nd Leg., ch. 901, § 53(b), eff. Aug. 26, 1991; Acts 1991, 72nd Leg., 1st C.S., ch. 5, § 8.05, eff. Jan. 1, 1992; Acts 2006, 79th Leg., 3rd C.S., ch. 1, § 5, eff. Jan. 1, 2008; Acts 2007, 80th Leg., ch. 1282, § 11, eff. Jan. 1, 2008; Acts 2013, 83rd Leg., ch. 117 (S.B. 1286), § 24, eff. Sept. 1, 2013; Acts 2013, 83rd Leg., ch. 1232 (H.B. 500), § 6, eff. Jan. 1, 2014.

V. T. C. A., Tax Code § 171.101, TX TAX § 171.101
Current through the end of the 2023 Regular, Second, Third and Fourth Called Sessions of the 88th Legislature, and the Nov. 7, 2023 general election.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Appendix 8:**

**Tex. Tax Code § 171.0002 (2015)**

Vernon's Texas Statutes and Codes Annotated
  Tax Code (Refs & Annos)
    Title 2. State Taxation (Refs & Annos)
      Subtitle F. Franchise Tax; Credits (Refs & Annos)
        Chapter 171. Franchise Tax (Refs & Annos)
          Subchapter A. Definitions; Tax Imposed (Refs & Annos)

This section has been updated. Click here for the updated version.

V.T.C.A., Tax Code § 171.0002

§ 171.0002. Definition of Taxable Entity

Effective: January 1, 2012 to August 31, 2023

(a) Except as otherwise provided by this section, "taxable entity" means a partnership, limited liability partnership, corporation, banking corporation, savings and loan association, limited liability company, business trust, professional association, business association, joint venture, joint stock company, holding company, or other legal entity. The term includes a combined group. A joint venture does not include joint operating or co-ownership arrangements meeting the requirements of Treasury Regulation Section 1.761-2(a)(3) that elect out of federal partnership treatment as provided by Section 761(a), Internal Revenue Code.

(b) "Taxable entity" does not include:

  (1) a sole proprietorship;

  (2) a general partnership:

    (A) the direct ownership of which is entirely composed of natural persons; and

    (B) the liability of which is not limited under a statute of this state or another state, including by registration as a limited liability partnership;

  (3) a passive entity as defined by Section 171.0003; or

  (4) an entity that is exempt from taxation under Subchapter B. [1]

(c) "Taxable entity" does not include an entity that is:

(1) a grantor trust as defined by Sections 671 and 7701(a)(30)(E), Internal Revenue Code, all of the grantors and beneficiaries of which are natural persons or charitable entities as described in Section 501(c)(3), Internal Revenue Code, excluding a trust taxable as a business entity pursuant to Treasury Regulation Section 301.7701-4(b);

(2) an estate of a natural person as defined by Section 7701(a)(30)(D), Internal Revenue Code, excluding an estate taxable as a business entity pursuant to Treasury Regulation Section 301.7701-4(b);

(3) an escrow;

(4) a real estate investment trust (REIT) as defined by Section 856, Internal Revenue Code, and its "qualified REIT subsidiary" entities as defined by Section 856(i)(2), Internal Revenue Code, provided that:

(A) a REIT with any amount of its assets in direct holdings of real estate, other than real estate it occupies for business purposes, as opposed to holding interests in limited partnerships or other entities that directly hold the real estate, is a taxable entity; and

(B) a limited partnership or other entity that directly holds the real estate as described in Paragraph (A) is not exempt under this subdivision, without regard to whether a REIT holds an interest in it;

(5) a real estate mortgage investment conduit (REMIC), as defined by Section 860D, Internal Revenue Code;

(6) a nonprofit self-insurance trust created under Chapter 2212, Insurance Code, or a predecessor statute;

(7) a trust qualified under Section 401(a), Internal Revenue Code;

(8) a trust or other entity that is exempt under Section 501(c)(9), Internal Revenue Code; or

(9) an unincorporated entity organized as a political committee under the Election Code or the provisions of the Federal Election Campaign Act of 1971 (2 U.S.C. Section 431 et seq. [2] ).

(d) An entity that can file as a sole proprietorship for federal tax purposes is not a sole proprietorship for purposes of Subsection (b)(1) and is not exempt under that subsection if the entity is formed in a manner under the statutes of this state, another state, or a foreign country that limit the liability of the entity.

**Credits**
Added by Acts 2006, 79th Leg., 3rd C.S., ch. 1, § 2, eff. Jan. 1, 2008. Amended by Acts 2007, 80th Leg., ch. 1282, § 2, eff. Jan. 1, 2008; Acts 2011, 82nd Leg., 1st C.S., ch. 4 (S.B. 1), § 45.02, eff. Jan. 1, 2012.

---

**Footnotes**

---

1        V.T.C.A., Tax Code § 171.051 et seq.

2        Transferred; see, now, 52 U.S.C.A. § 30101 et seq.

V. T. C. A., Tax Code § 171.0002, TX TAX § 171.0002

Current through the end of the 2023 Regular, Second, Third and Fourth Called Sessions of the 88th Legislature, and the Nov. 7, 2023 general election.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Appendix 9:**

**Tex. Tax Code § 171.1014**

Vernon's Texas Statutes and Codes Annotated
  Tax Code (Refs & Annos)
    Title 2. State Taxation (Refs & Annos)
      Subtitle F. Franchise Tax; Credits (Refs & Annos)
        Chapter 171. Franchise Tax (Refs & Annos)
          Subchapter C. Determination of Taxable Margin; Allocation and Apportionment

V.T.C.A., Tax Code § 171.1014

§ 171.1014. Combined Reporting; Affiliated Group Engaged in Unitary Business

Currentness

(a) Taxable entities that are part of an affiliated group engaged in a unitary business shall file a combined group report in lieu of individual reports based on the combined group's business. The combined group may not include a taxable entity that conducts business outside the United States if 80 percent or more of the taxable entity's property and payroll, as determined by factoring under Chapter 141, are assigned to locations outside the United States. In applying Chapter 141, if either the property factor or the payroll factor is zero, the denominator is one. The combined group may not include a taxable entity that conducts business outside the United States and has no property or payroll if 80 percent or more of the taxable entity's gross receipts, as determined under Sections 171.103, 171.105, and 171.1055, are assigned to locations outside the United States.

(b) The combined group is a single taxable entity for purposes of the application of the tax imposed under this chapter, including Section 171.002(d).

(c) For purposes of Section 171.101, a combined group shall determine its total revenue by:

(1) determining the total revenue of each of its members as provided by Section 171.1011 as if the member were an individual taxable entity;

(2) adding the total revenues of the members determined under Subdivision (1) together; and

(3) subtracting, to the extent included under Section 171.1011(c)(1)(A), (c)(2)(A), or (c)(3), items of total revenue received from a member of the combined group.

(d) For purposes of Section 171.101, a combined group shall make an election to subtract either cost of goods sold or compensation that applies to all of its members, or $1 million. Regardless of the election, the taxable margin of the combined group may not exceed the amount provided by Section 171.101(a)(1)(A) for the combined group.

(d-1) A member of a combined group may claim as cost of goods sold those costs that qualify under Section 171.1012 if the goods for which the costs are incurred are owned by another member of the combined group.

(e) For purposes of Section 171.101, a combined group that elects to subtract costs of goods sold shall determine that amount by:

(1) determining the cost of goods sold for each of its members as provided by Section 171.1012 as if the member were an individual taxable entity;

(2) adding the amounts of cost of goods sold determined under Subdivision (1) together; and

(3) subtracting from the amount determined under Subdivision (2) any cost of goods sold amounts paid from one member of the combined group to another member of the combined group, but only to the extent the corresponding item of total revenue was subtracted under Subsection (c)(3).

(f) For purposes of Section 171.101, a combined group that elects to subtract compensation shall determine that amount by:

(1) determining the compensation for each of its members as provided by Section 171.1013 as if each member were an individual taxable entity, subject to the limitation prescribed by Section 171.1013(c);

(2) adding the amounts of compensation determined under Subdivision (1) together; and

(3) subtracting from the amount determined under Subdivision (2) any compensation amounts paid from one member of the combined group to another member of the combined group, but only to the extent the corresponding item of total revenue was subtracted under Subsection (c)(3).

(g) Repealed by Acts 2007, 80th Leg., ch. 1282, § 37(3).

(h) Each taxable entity that is part of a combined group report shall, for purposes of determining margin and apportionment, include its activities for the same period used by the combined group.

(i) Each member of the combined group shall be jointly and severally liable for the tax of the combined group.

(j) Notwithstanding any other provision of this section, a taxable entity that provides retail or wholesale electric utilities may not be included as a member of a combined group that includes one or more taxable entities that do not provide retail or wholesale electric utilities if that combined group in the absence of this subsection:

(1) would not meet the requirements of Section 171.002(c) solely because one or more members of the combined group provide retail or wholesale electric utilities; and

(2) would have less than five percent of the combined group's total revenue derived from providing retail or wholesale electric utilities.

**Credits**

Added by Acts 2006, 79th Leg., 3rd C.S., ch. 1, § 5, eff. Jan. 1, 2008. Amended by Acts 2007, 80th Leg., ch. 1282, §§ 17, 37(3), eff. Jan. 1, 2008; Acts 2013, 83rd Leg., ch. 1232 (H.B. 500), § 11, eff. Jan. 1, 2014.

V. T. C. A., Tax Code § 171.1014, TX TAX § 171.1014

Current through the end of the 2023 Regular, Second, Third and Fourth Called Sessions of the 88th Legislature, and the Nov. 7, 2023 general election.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# Appendix 10:
# Tex. Tax Code § 171.106 (2015)

Vernon's Texas Statutes and Codes Annotated
    Tax Code (Refs & Annos)
        Title 2. State Taxation (Refs & Annos)
            Subtitle F. Franchise Tax; Credits (Refs & Annos)
                Chapter 171. Franchise Tax (Refs & Annos)
                    Subchapter C. Determination of Taxable Margin; Allocation and Apportionment

This section has been updated. Click here for the updated version.

V.T.C.A., Tax Code § 171.106

§ 171.106. Apportionment of Margin to This State

Effective: January 1, 2014 to December 31, 2017

(a) Except as provided by this section, a taxable entity's margin is apportioned to this state to determine the amount of tax imposed under Section 171.002 by multiplying the margin by a fraction, the numerator of which is the taxable entity's gross receipts from business done in this state, as determined under Section 171.103, and the denominator of which is the taxable entity's gross receipts from its entire business, as determined under Section 171.105.

(b) A taxable entity's margin that is derived, directly or indirectly, from the sale of management, distribution, or administration services to or on behalf of a regulated investment company, including a taxable entity that includes trustees or sponsors of employee benefit plans that have accounts in a regulated investment company, is apportioned to this state to determine the amount of the tax imposed under Section 171.002 by multiplying the taxable entity's total margin from the sale of services to or on behalf of a regulated investment company by a fraction, the numerator of which is the average of the sum of shares owned at the beginning of the year and the sum of shares owned at the end of the year by the investment company shareholders who are commercially domiciled in this state or, if the shareholders are individuals, are residents of this state, and the denominator of which is the average of the sum of shares owned at the beginning of the year and the sum of shares owned at the end of the year by all investment company shareholders. In this subsection, "regulated investment company" has the meaning assigned by Section 851(a), Internal Revenue Code.

(c) A taxable entity's margin that is derived, directly or indirectly, from the sale of management, administration, or investment services to an employee retirement plan is apportioned to this state to determine the amount of the tax imposed under Section 171.002 by multiplying the taxable entity's total margin from the sale of services to an employee retirement plan company by a fraction, the numerator of which is the average of the sum of beneficiaries domiciled in Texas at the beginning of the year and the sum of beneficiaries domiciled in Texas at the end of the year, and the denominator of which is the average of the sum of all beneficiaries at the beginning of the year and the sum of all beneficiaries at the end of the year. In this section, "employee retirement plan" means a plan or other arrangement that is qualified under Section 401(a), Internal Revenue Code, or satisfies the requirements of Section 403, Internal Revenue Code, or a government plan described in Section 414(d), Internal Revenue Code. The term does not include an individual retirement account or individual retirement annuity within the meaning of Section 408, Internal Revenue Code.

(d) A banking corporation shall exclude from the numerator of the bank's apportionment factor interest earned on federal funds and interest earned on securities sold under an agreement to repurchase that are held in this state in a correspondent bank that is domiciled in this state. In this subsection, "correspondent" has the meaning assigned by 12 C.F.R. Section 206.2(c).

(e) Receipts from services that a defense readjustment project performs in a defense economic readjustment zone are not receipts from business done in this state.

(f) Notwithstanding Section 171.1055, if a loan or security is treated as inventory of the seller for federal income tax purposes, the gross proceeds of the sale of that loan or security are considered gross receipts.

(f-1) Notwithstanding Section 171.1055, if a lending institution categorizes a loan or security as "Securities Available for Sale" or "Trading Securities" under Financial Accounting Standard No. 115, the gross proceeds of the sale of that loan or security are considered gross receipts. In this subsection, "Financial Accounting Standard No. 115" means the Financial Accounting Standard No. 115 in effect as of January 1, 2009, not including any changes made after that date. In this subsection, "security" means a security as defined in Section 171.0001(13-a).

(g) A receipt from Internet hosting as defined by Section 151.108(a) is a receipt from business done in this state only if the customer to whom the service is provided is located in this state.

<Text of (h) effective January 1, 2018>

(h) A taxable entity that is a broadcaster shall include in the numerator of the broadcaster's apportionment factor receipts arising from licensing income from broadcasting or otherwise distributing film programming by any means only if the legal domicile of the broadcaster's customer is in this state. In this subsection:

(1) "Broadcaster" means a taxable entity, not including a cable service provider or a direct broadcast satellite service, that is a:

(A) television station licensed by the Federal Communications Commission;

(B) television broadcast network;

(C) cable television network; or

(D) television distribution company.

(2) "Customer" means a person, including a licensee, that has a direct connection or contractual relationship with a broadcaster under which the broadcaster derives revenue.

(3) "Film programming" means all or part of a live or recorded performance, event, or production intended to be distributed for visual and auditory perception by an audience.

(4) "Programming" includes news, entertainment, sporting events, plays, stories, or other literary, commercial, educational, or artistic works.

**Credits**

Acts 1981, 67th Leg., p. 1698, ch. 389, § 1, eff. Jan. 1, 1982. Amended by Acts 1991, 72nd Leg., 1st C.S., ch. 5, § 8.07, eff. Jan. 1, 1992; Acts 1997, 75th Leg., ch. 1185, § 7, eff. Jan. 1, 1998; Acts 1999, 76th Leg., ch. 184, § 2, eff. Jan. 1, 2000; Acts 2001, 77th Leg., ch. 1263, § 59, eff. Jan. 1, 2002; Acts 2003, 78th Leg., ch. 209, § 37, eff. Oct. 1, 2003; Acts 2006, 79th Leg., 3rd C.S., ch. 1, § 5, eff. Jan. 1, 2008; Acts 2007, 80th Leg., ch. 1282, § 22, eff. Jan. 1, 2008; Acts 2009, 81st Leg., ch. 1055, § 1, eff. Jan. 1, 2010; Acts 2013, 83rd Leg., ch. 1232 (H.B. 500), § 12, eff. Jan. 1, 2014; Acts 2015, 84th Leg., ch. 1098 (H.B. 2896), § 1, eff. Jan. 1, 2018.

V. T. C. A., Tax Code § 171.106, TX TAX § 171.106

Current through the end of the 2023 Regular, Second, Third and Fourth Called Sessions of the 88th Legislature, and the Nov. 7, 2023 general election.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

# Appendix 11:

# Tex. Tax Code § 171.002 (2015)

Vernon's Texas Statutes and Codes Annotated
  Tax Code (Refs & Annos)
    Title 2. State Taxation (Refs & Annos)
      Subtitle F. Franchise Tax; Credits (Refs & Annos)
        Chapter 171. Franchise Tax (Refs & Annos)
          Subchapter A. Definitions; Tax Imposed (Refs & Annos)

This section has been updated. Click here for the updated version.

V.T.C.A., Tax Code § 171.002

§ 171.002. Rates; Computation of Tax

Effective: January 1, 2014 to December 31, 2015

<Text of (a) effective until January 1, 2016>

(a) Subject to Sections 171.003 and 171.1016 and except as provided by Subsection (b), the rate of the franchise tax is one percent of taxable margin.

<Text of (a) effective January 1, 2016>

(a) Subject to Sections 171.003 and 171.1016 and except as provided by Subsection (b), the rate of the franchise tax is | 0.75 | one percent of taxable margin.

<Text of (b) effective until January 1, 2016>

(b) Subject to Sections 171.003 and 171.1016, the rate of the franchise tax is 0.5 percent of taxable margin for those taxable entities primarily engaged in retail or wholesale trade.

<Text of (b) effective January 1, 2016>

(b) Subject to Sections 171.003 and 171.1016, the rate of the franchise tax is | 0.375 | 0.5 percent of taxable margin for those taxable entities primarily engaged in retail or wholesale trade.

(c) A taxable entity is primarily engaged in retail or wholesale trade only if:

(1) the total revenue from its activities in retail or wholesale trade is greater than the total revenue from its activities in trades other than the retail and wholesale trades;

(2) except as provided by Subsection (c-1), less than 50 percent of the total revenue from activities in retail or wholesale trade comes from the sale of products it produces or products produced by an entity that is part of an affiliated group to which the taxable entity also belongs; and

(3) the taxable entity does not provide retail or wholesale utilities, including telecommunications services, electricity, or gas.

(c-1) Subsection (c)(2) does not apply to total revenue from activities in a retail trade described by Major Group 58 of the Standard Industrial Classification Manual published by the federal Office of Management and Budget.

(d) A taxable entity is not required to pay any tax and is not considered to owe any tax for a period if:

(1) the amount of tax computed for the taxable entity is less than $1,000; or

(2) the amount of the taxable entity's total revenue from its entire business is less than or equal to $1 million or the amount determined under Section 171.006 per 12-month period on which margin is based.

**Credits**

Acts 1981, 67th Leg., p. 1691, ch. 389, § 1, eff. Jan. 1, 1982. Amended by Acts 1984, 68th Leg., 2nd C.S., ch. 31, art. 3, part D, § 1, eff. May 1, 1985; Acts 1987, 70th Leg., 2nd C.S., ch. 5, art. 2, pt. 1, § 1, eff. Jan. 1, 1988; Acts 1987, 70th Leg., 2nd C.S., ch. 5, art. 2, pt. 2, § 1, eff. Jan. 1, 1990; Acts 1991, 72nd Leg., 1st C.S., ch. 5, § 8.031(a), eff. Jan. 1, 1992; Acts 1997, 75th Leg., ch. 1185, § 2, eff. Jan. 1, 1998; Acts 1999, 76th Leg., ch. 394, § 10, eff. Jan. 1, 2000; Acts 2006, 79th Leg., 3rd C.S., ch. 1, § 2, eff. Jan. 1, 2008; Acts 2007, 80th Leg., ch. 1282, § 7, eff. Jan. 1, 2008; Acts 2009, 81st Leg., ch. 286, § 1(a), eff. Jan. 1, 2010; Acts 2009, 81st Leg., ch. 286, § 2(a), eff. Jan. 1, 2014; Acts 2011, 82nd Leg., 1st C.S., ch. 4 (S.B. 1), §§ 37.01, 37.02, eff. Sept. 28, 2011; Acts 2013, 83rd Leg., ch. 1232 (H.B. 500), §§ 16, 17, eff. Jan. 1, 2014; Acts 2015, 84th Leg., ch. 449 (H.B. 32), § 2, eff. Jan. 1, 2016.

V. T. C. A., Tax Code § 171.002, TX TAX § 171.002
Current through the end of the 2023 Regular, Second, Third and Fourth Called Sessions of the 88th Legislature, and the Nov. 7, 2023 general election.

---

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# Appendix 12:

# Tex. Tax Code § 171.0023 (2015)

Vernon's Texas Statutes and Codes Annotated
  Tax Code (Refs & Annos)
    Title 2. State Taxation (Refs & Annos)
      Subtitle F. Franchise Tax; Credits (Refs & Annos)
        Chapter 171. Franchise Tax (Refs & Annos)
          Subchapter A. Definitions; Tax Imposed (Refs & Annos)

This section has been updated. Click here for the updated version.

V.T.C.A., Tax Code § 171.0023

§ 171.0023. Temporary Permissive Alternate Rates for 2015

Effective: January 1, 2014 to December 30, 2015

<Text of section effective until Dec. 31, 2015 >

(a) Notwithstanding Section 171.002(a) and subject to Section 171.1016 and Subsections (b) and (d) of this section, a taxable entity may elect to pay the tax imposed under this chapter at a rate of 0.95 percent of taxable margin.

(b) Notwithstanding Section 171.002(b) and subject to Section 171.1016 and Subsection (d) of this section, a taxable entity primarily engaged in retail or wholesale trade as defined by Sections 171.002(c) and (c-1) may elect to pay the tax imposed under this chapter at a rate of 0.475 percent of taxable margin.

(c) This section applies only to a report originally due on or after January 1, 2015, and before January 1, 2016.

(d) A taxable entity may elect to compute the tax at the rate provided by Subsection (a) or (b), as applicable, on a report specified by Subsection (c) only if the comptroller certifies, on or after September 1, 2014, that probable revenue for the state fiscal biennium ending August 31, 2015, is estimated to exceed probable revenue as stated in the comptroller's Biennial Revenue Estimate for the 2014-2015 fiscal biennium, as adjusted for estimates of revenue and disbursements associated with legislation enacted by the 83rd Legislature, including any contingent appropriations certified before September 1, 2014, by an amount sufficient to offset the loss in probable revenue that will result if taxable entities elect to compute the tax at the rates provided by Subsections (a) and (b). If the comptroller does not make the certification described by this subsection, a taxable entity may not elect to pay the tax at the rate provided by Subsection (a) or (b) and shall pay the tax at the rates provided by Section 171.002.

(e) This section expires December 31, 2015.

**Credits**
Added by Acts 2013, 83rd Leg., ch. 1232 (H.B. 500), § 2, eff. Jan. 1, 2014.

V. T. C. A., Tax Code § 171.0023, TX TAX § 171.0023
Current through the end of the 2023 Regular, Second, Third and Fourth Called Sessions of the 88th Legislature, and the Nov. 7, 2023 general election.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

# Appendix 13:

# Tex. Tax Code § 171.1016 (2015)

Vernon's Texas Statutes and Codes Annotated
  Tax Code (Refs & Annos)
    Title 2. State Taxation (Refs & Annos)
      Subtitle F. Franchise Tax; Credits (Refs & Annos)
        Chapter 171. Franchise Tax (Refs & Annos)
          Subchapter C. Determination of Taxable Margin; Allocation and Apportionment

This section has been updated. Click here for the updated version.

V.T.C.A., Tax Code § 171.1016

§ 171.1016. E-Z Computation and Rate

Effective: January 1, 2014 to December 31, 2015

<Text of (a) effective until January 1, 2016>

(a) Notwithstanding any other provision of this chapter, a taxable entity whose total revenue from its entire business is not more than $10 million may elect to pay the tax imposed under this chapter in the amount computed and at the rate provided by this section rather than in the amount computed and at the tax rate provided by Section 171.002.

<Text of (a) effective January 1, 2016>

(a) Notwithstanding any other provision of this chapter, a taxable entity whose total revenue from its entire business is not more than | $20 | $10 million may elect to pay the tax imposed under this chapter in the amount computed and at the rate provided by this section rather than in the amount computed and at the tax rate provided by Section 171.002.

<Text of (b) effective until January 1, 2016>

(b) The amount of the tax for which a taxable entity that elects to pay the tax as provided by this section is liable is computed by:

(1) determining the taxable entity's total revenue from its entire business, as determined under Section 171.1011;

(2) apportioning the amount computed under Subdivision (1) to this state, as provided by Section 171.106, to determine the taxable entity's apportioned total revenue; and

(3) multiplying the amount computed under Subdivision (2) by the rate of 0.575 percent.

<Text of (b) effective January 1, 2016>

(b) The amount of the tax for which a taxable entity that elects to pay the tax as provided by this section is liable is computed by:

(1) determining the taxable entity's total revenue from its entire business, as determined under Section 171.1011;

(2) apportioning the amount computed under Subdivision (1) to this state, as provided by Section 171.106, to determine the taxable entity's apportioned total revenue; and

(3) multiplying the amount computed under Subdivision (2) by the rate of | 0.331 | 0.575  percent.

(c) A taxable entity that elects to pay the tax as provided by this section may not take a credit, deduction, or other adjustment that is not specifically authorized by this section.

(d) Repealed by Acts 2013, 83rd Leg., ch. 1232 (H.B. 500), § 15.

(e) A reference in this chapter or other law to the rate of the franchise tax means, as appropriate, the rate under Section 171.002 or, for a taxable entity that elects to pay the tax as provided by this section, the rate under this section.

**Credits**

Added by Acts 2007, 80th Leg., ch. 1282, § 19, eff. Jan. 1, 2008. Amended by Acts 2011, 82nd Leg., ch. 91 (S.B. 1303), § 27.001(58), eff. Sept. 1, 2011; Acts 2013, 83rd Leg., ch. 1232 (H.B. 500), § 15, eff. Jan. 1, 2014; Acts 2015, 84th Leg., ch. 449 (H.B. 32), § 3, eff. Jan. 1, 2016.

V. T. C. A., Tax Code § 171.1016, TX TAX § 171.1016

Current through the end of the 2023 Regular, Second, Third and Fourth Called Sessions of the 88th Legislature, and the Nov. 7, 2023 general election.

---

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# Appendix 14:
# Senate Report No. 93-12 (1973)

S. REP. 93-12, S. Rep. No. 12, 93RD Cong., 1ST Sess. 1973, 1973 U.S.C.C.A.N. 1434, 1973 WL 12580 (Leg.Hist.)

**\*1434**  P.L. 93-44, AIRPORT DEVELOPMENT ACCELERATION ACT OF 1973

Senate Report (Commerce Committee) No. 93-12,

Feb. 1, 1973 (To accompany S. 38)

House Report (Interstate and Foreign Commerce Committee) No. 93-157,

Apr. 19, 1973 (To accompany H.R. 6388)

House Conference Report No. 93-225,

May 24, 1973 (To accompany S. 38)

Cong. Record Vol. 119 (1973)

DATES OF CONSIDERATION AND PASSAGE

Senate February 5, June 5, 1973

House May 2, 30, 1973

The Senate bill was passed in lieu of the House bill. The Senate Report and the House Conference Report are set out.

(CONSULT NOTE FOLLOWING TEXT FOR INFORMATION ABOUT OMITTED
MATERIAL. EACH COMMITTEE REPORT IS A SEPARATE DOCUMENT ON WESTLAW.)

SENATE REPORT NO. 93-12

Feb. 1, 1973

THE Committee on Commerce, to which was referred the bill (S. 38) to amend the Airport and Airway Development Act of 1970 to increase the United States share of allowable projects costs under such Act, to amend the Federal Aviation Act of 1958 to prohibit certain state taxation of persons in air transportation, and for other purposes having considered the same, reports favorably thereon with one technical amendment and recommends that the bill (as amended) do pass.

PURPOSE

S. 38 amends the Airport and Airway Development Act of 1970 and the Federal Aviation Act of 1958 to increase Federal financial **\*1435**  assistance for airport development throughout the United States. It also prohibits the levying, by State and local governments, of passenger 'head' taxes or use taxes on the carriage of persons in air transportation.

The legislation to provide increased Federal participation in airport development grants is required because of the serious financial difficulties being experienced by many local government agencies who bear the responsibility to build, operate and maintain the nation's system of publicly-owned airports. The funds required to increase the Federal share of airport development grants will come from the Airport and Airway Trust Fund established by the Airport and Airway Revenue Act of 1970. The fund is funded from revenues from user taxes on aviation-system users and contains and will contain adequate revenues to cover the cost of the increased Federal assistance. No new taxation and no expenditure of general U.S. funds will be required as a result of the legislation.

The bill prohibits any government agency other than the United States from establishing or levying a passenger head tax or use tax on the carriage of persons in air transportation. This prohibition will ensure that passengers and air carriers will be taxed at a uniform rate-- by the United States-- and that local 'head' taxes will not be permitted to inhibit the flow of interstate commerce and the growth and development of air transportation.

SECTION-BY-SECTION ANALYSIS

Section 2 of the bill amends Section 11(2) of the Airport and Airway Development Act of 1970 by amending the definition of 'airport development' to include:

1. The construction, alteration, repair, or acquisition of airport passenger terminal buildings or facilities directly related to the handling of passengers or their baggage at the airport. Such development is not now eligible for Federal financial aid.

2. The acquisition, improvement, or repair of safety equipment required by rule or regulation for certification of an airport under section 612 of the Federal Aviation Act of 1958, and security equipment required of the sponsor by the Secretary for the safety and security of persons and property at the airport. While such development is now eligible for Federal assistance under present law, the definition is amended to eliminate any possible ambiguity or doubt and to assure that the definition is all inclusive.

Section 3(a) of the bill increases the minimum annual authorization for airport development grants to air carrier and reliever airports from the present $250 million per year to $375 million per year for fiscal years 1974 and 1975. Similarly, the minimum annual authorization for general aviation airports is increased from the present $30 million per year to $45 million per year for fiscal years 1974 and 1975. This increase in the minimum annual authorization level is necessitated because of the increased Federal share to be provided in airport development grants. It will assure that total investment in airport development will not decline as a result of the increased Federal participation.

Section 3(b) of S. 38 increases the five-year limit on obligations imposed by Section 14(b) of the Airport and Airway Development Act from $840 million to $1.68 billion. This increase reflects the increase **\*1436** in the minimum authorization level for airport development grants for fiscal years 1974 and 1975, and the bill's intent that total obligations for airport development grants for the five-year period 1971 through 1975 be $1.68 billion. The amendment to Section 14(b) also increases the authority to liquidate obligations incurred as a result of the increased authority to make obligations for fiscal years 1974 and 1975.

Section 4 of the bill amends Section 16(c)(1) of the Airport and Airway Development Act by providing the Secretary with authority to approve an airport development project grant at an airport owned by the United States. This provision will permit grants-in-aid for joint-use, military/civil airports provided such grants are used to make improvements to civil portions of such airports.

Section 5 of the bill provides that the U.S. share of allowable project costs of airport airfield development projects is increased from an amount not to exceed 50 percent to 75 percent at all airports classified as medium hubs, small hubs, non hubs and general aviation airports. Airports classified as large hubs (there are 22 throughout the U.S.) shall continue to be eligible for Federal assistance, for airfield development projects, at a level of 50 percent.

Section 5 further provides that equipment required by regulation of the Federal Aviation Administration or the Secretary of Transportation for airport certification or for airport security shall be eligible for 82 percent Federal participation.

Finally, Section 5 provides that airport development projects involving terminal area development shall be eligible for Federal participation at 50 percent of the allowable project costs.

Section 6 of S. 38 Limits U.S. assistance to projects involving airport terminal area development to those portions of the terminal directly related to the movement of passengers and their baggage. Such development as airport parking lots, concession areas, etc., would be excluded from U.S. financial assistance.

Section 7 of the bill adds a new Section 1113 to the Federal Aviation Act of 1958 prohibiting any tax, fee, head charge or other charge, directly or indirectly, on persons traveling in air transportation or on the carriage of persons in air transportation or on the gross receipts derived therefrom. The bill allows, however, for the continuation of the levy and collection of reasonable rental charges, landing fees, and other service charges for the use of airport facilities. However, State jurisdictions meeting certain criteria established in the bill are given until July 1, 1973 to comply with the prohibition.

Finally, Section 7(b) of the bill amends the table of contents of the Federal Aviation Act to reflect the addition of the new Section 1113.

The only amendment to s. 38 adopted by the Committee was a technical one which corrected a drafting error made when the bill was introduced. In all other respects the bill is the same as introduced and very similar to S. 3755 as passed by the Senate on August 10, 1972.

## COMMITTEE CONSIDERATION

S. 38 is, in nearly all respects, the same as S. 3755 which passed the Senate on August 10, 1972 and is similar to the bill which was agreed to by a conference Committee of the Senate and the House on October 4, 1972. On October 27, 1972, after Congress had adjourned, President Nixon pocket vetoed the bill.

 **\*1437** S. 38 was considered in executive session of the Aviation Subcommittee and ordered favorably reported to the Commerce Committee on January 22. On the following day the bill was considered and ordered favorably reported, without objection, by the full Committee.

Hearings on the subject of increased Federal participation in airport development projects were held on April 25 and 26, 1972 by the Aviation Subcommittee. On June 12, 1972, additional hearings were held before the Subcommittee to consider the issue of state and local 'head' taxes or user fees on passengers in air transportation.

Since the bill is in most aspects the same as the one which was vetoed by the President in October of 1972, hearings on the subject in the 93d Congress were not held because the issues were thoroughly discussed and considered in hearings and executive meetings of the Committee during the 92d Congress.

## BACKGROUND AND DISCUSSION

In 1970, responding to sharply increasing airport and airspace congestion and shrinking margins of safety, Congress enacted legislation for the rapid modernization and expansion of our national aviation system. In the course of public hearings on bills which led to the Airport and Airway Development and Revenue Acts of 1970, testimony and statements for the record were received from virtually every Government and non-Government segment of air transportation. All witnesses attested to the urgent need to make substantial capital improvements to the airport and airway system as expeditiously as possible.

Under the Act, substantial new and increased taxes were levied upon aviation users to support the capital development program. These funds were intended primarily to facilitate a fourfold increase in capital expenditures for airport development alone and were designed to provide a Federal investment of over $2.5 billion in the next 10 years.

In enacting this legislation, the Congress was well aware that general appropriations requested by the Administration for air systems improvements and amounts allocated by the Congress historically have not fully met the aviation system needs, in deference to nonaviation budgetary demands. To ensure that the modernization and expansion effort contemplated under the Airport and Airway Development Act not suffer a similar shortfall, a Trust Fund was established to accumulate user revenues to be employed in the capital development program. To ensure the development, Congress specified minimum amounts to be allocated to airport and airway system improvements rather than the more usual practice of imposing maximum limitations on spending.

Department of Transportation budget requests for fiscal 1971 were submitted prior to enactment of the Airport and Airway Development Act. Accordingly, the Department first asked for spending authority under the Act in a supplemental request.

This request, transmitted almost 6 months after the law was enacted, programmed only $100 million for airport development, not the $280 million minimum specified in the Act. The Department concurrently requested $226 million for air navigation facilities and equipment (airways) rather than the $250 million minimum. The Supplemental Appropriations Act of 1971 increased appropriations for airports and airways to amounts in excess of those requested to $170 million and $238 million, respectively. Members of Congress and the industry expressed surprise and concern **\*1438** at the deficiency. Moreover, it became increasingly clear that the Department of Transportation intended to employ the residual portion of Trust Fund money remaining (amounting to approximately $250 million) to fund FAA operational and maintenance programs rather than to utilize these assets in full amount for priority airport and airway improvements. It was alleged that this constituted an unlawful diversion of Trust Funds and that the Department had not kept faith with air-system users and the Congress.

This situation resulted in the passage of legislation, Public Law 92-174, on November 27, 1971, further clarifying the intent of Congress as to the uses to which trust fund revenues could be put. That law prohibits the use of any trust fund money for operating and maintaining the air traffic control system and specifies that all user tax revenues must be used for capital investment in aviation facilities and for research and development activities related to improving the U.S. air traffic control system.

Since the passage of the 1970 Act, airport development in the United States has increased at a rapid pace and the provisions of the 1970 program have been instrumental in assisting local communities in meeting the financial requirements of providing expanded and modernized airport facilities.

Because of the program's obviously attractive features, the FAA has experienced a vigorous response from airport sponsors and various planning agencies all across the country. The FAA has obligated the full $280 million alloted for FY 1972 under the Airport Development Aid Program (ADAP). In Fiscal Year 1971, the Agency obligated all but four cents of the Airport Development Aid Program, limited by the Administration to $170 million. During the first 18 months of the program funds were approved and obligated for new runways at 57 airports; runway extensions at 70 airports; runway reconstruction and strengthening at 164 airports; land acquisition at 179 airports; and initial phase development at 36 new airports.

Increased capacity at airports was also realized by providing for new construction and expansion of existing taxiway systems and aircraft parking aprons. Over the relatively short life of the program new taxiways have been installed at 179 airports; taxiway extensions at 64 airports; new parking aprons at 97 airports; and apron extensions at 84 airports.

As of March 31, 1972, the Agency had entered into grant agreements totaling $221,623,596. They were distributed among the various airport categories as follows:

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

As of April 25, 1972, the FAA testified that it had approved 650 individual requests for assistance totaling $396 million dollars. At that time an additional 240 requests were pending totaling $152 million.

**\*1439** The projects which have been approved to date will reduce the backlog of unfunded construction carried over from the 1965-1970 period. In fact, more funds will have been allocated in the first two years of the new program than in the preceding seven years under the old law.

Unfortunately, however, not a single new jetport has been approved for siting and development since the 1970 law was signed. Local community opposition to aircraft noise has prevented or at least delayed sponsor requests for new airport assistance throughout the nation. The jetport impasse is a reflection of the times in which we live and appears to be impervious to financial factors.

While the Committee believes the 1970 Act is working well, this is not to suggest that certain changes are not needed as soon as possible. New problems have arisen since Congress completed its deliberations two years ago: (1) comprehensive and expensive security programs were required for all 531 air carriers airports by June of this year, a possibility not envisioned in

1970; and (2) the airlines' depressed economic condition in the 1970-1972 period resulted in hundreds of airport sponsors being unable to provide the required matching funds for available Federal-user-tax dollars.

In addition, other issues, considered but not resolved in 1970, become more pressing with the passing of time. The financing of passenger terminal buildings is a prime example.

### (1) FEDERAL PERCENTAGE SHARE OF AIRPORT DEVELOPMENT GRANTS

The current statutory language, which requires the local airport sponsor to provide, with minor exceptions, 50% of the total costs for the development of airport landing areas is a carryover from the pre-ADAP era. The language in the 1970 Airport and Airway Development Act tracks the 1946 provisions of the first Federal Airport Act. In addition to this matching requirement, the sponsor presently has to arrange local financing for 100% of the costs of the terminal-area components of his facility.

To whom does the sponsor look for revenue or government aid with which to match available Federal funds? Nationwide, State governments provide only 2-3% of total airport system costs. The remainder must be obtained from airline and other users of the airport facilities, including concessionaires, or be absorbed by the parent local government through subsidy.

Prior to the 1970 Airport/Airway Act, the problem of securing local funds to match Federal grants was relatively small because the amount of available Federal funds was small. With a four-fold increase in the amount of Trust Fund monies committed to the new ADAP program, however, there has been a concomitant worsening of the matching problem for many, primarily smaller, airport sponsors.

Local governments are increasingly unable to finance airport improvements, especially at small airports, from local tax dollars, because other local governmental needs are also pressing. The airport operators testified that charges on concessionaires have been increased to about their maximum limits. When all these sources of local matching funds are exhausted, the prime remaining sources of increased airport revenue at the 531 air-carrier airports in the U.S. are the airport's airline tenants.

 **\*1440**  The 1970 Act and its $280 million annual airport authorization came in the midst of an airline economic recession. The carrier's $200 million loss in 1970 and $30 to $55 million loss in 1971 represented, for airports large and small, runways and taxiways which could not be built and terminal buildings which would be stretched again rather than replaced.

As a partial result of the airlines' inability to underwrite airport development through increased landing fees and support for revenue bond issues during the past several years, more than 900 requests for ADAP Aid, totaling in excess of $270 million, have never been submitted or have been withdrawn.

Of the nearly 3000 publicly-owned airports in the U.S., only 531 are presently served by certificated air carriers. The remaining 2,400 have great difficulty in meeting the 50-50 matching requirement since they cannot rely on airline landing fees and space rental revenues to help underwrite their capital investment needs. These airports serve general aviation and provide the only air transportation link between small communities and the nation's air transport system. Because such airports are not self-sustaining they continually need operating and capital investment subsidy if they are to continue serving the public. In many instances the Federal ADAP program has not provided these airports with any assistance whatever because local funds were not available to provide the necessary matching money.

While the Administration has recommended no increase in the Federal share of ADAP grants at the present time, in testimony before the Committee on April 25, 1972, the Administrator of the FAA testified, 'Despite the obvious success under the Airport Development Aid Program it would be unfair and unrealistic to say that we have not noted some difficulty on the part of airport sponsors in raising their share of the funding of the program.'

In addition, the Administration furnished the Committee a representative list of communities which have deferred airport development projects because of local failure to meet the matching requirement.

While, on the one hand, the Committee has heard evidence indicating small communities have had difficulty in raising matching money to qualify for ADAP grants, we have heard no evidence indicating that the nation's 22 largest airports, the so-called large hubs, have experienced financial difficulty resulting in failure to participate in the ADAP program. On the contrary, the large hubs appear for the most part to be self-sustaining. In many cases these airports are actually profitable. Fees paid by the airlines for landing and for space rental and fees obtained from concessionaires for parking, restaurants, shops, etc., are adequate to cover both the operational expenses of the airports and to underwrite the capital investment borrowing required. The Committee asked various witnesses for examples of airports in the large hub category which had encountered difficulty in meeting the 50%-50% matching requirement. No examples have been provided. Therefore, the Committee concludes that the present 50%-50% ADAP formula is adequate in assisting with airport development needs at the nation's 22 largest airports.

However, the Committee believes that the ADAP program could be made more responsive to the needs of the nation's smaller communities and municipalities if the ratio of Federal participation was increased. In light of the significant surplus of revenues to be expected in **\*1441** the Airport and Airway Trust Fund in the years ahead it is appropriate that Congress act to provide greater Federal assistance to these financially hard-pressed smaller communities.

S. 38 contains a prohibition on State taxation of passengers or on the carriage of passengers in air transportation. This prohibition will potentially deprive airport operators from a new and attractive source of revenue with which to support their airports-- namely the passenger head tax. This provision will be discussed later but the Committee points out here that in denying government agencies potential revenues from passenger head taxes, it is also responding to the local need for greater Federal assistance in airport grants.

Airport development requires a greater percentage contribution from local sponsors than any other major Federal transportation program. Interstate highways receive 90%; other highway programs will be funded at 70% under a current DOT proposal before Congress. Mass transit projects are financed at 66 2/3%.

This 'discriminatory' pattern has many undesirable effects at the local level. For example, a mayor with many transportation needs gets a far better 'return on investment' by plowing local funds into transportation projects other than airports.

An increased Federal share is an equitable, and the easiest, method of getting necessary airport development accomplished through charges primarily on the airline passengers. While the same end could be achieved via airline-fare increases, the process would be more time consuming, and there would be no assurance that the increased carrier revenues would be used for airport development alone.

Therefore, the Committee has concluded that airport development grant projects, involving airfield development, should be funded on a ratio of 75%- 25% at all publicly-owned airports except the 22 large hubs.

Because the bill generally increases the Federal assistance level, the Committee has also increased the minimum annual authorization for airport grants. Presently the minimum is $280 million; S. 38 increases it to $420 million. This increase is made to ensure that the same total level of airport development will be accomplished. Presently on the 50%-50% basis, the Act provides for at least $560 million dollars worth of development each year. If all projects were funded at the 75%-25% level then the investment ratio is changed from $280 million Federal-$280 million local to $420 million Federal-$140 million local. The bill provides for the new higher minimum authorization reflecting this increased Federal participation and amends the Act so as to allow for advance obligational authority consistent with the increase in Federal participation in airport grants. The table below summarizes the current financial condition of the Airport and Airway Trust Fund and provides future projections. It appears there will be sufficient revenues in the fund beginning in FY 1973 to fund the increased Federal participation in airport grants. Indeed, even with the increase in authorization provided by the bill, there will be Trust Fund surpluses in future years.

**\*1442**  FEDERAL AVIATION ADMINISTRATION, AIRPORT AND AIRWAY TRUST FUND-
COMPARISON OF REVENUES/OBLIGATION AUTHORITY, FISCAL YEARS 1971-80

(In millions)

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

Sources: Fiscal years 1971-73, FAA Office of Budget; Fiscal years 1974-80, FAA's National Aviation system plan: 10-year plan 1973-83 (revenues in current dollars, obligational authority in 1972 dollars).

In addition to increasing the Federal participation in grants involving airport/airfield development, the Committee recommends Federal funding for equipment required by the Secretary of Transportation for airport certification or for airport security be increased to a level of 82% Federal-18% local. The acquisition of safety and security equipment is currently eligible for grant assistance on a 50%-50% basis. However, under present law, certain safety equipment relating to the establishment of on-airport navigational aids and associated lighting equipment is eligible for Federal funding at the 82% level. The Committee believes that since additional requirements have recently been imposed on airport authorities by legislation providing for airport certification and by regulations requiring increased airport security, the Federal government has an increased obligation to assist local governments in meeting these Federally-imposed standards.

New Federal Aviation Regulation Part 107 required air carrier airport sponsors to develop comprehensive plans and programs by June 17, 1972, to protect all runways, taxiways, and aprons from unauthorized access. Within 90 days after approval of these airport plans by the FAA, airport sponsors must implement the agreed-upon program. Local sponsors, of course, have not budgeted to provide the fencing, floodlighting, and personnel-identification systems which the new security regulations require. Because of the emergency nature of this development, the Federal government should provide a higher level of assistance for these types of projects so as to ease the financial burden on local governments created by the recent and serious sky-jacking and extortion threats against the nation's air transportation system.

Similarly, the 1970 Airport and Airway Development Act required that all air-carrier airports in the U.S. be certificated by the Federal  **\*1443**  Aviation Administration. The FAA, under the law, has designed rules and regulations, which are to be imposed on airport authorities, to assure a higher level of safety on and around the airport. In many instances new and expensive firefighting and crash-rescue equipment will have to be acquired in order to comply with the FAA's regulations. The Committee recommends that all capital investment required as a result of the certification regulations be funded at a ratio of 82% Federal-18% local. However, the provisions of the bill relating to funding of airport-certification requirements should apply to the acquisition or establishment of non-consumable items such as fire-fighting and crash-rescue equipment but should not apply to purchase or acquisition of consumable items such as firefighting foam, protective clothing, etc.

## (2) FEDERAL ASSISTANCE FOR TERMINAL AREA DEVELOPMENT

In 1970, the Airport/Airway bill developed by this Committee and approved by the Senate contained provisions providing Federal financial assistance to the public-use terminal areas of U.S. airports. Subsequently, in conference with the House, the provision was dropped because of strong opposition by House members of the Conference Committee.

A majority of the Committee believes even more strongly today that in 1970 that all public-use areas of the nation's publicly-owned airports should be eligible for grant assistance under terms of the 1970 Act because most of the revenues funding the development program are being paid by airline passengers who require adequate and convenient terminal facilities as well as safe and adequate airfield facilities.

The case for terminal-area eligibility has intensified with the passing of time. According to all the surveys presented to the Committee, the dollar requirements for terminal-area development far exceed the total capital investment needed for airfield

expansion in this decade. With the larger wide-bodied aircraft and the projected traffic growth of the 1970's come escalating requirements for baggage-handling space, passenger-processing space, moving sidewalks to facilitate passenger movement, waiting rooms for travelers and other public-use facilities.

Those who have not in the past favored Federal assistance for terminal-area projects might well consider two basic points. First, the funds for the airport development program authorized in 1970 are coming from the users of airport facilities and not from general tax sources. It would appear clear that those who are contributing tax dollars for civil aviation development would want this revenue to help solve all parts of the 'airport problem.' For the harried traveler who is waiting for his baggage to be delivered, the distinction between the traditionally conceived 'eligible' and 'ineligible' parts of the airport is meaningless. Second, the bill does not provide that Federal financing be available for those parts of the terminal area complex which can be supported by other sources of revenue. Parking lots, cocktail lounges, and other concessionaire areas should continue to be financed through arrangements at the local level.

A recent airline study of the airport needs at the 22 major hubs projected a cost of $2.5 billion for needed construction of airport facilities at the major hubs during 1971-1975. Of this, only $830 million is eligible under the Airport Development Air Program. **\*1444** Similarly, only $640 million of the $2.4 billion in projected needs for the period 1976-1980 is now eligible for Federal assistance. (The cost of facilities for the exclusive use of the airlines, including those for servicing aircraft, training, and food preparation, are not included in the tabulation.) The Committee has been told that terminal improvement costs for the other 500 air/carrier airports would be an equal amount of approximately $5 billion over the ten-year period; the percentage of ADAP eligible items would also be about the same.

Virtually every major airport needs, or will need, substantial terminal expansion during the coming decade. The future growth in air transportation will hit the terminal complex harder than runways and air navigation facilities, especially as wide-bodied jets with greater capacity are introduced into service in increasing numbers. If we fail to recognize the fact that the terminal area is rapidly becoming a greater problem for the nation's airports than are the airfield facilities, and fail to provide funds for terminal-area improvements, we will not succeed in solving the airport congestion problem. Broadened ADAP eligibility for passenger terminals will help to break the logjam of terminal expansion projects that have been building up because of the inability of the airport operator and the airlines to finance them.

A recent sampling of the large hubs indicates that at least $340.6 million in key terminal-area improvements is being held in abeyance because communities and/or airlines are unable to provide the financing. A few examples:

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

S. 38 provides for Federal participation in grants involving airport public-use area terminal development on a 50%-50% basis; all publicly-owned airports are eligible. The Committee is of the view that airfield development should continue to have the highest priority for financing dollars because of its direct relationship to safety. It is stressing that priority by increasing Federal participation in grant agreements for airfield development for most airport sponsors.

At the nation's 65 largest airports, the terminal-area assistance provision will be most beneficial since the greatest needs of these airports are in modernizing and expanding terminal facilities. In many cases most airfield work at these airports is completed.

We suggest that the Executive Branch review its policies toward terminal construction; presently contradictions abound. While the FAA is unable to finance improvements to the public-use areas of terminals with user tax funds, the Economic Development Administration is financing the construction of all parts of terminal buildings with general tax funds. Further, the four U.S. inspection agencies (Customs, Agriculture, Public Health and Immigration) make no payments for the space they use for passenger processing at international airports, although they are authorized by the Federal Aviation Act to do so. The U.S. Postal Service, on the other hand, does lease space for its activities. While the Administration has expressed opposition

to terminal-area provisions of this bill, it continues to follow **\*1445** a confusing and contradictory course, as is apparent by the discussion above.

## MULTI-YEAR AIRPORT DEVELOPMENT GRANTS

Sec. 14(b) of the Airport and Airway Development Act contains a provision authorizing the Secretary to enter into multi-year grant agreements with airport sponsors. This feature of the 1970 Act, for the first time, provided airport sponsors some advance indication of the availability of Federal funds on more than a yearly basis. Currently the Secretary may enter into grant agreements for up to three fiscal years in advance of the actual appropriation of user tax monies. Originally, the Senate bill of 1970 provided multi-year contract authority for a period of five years-- however the provision was trimmed to three years because of action of the Senate-House Conference Committee.

S. 38 contains a provision in Section 3(b) extending the multi-year grant authority for an additional two years through FY 1975. The new obligational limits imposed by the amendment reflect the increase in the minimum annual authorization level provided in Section 3(b) of the bill from $280 million to $420 million; therefore the Committee has increased the maximum obligation permitted through FY 1975 to $1,680,000,000.

If the Committee amendment to the Act is not enacted, beginning in FY 1974 airport development aid grants will have to be made on a year-to-year basis as they were prior to 1970, thus inhibiting the orderly progression of development programs. The Committee believes that adoption of the amendment is vitally important to the continuation of an orderly airport development program and will continue to provide assurance to airport sponsors of continuing Federal commitments for grants-in-aid for periods longer than a single year.

## (3) GRANT ASSISTANCE TO MILITARY-CIVIL JOINT-USE AIRPORTS

Section 4 of the bill corrects an inadvertent oversight made in 1970 when the Airport and Airway Act was enacted. The 1970 Act prohibits the United States from being a project sponsor but overlooks the fact that certain military airports owned by the United States permit joint use by civil aviation.

The Committee believes that such joint-use airports should be eligible to receive ADAP grants providing that such grants are strictly used to provide additional or expanded facilities for the use of civil aviation. Obviously, the Committee does not intend that ADAP grants be used to finance developments which are not related to civil aviation activities but which are required by the military.

The Administration, in testifying in favor of this provision, indicated that grants to such airports would be few and would not amount to more than several million dollars per year.

The Committee also believes that grants for airport development at airports owned by the United States should be conditioned on the airport being available for use by all segments of civil aviation.

## **\*1446** (4) PROHIBITION OF STATE AND LOCAL TAXATION

S. 38 prohibits a new, inequitable, and potentially chaotic burden of taxation on the nearly 200 million persons who use air transportation each year. The legislation prohibits the levying of state or local head taxes, fees, or charges either on passengers or on the carriage of such passengers in interstate commerce. The provision is in response to a situation which has been brought about by an April 19, 1972 Supreme Court decision in Evansville-Vanderburgh Airport Authority District et al. v. Delta Airlines, Inc. et al., upholding passenger head taxes enacted by New Hampshire and by Evansville, Indiana, for 'aviation-related

purposes'. While this decision has invited state and local governments to enact head taxes or fees on air travelers, the Court decision does not provide adequate safeguards to prevent undue or discriminatory taxation.

The Court upheld the validity of a city-imposed 'use and service charge' of $1 for each enplaning commercial passenger at Evansville, Indiana, and a New Hampshire state law levying $1 charge for a passenger on large commercial airlines, and 50¢ a passenger charge on smaller planes. In Evansville, the money, to be collected directly from passengers by the airlines, was earmarked for maintenance and improvements at the airport. In New Hampshire, the state fixed the charge directly on the airlines, with half of the revenue to go into the state aeronautical fund and the balance going to the airport authority. The Court, in essence, ruled that states and cities could constitutionally impose a reasonable charge on interstate and intrastate air passengers in order to underwrite airport operational and development costs. Yet, the decision did not sufficiently define the ruling as, for example, what constitutes a reasonable charge, or just how far a state or municipality could go in levying head taxes. Obviously, the decision raised more questions than it answered, and the result was predictable.

It is significant that revenues which would be derived from some of these local or state head taxes would not be earmarked for airport development, but would be used to gain financial windfalls. The most blatant example of this is Philadelphia which imposed a $2 head tax on enplaning as well as deplaning passengers, with the funds going, unearmarked for airport development, into the cities' general fund. So the head tax has already grown from a 50¢ charge for air commuter passengers in New Hampshire to a $4 charge for a Philadelphia round-trip.

Recent experience with the Philadelphia tax is indicative of the chaos which such local taxation works on the national air transportation system. The head tax brings on confusion, delay, anger and resentment and cuts against the grain of the traditional American right to travel among the States unburdened by travel taxes. Two newspaper accounts are printed below describing the situation created by the Philadelphia head tax which became effective July 1, 1972:

**\*1447**  (From the Philadelphia Inquirer, July 2, 1972)

THOUSANDS BALK AT AIRPORT TAX; LONG LINES DELAY FLIGHTS OUT

(By Jan Schaffer)

Departing flights at Philadelphia International Airport were delayed as long as one hour Saturday as thousands of passengers refused to pay the city's new $2 one-way, $4 round-trip transit tax.

'It's chaos down here. It hasn't been this bad since Christmas,' said TWA customer services agent Bea Lutz as crowds of travelers chose to fill out lengthy refusal forms rather than pay the new levy.

'We can't even see the end of the line from behind the counter up here.'

After the tax went into effect at midnight Saturday, some airlines reported that up to 50 percent of their customers were refusing to pay.

'We had special refusal vouchers printed up and we had to get more printed today,' said TWA public relations director Robert Hall. 'I'd say 30 to 40 percent are refusing to pay.'

At Allegheny Airlines counter, Tom Fitzmorris, assistant passenger services manager, said '40 to 50 percent' of his customers were filing out forms rather than handing over the $2.

United Airlines reported a 10 percent refusal rate and Eastern about 20 percent.

'This city is really scratching for your last buck when they start taxing someone who's just passing through,' said one airport user, Phil Gasser, who was en route home to Waukesha, Wis.

One traveler heading for Los Angeles said the delays caused by attempting to collect the money from disgruntled passengers caused him to miss his plane.

'We had to stand in line two times,' he said.

Although the airlines had sought a preliminary injunction against collection of the tax, Common Pleas Judge Frank J. Montemuro refused their plea last week.

At the same time, however, he said the city-- which estimated it will gain $14 million annually through receipt of the levy-- cannot impose penalties on airlines if they fail to collect all the taxes due.

(From the Philadelphia Evening Bulletin, July 1, 1972)

GRUMBLING IS THE ORDER OF THE DAY AS $2 AIRPORT HEAD TAX HITS PHILA.

(By Douglas D. Gill and Ned Warwick)

Philadelphia's new $2 tax on passengers arriving and departing at Philadelphia International Airport went into effect today.

 **\*1448**  The tax was greeted by the same grumbling that has greeted new taxes since governments first imposed them.

'An air port head tax? That's ridiculous,' said Malcolm Fry, of 520 Acorn St., Roxborough, as he and his wife, Lois, arrived at 12:35 A.M. on an Eastern Airlines flight from Miami.

Fry and other passengers whose flights took off before the tax was imposed at midnight didn't have to pay the new levy.

But the new charge was made on tickets for flights leaving after midnight, regardless of whether the tickets were bought before the tax went into operation.

PAY AGAIN?

One of the first to pay the tax was Sam Palmieri of Stratford, N.J., who bought two round-trip tickets for a flight July 6 to San Juan, P.R., for himself and his wife. He paid $280 for the tickets and $4 for two departure taxes.

Palmieri asked the American Airlines ticket seller, 'How do I get back into Philadelphia? Will I have to pay again?'

'Oh Lord, yes, you will,' she said. 'I forgot to put that onto your bill. Oh well, I suppose somebody will ask you for it when you get back. Don't worry about it until then.'

'Hell, I just won't come back,' Palmieri said.

Dave Strode of 35 Evergreen lane, Haddonfield, N.J., was in line behind Palmieri and bought a one-way ticket to Atlanta. He's a student at Georgia Tech and says he flies to Georgia and back about nine times a year.

$40 A YEAR

'That means at $4 each time, I'll be paying almost $40 to Philadelphia every year,' he said. 'They don't give me anything for it.'

City Council adopted the new levy by a 15-0 vote May 25. Because of Mayor Rizzo's campaign promise not to raise taxes, city officials have billed the new tax as a 'user charge' instead of a tax.

'Whatever they call it, I think it stinks,' said Robert Maler, a ticket agent for American Airlines.

AIRPORT A MESS

'Nobody would mind paying this tax if they had a decent airport to come to, ' he said. 'As it is, it's a mess. Temporary wood and cardboard partitions are everywhere and have been for as long as I can remember. Trash is all over the floor. Just look at it. This airport is the most inconvenient of any I've ever been in. We're all going to have to start apologizing for the city.

Donna Iacino, who was behind the American counter with Maier, said, 'Why doesn't the city have its own agents down here to collect it themselves? Why should we do their work for them. They're not paying us any salary.'

**\*1449** James Jensen of Wilmington, a chemist, told about the tax by a report, said, 'Oh my God. I've got five children with me. What am I going to do now?'

7 TO CHICAGO

He and his wife and family were flying to Chicago (sic) Trans World Airlines on their way to Appleton, Wis., for a vacation.

'I'll just have to refuse to pay the tax and worry about it later,' Jensen said.

Airlines provided passengers with refusal forms if they did not wish to pay the tax. The airlines are required to fly passengers whether they pay the tax or not. In such cases it will be up to the city to collect the tax. The forms list the refuser's name and address.

AT DEPARTURE GATES

TWA collected the tax at the departure gates. The other airlines collected it at the ticket counters.

'I'm not against the head tax,' Jensen said. 'It's just that I wish we had had a little former warning.'

Alvin White, 50, of 5719 N. 19th st. said, 'I hate it like hell. Boy do I hate it. I realize the airport needs improvement, but this is a heck of a way to raise money. I think it's going to impede traffic in and out of Philadelphia.'

White, an engineer, was flying a TWA plane to Kansas City.

REFUSAL FORMS

Don Quinn, customer service agent for TWA, said seven of 31 passengers for a Pittsburgh flight filled out refusal forms.

John Greto, an American Airlines ticket agent, said 10 passengers had filled out refusal forms by 8 A.M.

'You have the right to refuse to pay this head tax,' Ray Curran, an Allegheny Airlines ticket agent, told Leo Curran, 26 (no relation), of Richboro, Bucks County.

'I don't know,' Leo said. 'Should I fill out the form? What will happen to me?'

'I'm not really sure,' the ticket agent said. 'I guess they'll probably come after you to collect it.'

## 'FILL OUT FORM'

Leo's wife, Dorothy, 25, said, 'Fill out that form. We're not going to pay any $12 extra.' Leo, a teacher, followed his wife's instructions and filled out the form. He, his wife and his mother were flying to Boston.

In 1970, this Committee and Congress passed the Airport and Airway Development Act in order to provide for urgently needed improvements in the national air transportation system. An Aviation Trust Fund was created, along with a variety of user charges to assure **\*1450** adequate and sustained funding. An 8 percent charge was levied on domestic passengers, and $3 per person on international trips. Congress thereby established a uniform national program of taxation and funding for airport improvements. This Committee never intended that air travelers would be subject to state and local head taxes as well as to national user charges. The Committee believed there was no danger of this because the basic constitutional guarantee of a citizen's right to unhindered interstate travel, and a U.S. Supreme Court decision which had prevailed since 1867, indicated that such taxes could not be constitutionally imposed. It is unfair that this is happening now since state and local head taxes constitute an inequitable, double burden of taxation on air passengers. Obviously, this runs counter to the whole concept of uniformity underlying the Airport and Airways Development Act, and the maintenance of a national air transportation system.

The Air Transport Association of America, the airlines trade group informs the Committee that as of January 30, at least 31 jurisdictions have enacted passenger charges and proposals for such charges are pending in many other localities. Below is a table, supplied by the Association, indicating the jurisdictions charging head taxes, the amount, the effective date and the source of collection.

## AIRPORT PASSENGER TAX

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

The airlines testified that in Mobile, Ala., where they have been collecting a head tax, one thing is clear-- it makes people mad. It takes time to process a passenger; the carriers say that collecting the head tax adds at least 45 seconds per customer. Such difficulty in a smaller station is nothing compared to the congestion that could take place at New York, or some other large terminal. These processing delays concern the Committee. People don't like taxes, in general, and head taxes are particularly annoying.

**\*1451** Whether the passenger pays the head tax, or whether it is absorbed by the airlines, the end result is to raise the cost of air travel.

If the passenger must pay a local head tax, it adds directly to the cost of his trip. And if head taxes are absorbed by the carriers, where law permits, because of the cost and difficulty of collection, or even refusal of passengers to pay, it still will lead to increased air travel costs. If the carriers had to absorb $1 for every air passenger carried last year, that would amount to $170 million. The airlines could not reasonably be expected to bear such a burden. In the end, a fare increase would have to be implemented. Thus, the air passenger loses either way on state and local head taxes. In addition, there would come a point when this added cost could make air travel uneconomical for some people, and thus inhibit the growth of the air transportation system, particularly in short-haul markets.

The head tax imposes a flat rate on passengers, regardless of the distance traveled by the passenger. Therefore, the 'short haul' passenger, paying a $1 tax has the price of his ticket increased about 10% while a transcontinental passenger's ticket increases less than 1%. Since the head tax substantially increases the cost of a short haul flight, a person may turn to other modes of transportation. We believe that the addition in Philadelphia of $4 to the cost of a round trip fare will have this effect, causing severe problems for the substantial local and commuter service there. The diversion of this traffic from such air carriers would have a damaging effect on service to many smaller communities.

One commuter airline testified before the Committee that some short-haul airline fares have increased by more than 20% as a result of the Philadelphia tax. Certainly such taxation is a burden on air transportation and will serve to inhibit the growth and usefulness of air transport for travel involving short distances.

Quite clearly, if head taxes are to be used for non-aviation purposes, or for programs which don't benefit the airport system where it is collected, such taxes are not equitable. In addition, state and local head taxes to raise funds for airport development can be precluded, for they should not be necessary. Air passengers are already being charged sufficiently at the Federal level through an 8 percent user charge on domestic tickets and $3 per person on international tickets, and it is not necessary to place a double burden on them.

The bill reshapes the airport grant-in-aid program making use of the air passenger's money that is already in the Aviation Trust Fund, thereby making it easier for local communities to finance airport needs and ensuring that there is no need to resort to local head taxes.

A legal memorandum from the Senate legislative counsel to the Committee regarding passenger head taxes is printed below.

U.S. SENATE,
OFFICE OF THE LEGISLATIVE COUNSEL.

MEMORANDUM TO SENATOR MAGNUSON

This memorandum is in reply to your letter of May 3, 1972, in which you request our advice with respect to certain questions raised as a result of the decision of the Supreme Court of the United States in Evansville-Vanderburgh Airport Authority District et al. v. Delta Airlines, Inc., et al., decided April 19, 1972, . . . U.S. . . ..

**\*1452** The first question is whether Congress has sufficient authority, under the terms of the Constitution and the Court's decision, to preempt State and local taxation of passengers engaged in air transportation.

For purposes of this discussion we assume 'air transportation' has the definition contained in section 101(10) of the Federal Aviation Act of 1958 which is that such term 'means interstate, overseas, or foreign air transportation or the transportation of mail by aircraft.'

The best discussion of Federal and State authority in this area that we have found is contained in Freeman v. Hewit, 329 U.S.at 251. [1] It is as follows:

'The power of the States to tax and the limitations upon that power imposed by the Commerce Clause have necessitated a long, continuous process of judicial adjustment. The need for such adjustment is inherent in a federal government like ours, where the same transaction has aspects that may concern the interests and involve the authority of both the central government and the constituent States.

'The history of this problem is spread over hundreds of volumes of our Reports. To attempt to harmonize all that has been said in the past would neither clarify what has gone before nor guide the future. Suffice it to say that especially in this field opinions must be read in the setting of the particular cases and as the product of preoccupation with their special facts.

'Our starting point is clear. In two recent cases we applied the principle that the Commerce Clause was not merely an authorization to Congress to enact laws for the protection and encouragement of commerce among the States, but by its own force created an area of trade free from interference by the States. In short, the Commerce Clause even without implementing legislation by Congress is a limitation upon the power of the States. Southern Pacific Co. v. Arizona, 325 U.S. 761; [2] Morgan v. Virginia, 328 U.S. 373. [3] In so deciding we reaffirmed, upon fullest consideration, the course of adjudication unbroken through the Nation's history. This limitation on State power, as the Morgan case so well illustrates, does not merely forbid a State to single out interstate commerce for hostile actions. A State is also precluded from taking any action which may fairly be deemed to have the effect of impeding the free flow of trade between States. It is immaterial that local commerce is subjected to a similar encumbrance. It may commend itself to a State to encourage a pastoral instead of an industrial society. That is its concern and its privilege. But to compare a State's treatment of its local trade with the exertion of its authority against commerce in the national domain is to compare incomparables.

'These principles of limitation on State power apply to all State policy no matter what State interest gives rise to its legislation. A burden on interstate commerce is none the lighter and no less objectionable because it is imposed by a State under the taxing power rather than under manifestations of police power in the conventional sense. But, in the necessary accommodation between local needs and the overriding requirement of freedom for the national commerce, the incidence of a particular type of State action may throw the balance in support of the local need because interference with the national interest **\*1453** is remote or unsubstantial. A police regulation of local aspects of interstate commerce is a power often essential to a State in safeguarding vital local interests. At least until Congress chooses to enact a nation-wide rule, the power will not be denied to the State. The Minnesota Rate Cases, 230 U.S. 352, 402 et seq., [4] S.C. Hwy. Dept. v. Barnwell Bros., 303 U.S. 177; [5] Union Brokerage Co. v. Jensen, 322 U.S. 202, 209-12. [6] State taxation falling on interstate commerce, on the other hand, can only be justified as designed to make such commerce bear a fair share of the cost of the local government whose protection it enjoys. But revenue serves as well no matter what its source. To deny to a State a particular source of income because it taxes the very process of interstate commerce does not impose a crippling limitation on a State's ability to carry on its local function. Moreover, the burden on interstate commerce involved in a direct tax upon it is inherently greater, certainly less uncertain in its consequences, than results from the usual police regulations. The power to tax is a dominant power over revenue, attempts at such taxation have always been more carefully scrutinized and more consistently resisted than police power regulations of aspects of such commerce. The task of scrutinizing is a task of drawing lines. This is the historic duty of the Court so long as Congress does not undertake to make specific arrangements between the National Government and the States in regard to revenues from interstate commerce. See Act of July 3, 1944, 58 Stat. 723; H. Doc. 141, 79th Cong., 1st Sess., 'Multiple Taxation of Air Commerce'; and compare 54 Stat. 1059, 4 U.S.C. 13 et seq. (permission to States to extend taxing power to Federal areas). Considerations of proximity and degree are here, as so often in the law, decisive.'

The Court in the Evansville-Vanderburgh Airport case, on p. 14 of the slip opinion, quoted favorably from the opinion in the Freeman case quoted above. It said 'But there is no suggestion that the Indiana and New Hampshire charges do not in face advance the constitutionally permissible objective of having interstate commerce bear a fair share of the costs to the States of airports constructed and maintained for the purpose of aiding interstate air travel. In that circumstance, (a)t least until Congress chooses to enact a nation-wide rule, the power will not be denied to the State(s). Freeman v. Hewit, 329 U.S.at 253; see also Southern Pacific Co. v. Arizona, 325 U.S. 761, 775-776 (1945).' We believe the italicized material is a clear recognition on the part of the court of the power of Congress to preempt the field in the area under question. This is further borne out by the following from p. 13 of such slip opinion:

'We conclude, therefore, that the provisions before us impose valid charges on the use of airport facilities constructed and maintained with public funds. Furthermore, we do not think that they conflict with any federal policies furthering

uniform national regulation of air transportation. No federal statute or specific congressional action or declaration evidences a Congressional purpose to deny or pre-empt state and local power to levy charges designed to help defray the costs of airport construction and maintenance. A contrary purpose is evident in the Airport Development Act of 1970, 49 U.S.C. 1701 et seq. That **\*1454** Act provides that as 'a condition precedent to his approval of an airport development project,' the Secretary of Transportation must determine that . . . '.

Our opinion in response to your first question is that the Congress does have authority to pre-empt State and local taxation of passengers engaged in air transportation. The Court in the Evansville-Vandenburgh Airport case found a contrary purpose to be evident in the Airport Development Act of 1970, but if faced with a clear intent on the part of Congress to pre-empt would agree to it.

Questions 2 and 3 relate to each other and therefore will be discussed together. They are--

'(2) Whether in enacting such legislation, the Committee on Commerce would have jurisdiction and authority;

'(3) The form you believe the legislation should take; whether it should amend the Federal Aviation Act, the Airport and Airway Development Act or the Airport and Airway Revenue Act.'

In view of the fact that the Federal Aviation Act of 1958 is the Act under which the Federal Government exercises its authority under the commerce clause of the Constitution to regulate air transportation, it is our opinion that an amendment to such Act would be the most appropriate method of exercising the authority to pre-empt State and local taxation of passengers engaged in air transportation in the interests of the needs and proper regulation of such transportation. Such an amendment would of course come under the jurisdiction of the Committee on Commerce.

In accordance with your request we have also reviewed H.R. 2337, 92d Congress. As near as we can determine the intent of such bill would best be carried out by placing a period after 'air transportation' in lines 8 and 9 of the first page and deleting the material following through line 5 on p. 2. As cited above the term 'air transportation' is defined in the Federal Aviation Act of 1958. The material we suggest deleting cannot be intended to enlarge on such definition since it modifies 'air transportation'. It cannot restrict such definition since it is much broader in scope than 'air transportation '. We are unable to determine its purpose particularly since without it the bill seems adequate.

Two technical changes should be made in the bill. On the first page, line 6, and on page 2, the last line, 'Sec. 1113' should be inserted in lieu of 'Sec. 1112'.

Respectfully,

PETER W. LeROUX, Senior Counsel.

CONCLUSION

S. 38, as explained above, provides a great new source of funds for airport development and improvement throughout the United States. The bill, if enacted, will reduce substantially the reliance on locally-generated funds for airport development and will place a greater burden and responsibility on the United States to encourage, promote, and finance aviation facilities which are required in the national air transportation system.

The bill provides that the cost of this increased Federal participation will be borne by the users of the system, not the general taxpayer. The airlines, airline passengers and shippers, and aircraft owners and operators all contribute to the development of the system by paying user **\*1455** taxes established in 1970. S. 38 provides that a greater share of the revenues from these taxes will filter down to local governments-- airport sponsors-- to meet local and national needs.

In accepting a greater Federal role and responsibility in airport development the Committee has also acted to prohibit local taxation on passengers or on the carriage of passengers. We believe such taxation to be inimical to the development of a national system funded in large part by uniform Federal taxes. Currently, some disagreement exists within the Administration as to whether the Committee action increasing Federal participation in airport development is warranted at this time. The Committee, however, is convinced that it is.

Nonetheless, the Committee views S. 38 as an aviation development package-- the components of which cannot be separated. We believe that if the prohibition on local head taxes was not a part of the total new program, there would be need to re-evaluate the increased Federal funding for airport development projects called for in S. 38. If local taxes on passengers and air carriers are allowed to proliferate nationally and are to become a major factor in the financing of local airport facilities, then there is obviously less need for a Federal airport development program. If local head taxes become a significant airport funding mechanism the public interest may well require a reduction in Federal user taxes and a diminution of Federal participation in airport development projects.

Therefore, by prohibiting state taxation on passengers or on air transportation, the Committee has accepted greater responsibility for U.S. assistance, believing that the two actions must be viewed together and that neither should stand alone without the other.

## COST OF LEGISLATION

S. 38 increases, by $140 million, the Secretary's authority to enter into grant agreements for airport development grants for each of the Fiscal years 1974 and 1975 or $280 million total.

In addition the bill provides advance obligational authority for the five year period FY 1971-1975 of $1,680,000,000. Currently, advance obligational authority is limited to $840,000,000 for a three-year period. However, this provision will not result in additional cost to the U.S. above that presently provided for in the Act.

Under terms of the Act, as amended by S. 3755, the authority to enter into airport grant agreements would be as follows:

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

While the bill extends advance obligational authority for an additional 2 years and incorporates a higher annual authorization level, the actual increased cost to the U.S. will be $280 million over the five-year period FY 1971-1975. This cost of this additional authority will be funded entirely from the Airport and Airway Trust Fund through user tax revenues provided by the users of the national air transportation system. No general tax revenues will be required to pay for the additional spending authority.

**\*1456** AGENCY COMMENTS

THE SECRETARY OF TRANSPORTATION,
Washington, D.C., January 23, 1973.

Hon. WARREN G. MAGNUSON,

Chairman, Committee on Commerce,

U.S. Senate,

Washington, D.C.

DEAR MR. CHAIRMAN: The Department of Transportation would like to restate the Administration's views on the various proposed amendments to the Airport and Airway Development Act of 1970 that are contained in S. 38, which I understand your Committee will be considering today.

During the last session of Congress, we expressed strong opposition to several major amendments contained in S. 3755, the 'Airport Development Acceleration Act of 1972.' Specifically, the Administration found unacceptable the amendments that would have (1) authorized annual program levels for FY 1974 and FY 1975 of $420 million in lieu of the presently authorized annual level of $280 million, (2) extended the coverage of the Act to provide Federal assistance for funding of terminal area improvements, and (3) increased the Federal share from 50 to 75 percent at medium, small and non-hub airports. S. 38, as introduced, contains all three of these amendments. We continue to believe that each of these changes would be undesirable and untimely. Each would have a major impact on the basic program, and would have the effect of significantly increasing the flow of Federal funds into airport development and construction. As we indicated last year, it is not evident from an overall transportation perspective that such action is warranted at this time.

We advised you last year that we believe that any substantive changes in project eligibility, the Federal share, or overall program level should be delayed until completion and analysis of the Cost Allocation Study, the National Aviation System Plan, and the report of the Aviation Advisory Commission, each of which deal specifically with some of these issues. The first two documents are now nearing completion and the Aviation Advisory Commission has already issued its report. We are now reviewing that report, but do not yet have an official position on its recommendations. It is interesting to note, however, that the Commission, which included representatives from the aviation community, did not find a need for increasing the ADAP program above its current level of $280 million per year.

While there are obviously a number of problems involved in the operation of any major and relatively new program such as ADAP, we believe that we are making steady progress in working out administrative problems, and are achieving a more responsive and efficient operation. Some of the problems (e.g. inability of some small local communities to raise their matching share) that are often cited as justification for the major program changes incorporated in S. 38 are not common among the Nation's airports. With a few exceptions, the small and medium hub airports in the aggregate have been able to achieve in the first two years of ADAP nearly 40 percent of the development anticipated in the 1969 National Airport Plan for the entire decade of the 1970's. This indicates to us that there is not any significant need for increasing the Federal share for airports of this size.

**\*1457** As I stated in my letter to you of September 13, 1972, on S. 3755, the amendment to provide for 50 percent Federal financing of terminal improvements raises some far-reaching questions that deserve more study than has yet been given them. Historically, the terminal area-- with its many opportunities for incorporation of revenue producing concessions and wide variations in design-- has always been viewed as the airport operator's (or the airlines') responsibility, and thus an inappropriate area for the use of Federal funds. We strongly believe that any departure from this well established precedent should be made only after careful study and consideration of other alternatives.

With respect to the overall funding level increase proposed, our view is that it is not warranted from the point of view of transportation priorities generally, that the increases cannot be justified during a period of Federal fiscal stringency-- and that in any event, the increases are not necessary, if there is no increase in the Federal matching share and if the program is not extended to cover terminal construction.

In addition to the three major amendments discussed above, we commented at length last year on a proposed prohibition of locally imposed 'head taxes.' We felt such action was unwarranted and premature. We agreed, however, that a temporary moratorium on such taxes, such as that contained in last year's House version of the ADAP legislation, would be acceptable pending a comprehensive study of the impact of such taxes. Meanwhile, we note that head taxes have been imposed at a growing number of locations, and we are not aware of this causing any disruption of interstate commerce or any other serious problems. Hence, we continue to believe that an outright prohibition should not be enacted.

With respect to the other provisions of S. 38, we support the amendment providing for an increase in Federal funding of airport security equipment from 50 to 82 percent. We do not believe, however, that similar funding of airport certification costs would be justified. This activity, although important, does not meet the test of national urgency that clearly applies in the case of airport security funding. We also support the amendment to Section 16(c) of the Act which would clarify the eligibility under ADAP of civil sponsors at joint-use civil-military airports.

In conclusion, the Administration finds the amendments providing for a 50 percent increase in annual contract authority, Federal assistance for terminal area improvements, a higher Federal matching share, and prohibition of the 'head tax' to be unacceptable. We strongly believe that amendments of this nature should be studied more carefully and comprehensively before enactment of any such sweeping changes.

The Office of Management and Budget has advised that enactment of this legislation would not be in accord with the program of the President.

Sincerely,

JAMES M. BEGGS,
Acting Secretary.

1 67 S.Ct. 274, 91 L.Ed. 265, rehearing denied 67 S.Ct. 497, 329 U.S. 832, 91 L.Ed. 795.

2 65 S.Ct. 1515, 89 L.Ed. 1915.

3 66 S.Ct. 1050, 90 L.Ed. 1317, 165 A.L.R. 574.

4 33 S.Ct. 729, 57 L.Ed. 1511.

5 58 S.Ct. 510, 82 L.Ed. 734.

6 64 S.Ct. 70, 88 L.Ed. 1227, granting certiorari 215 Minn. 207, 9 N.W.2d 721.

(Note: 1. PORTIONS OF THE SENATE, HOUSE AND CONFERENCE REPORTS, WHICH ARE DUPLICATIVE OR ARE DEEMED TO BE UNNECESSARY TO THE INTERPRETATION OF THE LAWS, ARE OMITTED. OMITTED MATERIAL IS INDICATED BY FIVE ASTERISKS: *****. 2. TO RETRIEVE REPORTS ON A PUBLIC LAW, RUN A TOPIC FIELD SEARCH USING THE PUBLIC LAW NUMBER, e.g., TO(99-495))

S. REP. 93-12, S. Rep. No. 12, 93RD Cong., 1ST Sess. 1973, 1973 U.S.C.C.A.N. 1434, 1973 WL 12580 (Leg.Hist.)

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# Appendix 15:
# Tex. Tax Code § 171.001 (2015)

Vernon's Texas Statutes and Codes Annotated
   Tax Code (Refs & Annos)
      Title 2. State Taxation (Refs & Annos)
         Subtitle F. Franchise Tax; Credits (Refs & Annos)
            Chapter 171. Franchise Tax (Refs & Annos)
               Subchapter A. Definitions; Tax Imposed (Refs & Annos)

This section has been updated. Click here for the updated version.

V.T.C.A., Tax Code § 171.001

§ 171.001. Tax Imposed

Effective: January 1, 2008 to December 31, 2019

(a) A franchise tax is imposed on each taxable entity that does business in this state or that is chartered or organized in this state.

(b) The tax imposed under this chapter extends to the limits of the United States Constitution and the federal law adopted under the United States Constitution.

(c) The tax imposed under this section or Section 171.0011 is not imposed on an entity if, during the period on which the report is based, the entity qualifies as a passive entity as defined by Section 171.0003.

<Text of (d) effective until January 1, 2020>

(d) Notwithstanding Subsection (a), the tax imposed under this chapter is not imposed on a taxable entity that qualifies as a new veteran-owned business as defined by Section 171.0005 until the earlier of:

  (1) the fifth anniversary of the date on which the taxable entity begins doing business in this state; or

  (2) the date the taxable entity ceases to qualify as a new veteran-owned business as defined by Section 171.0005.

**Credits**
Acts 1981, 67th Leg., p. 1691, ch. 389, § 1, eff. Jan. 1, 1982. Amended by Acts 1991, 72nd Leg., ch. 901, § 53(a), eff. Aug. 26, 1991; Acts 1991, 72nd Leg., 1st C.S., ch. 5, § 8.01, eff. Jan. 1, 1992; Acts 1993, 73rd Leg., ch. 765, § 7, eff. Aug. 30, 1993; Acts 1995, 74th Leg., ch. 914, § 12, eff. Sept. 1, 1995; Acts 1995, 74th Leg., ch. 1002, § 1, eff. Jan. 1, 1996; Acts 1997, 75th Leg., ch. 1185, § 1, eff. Jan. 1, 1998; Acts 1999, 76th Leg., ch. 184, § 1, eff. Jan. 1, 2000; Acts 2003, 78th Leg., ch. 209, §§ 31, 32, eff. Oct. 1, 2003; Acts 2006, 79th Leg., 3rd C.S., ch. 1, § 2, eff. Jan. 1, 2008; Acts 2007, 80th Leg., ch. 1282, § 5, eff. Jan. 1, 2008; Acts 2015, 84th Leg., ch. 329 (S.B. 1049), § 4, eff. Jan. 1, 2016; Acts 2015, 84th Leg., ch. 329 (S.B. 1049), § 9(2), eff. Jan. 1, 2020.

V. T. C. A., Tax Code § 171.001, TX TAX § 171.001
Current through the end of the 2023 Regular, Second, Third and Fourth Called Sessions of the 88th Legislature, and the Nov. 7, 2023 general election.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Appendix 16:**

**Tex. Tax Code § 171.1011 (2015)**

Vernon's Texas Statutes and Codes Annotated
  Tax Code (Refs & Annos)
    Title 2. State Taxation (Refs & Annos)
      Subtitle F. Franchise Tax; Credits (Refs & Annos)
        Chapter 171. Franchise Tax (Refs & Annos)
          Subchapter C. Determination of Taxable Margin; Allocation and Apportionment

This section has been updated. Click here for the updated version.

V.T.C.A., Tax Code § 171.1011

§ 171.1011. Determination of Total Revenue from Entire Business

Effective: January 1, 2014 to December 31, 2017

(a) In this section, a reference to an Internal Revenue Service form includes a variant of the form. For example, a reference to Form 1120 includes Forms 1120-A, 1120-S, and other variants of Form 1120. A reference to an Internal Revenue Service form also includes any subsequent form with a different number or designation that substantially provides the same information as the original form.

(b) In this section, a reference to an amount reportable as income on a line number on an Internal Revenue Service form is the amount entered to the extent the amount entered complies with federal income tax law and includes the corresponding amount entered on a variant of the form, or a subsequent form, with a different line number to the extent the amount entered complies with federal income tax law.

(c) Except as provided by this section, and subject to Section 171.1014, for the purpose of computing its taxable margin under Section 171.101, the total revenue of a taxable entity is:

  (1) for a taxable entity treated for federal income tax purposes as a corporation, an amount computed by:

    (A) adding:

      (i) the amount reportable as income on line 1c, Internal Revenue Service Form 1120;

      (ii) the amounts reportable as income on lines 4 through 10, Internal Revenue Service Form 1120; and

      (iii) any total revenue reported by a lower tier entity as includable in the taxable entity's total revenue under Section 171.1015(b); and

    (B) subtracting:

(i) bad debt expensed for federal income tax purposes that corresponds to items of gross receipts included in Subsection (c)(1)(A) for the current reporting period or a past reporting period;

(ii) to the extent included in Subsection (c)(1)(A), foreign royalties and foreign dividends, including amounts determined under Section 78 or Sections 951-964, Internal Revenue Code;

(iii) to the extent included in Subsection (c)(1)(A), net distributive income from a taxable entity treated as a partnership or as an S corporation for federal income tax purposes;

(iv) allowable deductions from Internal Revenue Service Form 1120, Schedule C, to the extent the relating dividend income is included in total revenue;

(v) to the extent included in Subsection (c)(1)(A), items of income attributable to an entity that is a disregarded entity for federal income tax purposes; and

(vi) to the extent included in Subsection (c)(1)(A), other amounts authorized by this section;

(2) for a taxable entity treated for federal income tax purposes as a partnership, an amount computed by:

(A) adding:

(i) the amount reportable as income on line 1c, Internal Revenue Service Form 1065;

(ii) the amounts reportable as income on lines 4, 6, and 7, Internal Revenue Service Form 1065;

(iii) the amounts reportable as income on lines 3a and 5 through 11, Internal Revenue Service Form 1065, Schedule K;

(iv) the amounts reportable as income on line 17, Internal Revenue Service Form 8825;

(v) the amounts reportable as income on line 11, plus line 2 or line 45, Internal Revenue Service Form 1040, Schedule F; and

(vi) any total revenue reported by a lower tier entity as includable in the taxable entity's total revenue under Section 171.1015(b); and

(B) subtracting:

(i) bad debt expensed for federal income tax purposes that corresponds to items of gross receipts included in Subsection (c)(2)(A) for the current reporting period or a past reporting period;

(ii) to the extent included in Subsection (c)(2)(A), foreign royalties and foreign dividends, including amounts determined under Section 78 or Sections 951-964, Internal Revenue Code;

(iii) to the extent included in Subsection (c)(2)(A), net distributive income from a taxable entity treated as a partnership or as an S corporation for federal income tax purposes;

(iv) to the extent included in Subsection (c)(2)(A), items of income attributable to an entity that is a disregarded entity for federal income tax purposes; and

(v) to the extent included in Subsection (c)(2)(A), other amounts authorized by this section; or

(3) for a taxable entity other than a taxable entity treated for federal income tax purposes as a corporation or partnership, an amount determined in a manner substantially equivalent to the amount for Subdivision (1) or (2) determined by rules that the comptroller shall adopt.

(d) Subject to Section 171.1014, a taxable entity that is part of a federal consolidated group shall compute its total revenue under Subsection (c) as if it had filed a separate return for federal income tax purposes.

(e) A taxable entity that owns an interest in a passive entity shall exclude from the taxable entity's total revenue the taxable entity's share of the net income of the passive entity, but only to the extent the net income of the passive entity was generated by the margin of any other taxable entity.

(f) A taxable entity shall exclude from its total revenue, to the extent included under Subsection (c)(1)(A), (c)(2)(A), or (c)(3), flow-through funds that are mandated by law or fiduciary duty to be distributed to other entities, including taxes collected from a third party by the taxable entity and remitted by the taxable entity to a taxing authority.

(g) A taxable entity shall exclude from its total revenue, to the extent included under Subsection (c)(1)(A), (c)(2)(A), or (c)(3), only the following flow-through funds that are mandated by contract or subcontract to be distributed to other entities:

(1) sales commissions to nonemployees, including split-fee real estate commissions;

(2) the tax basis as determined under the Internal Revenue Code of securities underwritten; and

(3) subcontracting payments made under a contract or subcontract entered into by the taxable entity to provide services, labor, or materials in connection with the actual or proposed design, construction, remodeling, remediation, or repair of improvements on real property or the location of the boundaries of real property.

(g-1) A taxable entity that is a lending institution shall exclude from its total revenue, to the extent included under Subsection (c)(1)(A), (c)(2)(A), or (c)(3), proceeds from the principal repayment of loans.

(g-2) A taxable entity shall exclude from its total revenue, to the extent included under Subsection (c)(1)(A), (c)(2)(A), or (c)(3), the tax basis as determined under the Internal Revenue Code of securities and loans sold.

(g-3) A taxable entity that provides legal services shall exclude from its total revenue:

(1) to the extent included under Subsection (c)(1)(A), (c)(2)(A), or (c)(3), the following flow-through funds that are mandated by law, contract, or fiduciary duty to be distributed to the claimant by the claimant's attorney or to other entities on behalf of a claimant by the claimant's attorney:

(A) damages due the claimant;

(B) funds subject to a lien or other contractual obligation arising out of the representation, other than fees owed to the attorney;

(C) funds subject to a subrogation interest or other third-party contractual claim; and

(D) fees paid an attorney in the matter who is not a member, partner, shareholder, or employee of the taxable entity;

(2) to the extent included under Subsection (c)(1)(A), (c)(2)(A), or (c)(3), reimbursement of the taxable entity's expenses incurred in prosecuting a claimant's matter that are specific to the matter and that are not general operating expenses; and

(3) $500 per pro bono services case handled by the attorney, but only if the attorney maintains records of the pro bono services for auditing purposes in accordance with the manner in which those services are reported to the State Bar of Texas.

(g-4) A taxable entity that is a pharmacy cooperative shall exclude from its total revenue, to the extent included under Subsection (c)(1)(A), (c)(2)(A), or (c)(3), flow-through funds from rebates from pharmacy wholesalers that are distributed to the pharmacy cooperative's shareholders. A taxable entity that provides a pharmacy network shall exclude from its total revenue, to the extent included under Subsection (c)(1)(A), (c)(2)(A), or (c)(3), reimbursements, pursuant to contractual agreements, for payments to pharmacies in the pharmacy network.

(g-5) A taxable entity that is a qualified live event promotion company shall exclude from its total revenue, to the extent included under Subsection (c)(1)(A), (c)(2)(A), or (c)(3), a payment made to an artist in connection with the provision of a live entertainment event or live event promotion services.

(g-6) A taxable entity that is a qualified destination management company as defined by Section 151.0565 shall exclude from its total revenue, to the extent included under Subsection (c)(1)(A), (c)(2)(A), or (c)(3), payments made to other persons to

provide services, labor, or materials in connection with the provision of destination management services as defined by Section 151.0565.

<Text of (g-7) effective until January 1, 2018>

(g-7) A taxable entity that is a qualified courier and logistics company shall exclude from its total revenue, to the extent included under Subsection (c)(1)(A), (c)(2)(A), or (c)(3), subcontracting payments made by the taxable entity to nonemployee agents for the performance of delivery services on behalf of the taxable entity. For purposes of this subsection, "qualified courier and logistics company" means a taxable entity that:

(1) receives at least 80 percent of the taxable entity's annual total revenue from its entire business from a combination of at least two of the following courier and logistics services:

(A) expedited same-day delivery of an envelope, package, parcel, roll of architectural drawings, box, or pallet;

(B) temporary storage and delivery of the property of another entity, including an envelope, package, parcel, roll of architectural drawings, box, or pallet; and

(C) brokerage of same-day or expedited courier and logistics services to be completed by a person or entity under a contract that includes a contractual obligation by the taxable entity to make payments to the person or entity for those services;

(2) during the period on which margin is based, is registered as a motor carrier under Chapter 643, Transportation Code, and if the taxable entity operates on an interstate basis, is registered as a motor carrier or broker under the unified carrier registration system, as defined by Section 643.001, Transportation Code, during that period;

(3) maintains an automobile liability insurance policy covering individuals operating vehicles owned, hired, or otherwise used in the taxable entity's business, with a combined single limit for each occurrence of at least $1 million;

(4) maintains at least $25,000 of cargo insurance;

(5) maintains a permanent nonresidential office from which the courier and logistics services are provided or arranged;

(6) has at least five full-time employees during the period on which margin is based;

(7) is not doing business as a livery service, floral delivery service, motor coach service, taxicab service, building supply delivery service, water supply service, fuel or energy supply service, restaurant supply service, commercial moving and storage company, or overnight delivery service; and

(8) is not delivering items that the taxable entity or an affiliated entity sold.

<Text of (g-7) effective January 1, 2018>

(g-7) A taxable entity that is a qualified courier and logistics company shall exclude from its total revenue, to the extent included under Subsection (c)(1)(A), (c)(2)(A), or (c)(3), subcontracting payments made by the taxable entity to nonemployee agents for the performance of delivery services on behalf of the taxable entity. For purposes of this subsection, "qualified courier and logistics company" means a taxable entity that:

(1) receives at least 80 percent of the taxable entity's annual total revenue from its entire business from a combination of at least two of the following courier and logistics services:

(A) expedited same-day delivery of an envelope, package, parcel, roll of architectural drawings, box, or pallet;

(B) temporary storage and delivery of the property of another entity, including an envelope, package, parcel, roll of architectural drawings, box, or pallet; and

(C) brokerage of same-day or expedited courier and logistics services to be completed by a person or entity under a contract that includes a contractual obligation by the taxable entity to make payments to the person or entity for those services;

(2) during the period on which margin is based, is registered as a motor carrier under Chapter 643, Transportation Code, and if the taxable entity operates on an interstate basis, is registered as a motor carrier or broker under the | motor vehicle registration system established under 49 U.S.C. Section 14504a or a similar federal registration program that replaces that system | unified carrier registration system, as defined by Section 643.001, Transportation Code, during that period;

(3) maintains an automobile liability insurance policy covering individuals operating vehicles owned, hired, or otherwise used in the taxable entity's business, with a combined single limit for each occurrence of at least $1 million;

(4) maintains at least $25,000 of cargo insurance;

(5) maintains a permanent nonresidential office from which the courier and logistics services are provided or arranged;

(6) has at least five full-time employees during the period on which margin is based;

(7) is not doing business as a livery service, floral delivery service, motor coach service, taxicab service, building supply delivery service, water supply service, fuel or energy supply service, restaurant supply service, commercial moving and storage company, or overnight delivery service; and

(8) is not delivering items that the taxable entity or an affiliated entity sold.

(g-8) A taxable entity that is primarily engaged in the business of transporting aggregates shall exclude from its total revenue, to the extent included under Subsection (c)(1)(A), (c)(2)(A), or (c)(3), subcontracting payments made by the taxable entity to

independent contractors for the performance of delivery services on behalf of the taxable entity. In this subsection, "aggregates" means any commonly recognized construction material removed or extracted from the earth, including dimension stone, crushed and broken limestone, crushed and broken granite, other crushed and broken stone, construction sand and gravel, industrial sand, dirt, soil, cementitious material, and caliche.

(g-10) A taxable entity that is primarily engaged in the business of transporting barite shall exclude from its total revenue, to the extent included under Subsection (c)(1)(A), (c)(2)(A), or (c)(3), subcontracting payments made by the taxable entity to nonemployee agents for the performance of transportation services on behalf of the taxable entity. For purposes of this subsection, "barite" means barium sulfate (BaSO4), a mineral used as a weighing agent in oil and gas exploration.

(g-11) A taxable entity that is primarily engaged in the business of performing landman services shall exclude from its total revenue, to the extent included under Subsection (c)(1)(A), (c)(2)(A), or (c)(3), subcontracting payments made by the taxable entity to nonemployees for the performance of landman services on behalf of the taxable entity. In this subsection, "landman services" means:

(1) performing title searches for the purpose of determining ownership of or curing title defects related to oil, gas, or other related mineral or petroleum interests;

(2) negotiating the acquisition or divestiture of mineral rights for the purpose of the exploration, development, or production of oil, gas, or other related mineral or petroleum interests; or

(3) negotiating or managing the negotiation of contracts or other agreements related to the ownership of mineral interests for the exploration, exploitation, disposition, development, or production of oil, gas, or other related mineral or petroleum interests.

(h) If the taxable entity belongs to an affiliated group, the taxable entity may not exclude payments described by Subsection (f), (g), (g-1), (g-2), (g-3), or (g-4) that are made to entities that are members of the affiliated group.

(i) Except as provided by Subsection (g), a payment made under an ordinary contract for the provision of services in the regular course of business may not be excluded.

(j) Any amount excluded under this section may not be included in the determination of cost of goods sold under Section 171.1012 or the determination of compensation under Section 171.1013.

(k) A taxable entity that is a professional employer organization shall exclude from its total revenue payments received from a client for wages, payroll taxes on those wages, employee benefits, and workers' compensation benefits for the covered employees of the client.

(l) For purposes of Subsection (g)(1):

(1) "Sales commission" means:

(A) any form of compensation paid to a person for engaging in an act for which a license is required by Chapter 1101, Occupations Code; or

(B) compensation paid to a sales representative by a principal in an amount that is based on the amount or level of certain orders for or sales of the principal's product and that the principal is required to report on Internal Revenue Service Form 1099-MISC.

(2) "Principal" means a person who:

(A) manufactures, produces, imports, distributes, or acts as an independent agent for the distribution of a product for sale;

(B) uses a sales representative to solicit orders for the product; and

(C) compensates the sales representative wholly or partly by sales commission.

(m) A taxable entity shall exclude from its total revenue, to the extent included under Subsection (c)(1)(A), (c)(2)(A), or (c)(3), dividends and interest received from federal obligations.

(m-1) A taxable entity that is a management company shall exclude from its total revenue reimbursements of specified costs incurred in its conduct of the active trade or business of a managed entity, including "wages and cash compensation" as determined under Sections 171.1013(a) and (b).

(n) Except as provided by Subsection (o), a taxable entity that is a health care provider shall exclude from its total revenue:

(1) to the extent included under Subsection (c)(1)(A), (c)(2)(A), or (c)(3), the total amount of payments the health care provider received:

(A) under the Medicaid program, Medicare program, Indigent Health Care and Treatment Act (Chapter 61, Health and Safety Code), and Children's Health Insurance Program (CHIP);

(B) for professional services provided in relation to a workers' compensation claim under Title 5, Labor Code;[1] and

(C) for professional services provided to a beneficiary rendered under the TRICARE military health system; and

(2) the actual cost to the health care provider for any uncompensated care provided, but only if the provider maintains records of the uncompensated care for auditing purposes and, if the provider later receives payment for all or part of that care, the provider adjusts the amount excluded for the tax year in which the payment is received.

(n-1) The comptroller shall adopt rules governing:

(1) the computation of the actual cost to a health care provider of any uncompensated care provided under Subsection (n) (2); and

(2) the audit requirements related to the computation of those costs.

(o) A health care provider that is a health care institution shall exclude from its total revenue 50 percent of the amounts described by Subsection (n).

(p) In this section:

(1) "Federal obligations" means:

(A) stocks and other direct obligations of, and obligations unconditionally guaranteed by, the United States government and United States government agencies; and

(B) direct obligations of a United States government-sponsored agency.

(2) "Health care institution" means:

(A) an ambulatory surgical center;

(B) an assisted living facility licensed under Chapter 247, Health and Safety Code;

(C) an emergency medical services provider;

(D) a home and community support services agency;

(E) a hospice;

(F) a hospital;

(G) a hospital system;

(H) an intermediate care facility for the mentally retarded or a home and community-based services waiver program for persons with mental retardation adopted in accordance with Section 1915(c) of the federal Social Security Act (42 U.S.C. Section 1396n);

(I) a birthing center;

(J) a nursing home;

(K) an end stage renal disease facility licensed under Section 251.011, Health and Safety Code; or

(L) a pharmacy.

(3) "Health care provider" means a taxable entity that participates in the Medicaid program, Medicare program, Children's Health Insurance Program (CHIP), state workers' compensation program, or TRICARE military health system as a provider of health care services.

(4) "Obligation" means any bond, debenture, security, mortgage-backed security, pass-through certificate, or other evidence of indebtedness of the issuing entity. The term does not include a deposit, a repurchase agreement, a loan, a lease, a participation in a loan or pool of loans, a loan collateralized by an obligation of a United States government agency, or a loan guaranteed by a United States government agency.

(4-a) "Pro bono services" means the direct provision of legal services to the poor, without an expectation of compensation.

(4-b) Repealed by Acts 2007, 80th Leg., ch. 1282, § 37(2).

(5) "United States government" means any department or ministry of the federal government, including a federal reserve bank. The term does not include a state or local government, a commercial enterprise owned wholly or partly by the United States government, or a local governmental entity or commercial enterprise whose obligations are guaranteed by the United States government.

(6) "United States government agency" means an instrumentality of the United States government whose obligations are fully and explicitly guaranteed as to the timely payment of principal and interest by the full faith and credit of the United States government. The term includes the Government National Mortgage Association, the Department of Veterans Affairs, the Federal Housing Administration, the Farmers Home Administration, the Export-Import Bank, the Overseas Private Investment Corporation, the Commodity Credit Corporation, the Small Business Administration, and any successor agency.

(7) "United States government-sponsored agency" means an agency originally established or chartered by the United States government to serve public purposes specified by the United States Congress but whose obligations are not explicitly guaranteed by the full faith and credit of the United States government. The term includes the Federal Home Loan Mortgage Corporation, the Federal National Mortgage Association, the Farm Credit System, the Federal Home Loan Bank System, the Student Loan Marketing Association, and any successor agency.

(8) "Vaccine" means a preparation or suspension of dead, live attenuated, or live fully virulent viruses or bacteria, or of antigenic proteins derived from them, used to prevent, ameliorate, or treat an infectious disease.

(q) A taxable entity shall exclude from its total revenue, to the extent included under Subsection (c)(1)(A), (c)(2)(A), or (c)(3), all revenue received that is directly derived from the operation of a facility that is:

  (1) located on property owned or leased by the federal government; and

  (2) managed or operated primarily to house members of the armed forces of the United States.

(r) A taxable entity shall exclude, to the extent included under Subsection (c)(1)(A), (c)(2)(A), or (c)(3), total revenue received from oil or gas produced, during the dates certified by the comptroller pursuant to Subsection (s), from:

  (1) an oil well designated by the Railroad Commission of Texas or similar authority of another state whose production averages less than 10 barrels a day over a 90-day period; and

  (2) a gas well designated by the Railroad Commission of Texas or similar authority of another state whose production averages less than 250 mcf a day over a 90-day period.

(s) The comptroller shall certify dates during which the monthly average closing price of West Texas Intermediate crude oil is below $40 per barrel and the average closing price of gas is below $5 per MMBtu, as recorded on the New York Mercantile Exchange (NYMEX).

(t) The comptroller shall adopt rules as necessary to accomplish the legislative intent prescribed by this section.

(u) A taxable entity shall exclude from its total revenue the actual cost paid by the taxable entity for a vaccine.

(v) A taxable entity primarily engaged in the business of transporting goods by waterways that does not subtract cost of goods sold in computing its taxable margin shall exclude from its total revenue direct costs of providing transportation services by intrastate or interstate waterways to the same extent that a taxable entity that sells in the ordinary course of business real or tangible personal property would be authorized by Section 171.1012 to subtract those costs as costs of goods sold in computing its taxable margin, notwithstanding Section 171.1012(e)(3).

(w-1) A taxable entity primarily engaged in the business of providing services as an agricultural aircraft operation, as defined by 14 C.F.R. Section 137.3, shall exclude from its total revenue the cost of labor, equipment, fuel, and materials used in providing those services.

(x) A taxable entity that is registered as a motor carrier under Chapter 643, Transportation Code, shall exclude from its total revenue, to the extent included under Subsection (c)(1)(A), (c)(2)(A), or (c)(3), flow-through revenue derived from taxes and fees.

**Credits**

Added by Acts 2006, 79th Leg., 3rd C.S., ch. 1, § 5, eff. Jan. 1, 2008. Amended by Acts 2007, 80th Leg., ch. 1282, §§ 12, 13, 37(2), eff. Jan. 1, 2008; Acts 2009, 81st Leg., ch. 1360, § 3(a), eff. Jan. 1, 2010; Acts 2011, 82nd Leg., 1st C.S., ch. 4 (S.B. 1), § 45.03, eff. Jan. 1, 2012; Acts 2013, 83rd Leg., ch. 117 (S.B. 1286), § 25, eff. Sept. 1, 2013; Acts 2013, 83rd Leg., ch. 1006 (H.B. 2451), § 1, eff. Jan. 1, 2014; Acts 2013, 83rd Leg., ch. 1034 (H.B. 2766), § 1, eff. Jan. 1, 2014; Acts 2013, 83rd Leg., ch. 1232 (H.B. 500), §§ 7, 8, eff. Jan. 1, 2014; Acts 2017, 85th Leg., ch. 703 (H.B. 3254), § 1, eff. Jan. 1, 2018.

---

**Footnotes**

1        V.T.C.A., Labor Code § 401.001 et seq.

V. T. C. A., Tax Code § 171.1011, TX TAX § 171.1011

Current through the end of the 2023 Regular, Second, Third and Fourth Called Sessions of the 88th Legislature, and the Nov. 7, 2023 general election.

---

**End of Document**        © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# Appendix 17:
# Tex. Tax Code § 171.103

Vernon's Texas Statutes and Codes Annotated
  Tax Code (Refs & Annos)
    Title 2. State Taxation (Refs & Annos)
      Subtitle F. Franchise Tax; Credits (Refs & Annos)
        Chapter 171. Franchise Tax (Refs & Annos)
          Subchapter C. Determination of Taxable Margin; Allocation and Apportionment

V.T.C.A., Tax Code § 171.103

§ 171.103. Determination of Gross Receipts from Business Done in This State for Margin

Currentness

(a) Subject to Section 171.1055, in apportioning margin, the gross receipts of a taxable entity from its business done in this state is the sum of the taxable entity's receipts from:

(1) each sale of tangible personal property if the property is delivered or shipped to a buyer in this state regardless of the FOB point or another condition of the sale;

(2) each service performed in this state, except that receipts derived from servicing loans secured by real property are in this state if the real property is located in this state;

(3) each rental of property situated in this state;

(4) the use of a patent, copyright, trademark, franchise, or license in this state;

(5) each sale of real property located in this state, including royalties from oil, gas, or other mineral interests; and

(6) other business done in this state.

(b) A combined group shall include in its gross receipts computed under Subsection (a) the gross receipts of each taxable entity that is a member of the combined group and that has a nexus with this state for the purpose of taxation.

(c) Repealed by Acts 2013, 83rd Leg., ch. 1232 (H.B. 500), § 15.

(d) Repealed by Acts 2013, 83rd Leg., ch. 1232 (H.B. 500), § 15.

**Credits**
Acts 1981, 67th Leg., p. 1697, ch. 389, § 1, eff. Jan. 1, 1982. Amended by Acts 1984, 68th Leg., 2nd C.S., ch. 31, art. 15, § 1, eff. Oct. 2, 1984; Acts 1991, 72nd Leg., 1st C.S., ch. 5, § 8.06, eff. Jan. 1, 1992; Acts 1997, 75th Leg., ch. 1185, § 5, eff.

Jan. 1, 1998; Amended and consolidated this section with V.T.C.A., Tax Code § 171.1032 by Acts 2006, 79th Leg., 3rd C.S., ch. 1, § 5, eff. Jan. 1, 2008; Acts 2007, 80th Leg., ch. 1282, § 20, eff. Jan. 1, 2008; Acts 2013, 83rd Leg., ch. 1232 (H.B. 500), § 15, eff. Jan. 1, 2014.

V. T. C. A., Tax Code § 171.103, TX TAX § 171.103

Current through the end of the 2023 Regular, Second, Third and Fourth Called Sessions of the 88th Legislature, and the Nov. 7, 2023 general election.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Appendix 18:**

**Tex. Tax Code § 171.105**

Vernon's Texas Statutes and Codes Annotated
Tax Code (Refs & Annos)
Title 2. State Taxation (Refs & Annos)
Subtitle F. Franchise Tax; Credits (Refs & Annos)
Chapter 171. Franchise Tax (Refs & Annos)
Subchapter C. Determination of Taxable Margin; Allocation and Apportionment

V.T.C.A., Tax Code § 171.105

§ 171.105. Determination of Gross Receipts from Entire Business for Margin

Currentness

(a) Subject to Section 171.1055, in apportioning margin, the gross receipts of a taxable entity from its entire business is the sum of the taxable entity's receipts from:

(1) each sale of the taxable entity's tangible personal property;

(2) each service, rental, or royalty; and

(3) other business.

(b) If a taxable entity sells an investment or capital asset, the taxable entity's gross receipts from its entire business for taxable margin includes only the net gain from the sale.

(c) A combined group shall include in its gross receipts computed under Subsection (a) the gross receipts of each taxable entity that is a member of the combined group, without regard to whether that entity has a nexus with this state for the purpose of taxation.

**Credits**

Acts 1981, 67th Leg., p. 1698, ch. 389, § 1, eff. Jan. 1, 1982. Amended by Acts 1991, 72nd Leg., 1st C.S., ch. 5, § 8.07, eff. Jan. 1, 1992; Amended and consolidated this section with V.T.C.A., Tax Code § 171.1051 by Acts 2006, 79th Leg., 3rd C.S., ch. 1, § 5, eff. Jan. 1, 2008.

V. T. C. A., Tax Code § 171.105, TX TAX § 171.105
Current through the end of the 2023 Regular, Second, Third and Fourth Called Sessions of the 88th Legislature, and the Nov. 7, 2023 general election.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Appendix 19:**

**Plaintiff's Exhibit 6_American's Calculations (4 RR 82)**

AMERICAN AIRLINES GROUP, INC.
2014 CONSOLIDATED FEDERAL 1120 TAX RETURN
75-1825172

| | Per Filed TX Return | TX Adj | Per AAG 1120 | American | US AIRWAYS | Other Subs/Elims |
|---|---|---|---|---|---|---|
| Passenger Revenue | 35,461,940,269 | - | 35,461,940,269 | 23,311,771,016 | 13,608,472,864 | (1,458,303,611) |
| Freight Revenue | 874,657,698 | - | 874,657,698 | 716,776,277 | 157,881,421 | - |
| Other Revenue | 4,475,489,108 | - | 4,475,489,108 | 2,959,792,742 | 1,598,996,473 | (83,300,107) |
| 1A GROSS RECEIPTS | 40,812,087,075 | - | 40,812,087,075 | 26,988,340,035 | 15,365,350,758 | (1,541,603,718) |
| Less Passenger Revenue | (35,461,940,269) | - | (35,461,940,269) | (23,311,771,016) | (13,608,472,864) | 1,458,303,611 |
| Less Freight Revenue | (874,657,698) | - | (874,657,698) | (716,776,277) | (157,881,421) | - |
| Gross Rec. (Excluding Transportation) (line 1a) | 4,475,489,108 | - | 4,475,489,108 | 2,959,792,742 | 1,598,996,473 | (83,300,107) |
| | | | | | | |
| 4 DIVIDENDS | 2,129,809 | | 2,129,809 | 2,129,809 | - | - |
| 5 INTEREST | 32,486,152 | (11,027,210) | 43,513,362 | 25,309,726 | 7,234,276 | 10,969,360 |
| 6 GROSS RENTS | 17,320,180 | (17,005,616) | 34,325,796 | 10,101,746 | - | 24,224,050 |
| 7 GROSS ROYALTIES | - | - | - | - | - | - |
| 8 CAPITAL GAIN NET INCOME | - | (209,899,913) | 209,899,913 | 210,095,642 | | (195,729) |
| 9 NET GAIN (LOSS) 4797 | (1,225,565) | (242,467,513) | 241,241,948 | 74,616,336 | (5,219,294) | 171,844,906 |
| 10 OTHER INCOME | 54,993,892 | 138,461,672 | (83,467,780) | (65,158,264) | (21,241,724) | 2,932,208 |
| | | | | | | |
| Total Gross Revenue | 4,581,193,576 | (341,938,580) | 4,923,132,156 | 3,216,887,737 | 1,579,769,731 | 126,474,688 |
| | | | | | | |
| Less: Bad Debt Expense | 30,223,436 | (4,939,477) | 35,162,913 | 29,234,208 | 5,408,993 | 519,712 |
| Less: Federal Obligation Interest | - | - | - | - | - | - |
| Less: Dividends Rec'd | 2,129,809 | - | 2,129,809 | 2,129,809 | - | - |
| Less: Partnership (Income)/Loss | 1,198,265 | - | 1,198,265 | - | 1,198,265 | - |
| Less: Foreign Dividends | - | - | - | - | - | - |
| Less: Other exclusions | 53,840,403 | - | 53,840,403 | - | 60,949,477 | (7,109,074) |
| | | | | | | |
| Total Exclusions | 87,391,913 | (4,939,477) | 92,331,390 | 31,364,017 | 67,556,735 | (6,589,362) |
| | | | | | | |
| Total Revenue | 4,493,801,663 | (336,999,103) | 4,830,800,766 | 3,185,523,720 | 1,512,212,996 | 133,064,050 |

AA_00055

**Appendix 20:**

**Plaintiff's Exhibit 6_Receipts of American and US Airways**

**(4 RR 84-91, 93-95)**

**AMERICAN AIRLINES GROUP, INC.**
**TEXAS FRANCHISE TAX**
**FYE 12/31/2014**

|  |  | **Total** |
|---|---|---|
| Excess Baggage | A | 1,085,704,641 |
| Times 70% | | 70.0000% |
| Taxable Margin | | 759,993,249 |
| Times Apportionment Factor | | 0.0149 |
| Apportioned Taxable Margin | | 11,323,899 |
| Times Tax Rate | | 0.9500% |
| Total Tax | | 107,577.04 |

|  |  | **2014** |  |
|---|---|---|---|
| L- AA Baggage Fees | **Tab 3** | 574,424,043 | |
| L-US Baggage Fees | **Tab 4** | 511,280,598 | |
| Total Baggage Fees | | 1,085,704,641 | A |

AA_00057

American Airlines, Inc

|  | Per 1120 |  |
|---|---:|---|
| **1a - Gross Receipts or Sales** | | |
| **30-100 - Gross Receipts or Sales** | | |
| **005 - Mainline Passenger** | **(20,400,589,859)** | |
| **010 - Express** | **(2,911,181,157)** | |
| **015 - Cargo** | **(716,776,277)** | |
| **020 - Other** | | |
| 4001201 - Ramp Services - Rev Other | 17,905 | |
| 4001201 - Ramp Services - Rev Other | (210,235) | |
| 4080102 - Other Contract Revenue/Programming | (18,630,796) | |
| 4080102 - Other Contract Revenue/Programming | (2,505) | |
| 4101101 - Beverage - Gross Revenue | (19,682,611) | |
| 4101101 - Beverage - Gross Revenue | 66 | |
| 4101101 - Beverage - Gross Revenue | (2) | |
| 4101101 - Beverage - Gross Revenue | (145,040) | |
| 4102102 - AVOD Revenue | (324,290) | |
| 4102104 - Other Inflight Revenue | (27,736,757) | |
| 4102104 - Other Inflight Revenue | (74) | |
| 4102104 - Other Inflight Revenue | (952,938) | |
| 4102105 - Onboard Food Sales Revenue | (20,333,848) | |
| 4102105 - Onboard Food Sales Revenue | (73,290) | |
| 4102201 - Astro-Color Headset Rntl | (668,669) | |
| 4102301 - Inflight Duty Free Sales Revenue | (5,947,060) | |
| 4102401 - Dog Kennel Revenue | (11,777) | |
| 4102411 - Unacompanied Minor Service Charge | (10,465,205) | |
| 4102411 - Unacompanied Minor Service Charge | (1,050) | |
| 4102411 - Unacompanied Minor Service Charge | (4,957) | |
| 4102411 - Unacompanied Minor Service Charge | (1,050) | |
| 4102411 - Unacompanied Minor Service Charge | (87,037) | |
| 4102411 - Unacompanied Minor Service Charge | (2,120) | |
| 4102411 - Unacompanied Minor Service Charge | (1,364) | |
| 4102411 - Unacompanied Minor Service Charge | (2,435) | |
| 4102411 - Unacompanied Minor Service Charge | (7,239) | |
| 4102411 - Unacompanied Minor Service Charge | (150) | |
| 4102411 - Unacompanied Minor Service Charge | (150) | |
| 4102411 - Unacompanied Minor Service Charge | (1,802) | |
| 4102411 - Unacompanied Minor Service Charge | (300) | |
| 4102411 - Unacompanied Minor Service Charge | (900) | |
| 4102411 - Unacompanied Minor Service Charge | (1,200) | |
| 4103101 - Other Checked Bags | (481,731,841) | **a** |
| 4103101 - Other Checked Bags | (566,057) | **a** |
| 4103101 - Other Checked Bags | (576,546) | **a** |
| 4103101 - Other Checked Bags | (455,601) | **a** |
| 4103101 - Other Checked Bags | (503,449) | **a** |
| 4103101 - Other Checked Bags | (702,176) | **a** |
| 4103101 - Other Checked Bags | (577,011) | **a** |
| 4103101 - Other Checked Bags | (209,715) | **a** |
| 4103101 - Other Checked Bags | (458,354) | **a** |
| 4103101 - Other Checked Bags | (72,667) | **a** |
| 4103101 - Other Checked Bags | (206,623) | **a** |
| 4103101 - Other Checked Bags | (224,724) | **a** |
| 4103101 - Other Checked Bags | (473,963) | **a** |

| | | |
|---|---|---|
| 4103101 - Other Checked Bags | (2,544,758) | **a** |
| 4103101 - Other Checked Bags | (630,187) | **a** |
| 4103101 - Other Checked Bags | (42,471,102) | **a** |
| 4103101 - Other Checked Bags | (244,611) | **a** |
| 4103101 - Other Checked Bags | (3,237,921) | **a** |
| 4103101 - Other Checked Bags | (313,852) | **a** |
| 4103101 - Other Checked Bags | (931,041) | **a** |
| 4103101 - Other Checked Bags | (17,686) | **a** |
| 4103101 - Other Checked Bags | (803,582) | **a** |
| 4103101 - Other Checked Bags | (1,940,207) | **a** |
| 4103101 - Other Checked Bags | (29,438) | **a** |
| 4103101 - Other Checked Bags | (450,992) | **a** |
| 4103101 - Other Checked Bags | (37,339) | **a** |
| 4103101 - Other Checked Bags | (512,191) | **a** |
| 4103101 - Other Checked Bags | (606,805) | **a** |
| 4103101 - Other Checked Bags | (172,770) | **a** |
| 4103101 - Other Checked Bags | (595,753) | **a** |
| 4103101 - Other Checked Bags | (1,537,671) | **a** |
| 4103101 - Other Checked Bags | (218,607) | **a** |
| 4103101 - Other Checked Bags | (476,458) | **a** |
| 4103101 - Other Checked Bags | (133,308) | **a** |
| 4103101 - Other Checked Bags | (482,284) | **a** |
| 4103101 - Other Checked Bags | (337,729) | **a** |
| 4103101 - Other Checked Bags | (44,455) | **a** |
| 4103101 - Other Checked Bags | (8,479,807) | **a** |
| 4103101 - Other Checked Bags | (584,355) | **a** |
| 4103101 - Other Checked Bags | (232,609) | **a** |
| 4103101 - Other Checked Bags | (204,627) | **a** |
| 4103101 - Other Checked Bags | (6,829,094) | **a** |
| 4103101 - Other Checked Bags | (66,787) | **a** |
| 4103101 - Other Checked Bags | (242,456) | **a** |
| 4103101 - Other Checked Bags | (330,369) | **a** |
| 4103101 - Other Checked Bags | (831,223) | **a** |
| 4103101 - Other Checked Bags | (157,639) | **a** |
| 4103101 - Other Checked Bags | (440,420) | **a** |
| 4103102 - Checked Bag 1 | (1,511,568) | **a** |
| 4103102 - Checked Bag 1 | (1,820) | **a** |
| 4103102 - Checked Bag 1 | (250) | **a** |
| 4103102 - Checked Bag 1 | (1,540) | **a** |
| 4103102 - Checked Bag 1 | (2,855) | **a** |
| 4103102 - Checked Bag 1 | (2,860) | **a** |
| 4103102 - Checked Bag 1 | (84) | **a** |
| 4103102 - Checked Bag 1 | (707) | **a** |
| 4103102 - Checked Bag 1 | (60) | **a** |
| 4103102 - Checked Bag 1 | (2,496) | **a** |
| 4103102 - Checked Bag 1 | (1,745) | **a** |
| 4103102 - Checked Bag 1 | (46,536) | **a** |
| 4103102 - Checked Bag 1 | (2,962) | **a** |
| 4103102 - Checked Bag 1 | (993) | **a** |
| 4103102 - Checked Bag 1 | (11,588) | **a** |
| 4103102 - Checked Bag 1 | (4,933) | **a** |

| | | |
|---|---:|---|
| 4103102 - Checked Bag 1 | (6,401) | **a** |
| 4103102 - Checked Bag 1 | (155) | **a** |
| 4103102 - Checked Bag 1 | (582) | **a** |
| 4103102 - Checked Bag 1 | (150) | **a** |
| 4103102 - Checked Bag 1 | (389) | **a** |
| 4103102 - Checked Bag 1 | (4,495) | **a** |
| 4103102 - Checked Bag 1 | (140) | **a** |
| 4103102 - Checked Bag 1 | (4,670) | **a** |
| 4103102 - Checked Bag 1 | (275) | **a** |
| 4103102 - Checked Bag 1 | (348) | **a** |
| 4103102 - Checked Bag 1 | (32,133) | **a** |
| 4103102 - Checked Bag 1 | (280) | **a** |
| 4103102 - Checked Bag 1 | (4,520) | **a** |
| 4103103 - Fee Based Skycap Revenue | (6,638) | |
| 4103104 - Checked Bag 2 | (94,249) | **a** |
| 4103104 - Checked Bag 2 | (400) | **a** |
| 4103104 - Checked Bag 2 | (40) | **a** |
| 4103104 - Checked Bag 2 | (320) | **a** |
| 4103104 - Checked Bag 2 | (400) | **a** |
| 4103104 - Checked Bag 2 | (320) | **a** |
| 4103104 - Checked Bag 2 | (40) | **a** |
| 4103104 - Checked Bag 2 | 60 | **a** |
| 4103104 - Checked Bag 2 | (200) | **a** |
| 4103104 - Checked Bag 2 | (100) | **a** |
| 4103104 - Checked Bag 2 | (200) | **a** |
| 4103104 - Checked Bag 2 | (2,493) | **a** |
| 4103104 - Checked Bag 2 | (1,220) | **a** |
| 4103104 - Checked Bag 2 | (100) | **a** |
| 4103104 - Checked Bag 2 | (503) | **a** |
| 4103104 - Checked Bag 2 | (200) | **a** |
| 4103104 - Checked Bag 2 | (40) | **a** |
| 4103104 - Checked Bag 2 | (460) | **a** |
| 4103104 - Checked Bag 2 | (840) | **a** |
| 4103104 - Checked Bag 2 | (240) | **a** |
| 4103104 - Checked Bag 2 | (80) | **a** |
| 4103105 - Overweight/Oversized Baggage | (7,847,597) | **a** |
| 4103105 - Overweight/Oversized Baggage | (10,640) | **a** |
| 4103105 - Overweight/Oversized Baggage | (2,950) | **a** |
| 4103105 - Overweight/Oversized Baggage | (8,000) | **a** |
| 4103105 - Overweight/Oversized Baggage | (12,155) | **a** |
| 4103105 - Overweight/Oversized Baggage | (6,900) | **a** |
| 4103105 - Overweight/Oversized Baggage | (4,949) | **a** |
| 4103105 - Overweight/Oversized Baggage | (4,977) | **a** |
| 4103105 - Overweight/Oversized Baggage | (79,679) | **a** |
| 4103105 - Overweight/Oversized Baggage | (4,925) | **a** |
| 4103105 - Overweight/Oversized Baggage | (5,925) | **a** |
| 4103105 - Overweight/Oversized Baggage | (333,436) | **a** |
| 4103105 - Overweight/Oversized Baggage | (3,478) | **a** |
| 4103105 - Overweight/Oversized Baggage | (28,590) | **a** |
| 4103105 - Overweight/Oversized Baggage | (25,478) | **a** |
| 4103105 - Overweight/Oversized Baggage | (3,542) | **a** |

AA_00060

| | | |
|---|---:|---|
| 4103105 - Overweight/Oversized Baggage | (31,394) | **a** |
| 4103105 - Overweight/Oversized Baggage | (59,914) | **a** |
| 4103105 - Overweight/Oversized Baggage | (4,334) | **a** |
| 4103105 - Overweight/Oversized Baggage | (325) | **a** |
| 4103105 - Overweight/Oversized Baggage | (11,869) | **a** |
| 4103105 - Overweight/Oversized Baggage | (9,025) | **a** |
| 4103105 - Overweight/Oversized Baggage | (27,928) | **a** |
| 4103105 - Overweight/Oversized Baggage | (32,135) | **a** |
| 4103105 - Overweight/Oversized Baggage | (18,289) | **a** |
| 4103105 - Overweight/Oversized Baggage | (14,500) | **a** |
| 4103105 - Overweight/Oversized Baggage | (28,980) | **a** |
| 4103105 - Overweight/Oversized Baggage | (6,625) | **a** |
| 4103105 - Overweight/Oversized Baggage | (4,975) | **a** |
| 4103105 - Overweight/Oversized Baggage | (454) | **a** |
| 4103105 - Overweight/Oversized Baggage | (2,906) | **a** |
| 4103105 - Overweight/Oversized Baggage | (75,688) | **a** |
| 4103105 - Overweight/Oversized Baggage | (100) | **a** |
| 4103105 - Overweight/Oversized Baggage | (200) | **a** |
| 4103105 - Overweight/Oversized Baggage | (14,251) | **a** |
| 4103105 - Overweight/Oversized Baggage | (18,150) | **a** |
| 4201101 - Aircraft Pick-Up & Delivery | (3,354) | |
| 4201111 - Misc. Airfreight Income | 133 | |
| 4201111 - Misc. Airfreight Income | (25,986,392) | |
| 4202399.AA00 - | (16,185) | |
| 4202399.AABR - | (765) | |
| 4202399.AACO - | (40) | |
| 4202399.AADO - | (360) | |
| 4202399.AALD - | (170) | |
| 4202399.AAMT - | (1,275) | |
| 4203204 - Container Revenue | (198,643) | |
| 4301101 - UATP Ticketor Discount Revenue | (4,972,654) | |
| 4301102 - UATP Processing Fees | 568,584 | |
| 4301103 - UATP Customer Incentives | 1,045,770 | |
| 4302102 - Ticket Admin Fee Revenues | (40,452) | |
| 4303101 - PTA Service Charge - Inc | (20,635) | |
| 4306101 - Handling Fee Revenue | 80 | |
| 4309101 - Service Charge / Administrative Fee | (1,582,738) | |
| 4501107 - Field Mntc Svc Contract Rev | (2,043,900) | |
| 4501107 - Field Mntc Svc Contract Rev | (1,934,685) | |
| 4501107 - Field Mntc Svc Contract Rev | (344,541) | |
| 4501107 - Field Mntc Svc Contract Rev | 8,458 | |
| 4502101 - Svc Contracts - Pax/Rmp | (13,546,564) | |
| 4502101 - Svc Contracts - Pax/Rmp | (22,197) | |
| 4502101 - Svc Contracts - Pax/Rmp | (24,576) | |
| 4502101 - Svc Contracts - Pax/Rmp | (1,413) | |
| 4502101 - Svc Contracts - Pax/Rmp | (4,104) | |
| 4502101 - Svc Contracts - Pax/Rmp | (356) | |
| 4502101 - Svc Contracts - Pax/Rmp | (4,197) | |
| 4502101 - Svc Contracts - Pax/Rmp | (2,073,365) | |
| 4502101 - Svc Contracts - Pax/Rmp | (17,015) | |
| 4502101 - Svc Contracts - Pax/Rmp | (1,658,039) | |
| 4502102 - Svc Contracts - Freight | (14,043) | |
| 4502102 - Svc Contracts - Freight | (177,747) | |
| 4502102 - Svc Contracts - Freight | (365,321) | |
| 4502102 - Svc Contracts - Freight | (148,434) | |
| 4502103 - Svc Contracts - Other | (500,640) | |
| 4502103 - Svc Contracts - Other | (153,521) | |

| | |
|---|---|
| 4502103 - Svc Contracts - Other | 482 |
| 4502103 - Svc Contracts - Other | (1,772) |
| 4502201 - Contract Service/Facility Rent | (4,200) |
| 4502202 - Contract Service/Outside Facility | (228,442) |
| 4502203 - Contract Service/Other Non Salary | (421,980) |
| 4502299.IG00 - | (156,900) |
| 4502619.SM00 - | (54,674) |
| 4502699.SM00 - | (33,450) |
| 4502999.AACX - | (108,418) |
| 4504101 - Beverage Sales | 23 |
| 4504101 - Beverage Sales | (2,275,727) |
| 4504101 - Beverage Sales | 19,714 |
| 4504201 - Membership Dues | (69,843,691) |
| 4504201 - Membership Dues | 292,773 |
| 4504201 - Membership Dues | (292,773) |
| 4504202 - Small Business Misc Revenues | (14,697,106) |
| 4504202 - Small Business Misc Revenues | (12,079) |
| 4504301 - Concession Income | (1,055) |
| 4504302 - Catering Revenue | (126,351) |
| 4504303 - Usage Fee | (23,070,954) |
| 4504303 - Usage Fee | 7,140,484 |
| 4504303 - Usage Fee | (15,690) |
| 4504303 - Usage Fee | (138,833) |
| 4504303 - Usage Fee | (24,528) |
| 4504303 - Usage Fee | (1,010,930) |
| 4504303 - Usage Fee | (1,668,487) |
| 4504303 - Usage Fee | (1,583,585) |
| 4504303 - Usage Fee | (1,987,620) |
| 4504303 - Usage Fee | (591,956) |
| 4504303 - Usage Fee | (181,623) |
| 4504303 - Usage Fee | (516,039) |
| 4504304 - Exclusivity Payments | (17,520,778) |
| 4504305 - Audio Visual Rental Revenue | (27,377) |
| 4504306 - Conference Revenue | (10,924) |
| 4504306 - Conference Revenue | (741,671) |
| 4504609 - Food Sales | (6,656,762) |
| 4504609 - Food Sales | (49,906) |
| 4507104 - Other Flight Academy Sales Rev | (3,341,656) |
| 4551102 - Revenue Engine | (83,000) |
| 4551103 - Revenue Component | (916,962) |
| 4551107 - Revenue - Other | (1,294,673) |
| 4804203 - TMI - Land Costs | 78,912,955 |
| 4804210 - TMI - Land Commission Expense | 85,292 |
| 4804220 - TMI - Consumer Relations Expense | 3,809 |
| 4804303 - TMI - Gross Land Revenue | (88,300,044) |
| 4804304 - TMI - Ins & Fees Revenue | (1,687,551) |
| 4804503 - Hotel/Car - Retail Income | (154,347) |
| 4804503 - Hotel/Car - Retail Income | (4,401,335) |
| 4806104 - Miscellaneous Revenues | (51,547,694) |
| 4806104 - Miscellaneous Revenues | (926) |
| 4806104 - Miscellaneous Revenues | (819) |
| 4806104 - Miscellaneous Revenues | (26,769) |
| 4806104 - Miscellaneous Revenues | (40,213) |
| 4806104 - Miscellaneous Revenues | (1,547) |
| 4806104 - Miscellaneous Revenues | (588) |
| 4806104 - Miscellaneous Revenues | (2,311) |
| 4806104 - Miscellaneous Revenues | (4,364,559) |
| 4806104 - Miscellaneous Revenues | (64,481) |
| 4806104 - Miscellaneous Revenues | (183,126) |
| 4806104 - Miscellaneous Revenues | (24,499) |
| 4806104 - Miscellaneous Revenues | (142,093) |

| | |
|---|---:|
| 4806104 - Miscellaneous Revenues | (26,841) |
| 4806104 - Miscellaneous Revenues | 10,654 |
| 4806104 - Miscellaneous Revenues | (13,513) |
| 4806104 - Miscellaneous Revenues | (197,986) |
| 4806104 - Miscellaneous Revenues | (19,155) |
| 4806104 - Miscellaneous Revenues | (991) |
| 4806104 - Miscellaneous Revenues | (3,856) |
| 4806104 - Miscellaneous Revenues | (1,371,930) |
| 4806104 - Miscellaneous Revenues | (90,781) |
| 4806104 - Miscellaneous Revenues | (952) |
| 4806104 - Miscellaneous Revenues | 27,120 |
| 4806104 - Miscellaneous Revenues | (17,211) |
| 4806104 - Miscellaneous Revenues | 10,400 |
| 4806104 - Miscellaneous Revenues | (261,913) |
| 4806104 - Miscellaneous Revenues | 429 |
| 4806104 - Miscellaneous Revenues | (105,962) |
| 4806104 - Miscellaneous Revenues | (288,488) |
| 4806104 - Miscellaneous Revenues | (81,542) |
| 4806104 - Miscellaneous Revenues | (464,574) |
| 4806104 - Miscellaneous Revenues | (40,352) |
| 4806104 - Miscellaneous Revenues | (1,464,237) |
| 4806104 - Miscellaneous Revenues | (1,064,204) |
| 4806104 - Miscellaneous Revenues | (892) |
| 4806104 - Miscellaneous Revenues | (956) |
| 4806104 - Miscellaneous Revenues | (11,467) |
| 4806104 - Miscellaneous Revenues | (97,837) |
| 4806104 - Miscellaneous Revenues | (2,450) |
| 4806104 - Miscellaneous Revenues | (2) |
| 4806104 - Miscellaneous Revenues | (21,502) |
| 4806104 - Miscellaneous Revenues | (1,840) |
| 4806104 - Miscellaneous Revenues | (173,355) |
| 4806105 - Partner Contractual Revenue | (158,893,469) |
| 4806106 - Ticketing Fees | (62,293,701) |
| 4806107 - Misc Passenger Mktng Rev | (29,345) |
| 4806107 - Misc Passenger Mktng Rev | (1,184) |
| 4806109 - AAdvantage Promo Intngbls Prem/Txbl | (142,678,339) |
| 4806110 - AAdvantage Promo Intngbls Prem/Non- | (982,293,543) |
| 4806111 - AADV Ticketing Fees | (104,059,703) |
| 4806111 - AADV Ticketing Fees | (8,630) |
| 4806111 - AADV Ticketing Fees | (1,727) |
| 4806111 - AADV Ticketing Fees | (182) |
| 4806111 - AADV Ticketing Fees | (10,495) |
| 4806111 - AADV Ticketing Fees | (1,073,113) |
| 4806111 - AADV Ticketing Fees | (1,102) |
| 4806111 - AADV Ticketing Fees | (2,125) |
| 4806111 - AADV Ticketing Fees | (2,693) |
| 4806111 - AADV Ticketing Fees | (29,377) |
| 4806111 - AADV Ticketing Fees | (2,453) |
| 4806111 - AADV Ticketing Fees | (13,065) |
| 4806111 - AADV Ticketing Fees | (11,955) |
| 4806111 - AADV Ticketing Fees | (74) |
| 4806111 - AADV Ticketing Fees | (1,032) |
| 4806111 - AADV Ticketing Fees | (200) |
| 4806111 - AADV Ticketing Fees | (371) |
| 4806111 - AADV Ticketing Fees | (12,900) |
| 4806112 - External Conference Rooms | (794,366) |
| 4806113 - External Catering Revenue | (781,127) |
| 4806114 - External Cafeteria Revenue | (1,243,339) |
| 4806115 - External Dorm Room Revenue | (2,741,068) |
| 4806116 - External Gift Shop Revenue | (1,399) |
| 4806120 - Ticketing Fees | (10,789,082) |

AA_00063

| | |
|---|---:|
| 4806124 - Same Day Flight Change | (38,350,579) |
| 4806124 - Same Day Flight Change | (1,704) |
| 4806124 - Same Day Flight Change | (75) |
| 4806124 - Same Day Flight Change | (76) |
| 4806124 - Same Day Flight Change | (6,893) |
| 4806124 - Same Day Flight Change | (11,946) |
| 4806124 - Same Day Flight Change | (4,175) |
| 4806125 - Same-Day Standby | (1,146,437) |
| 4806126 - Other Incidental Revenue | (3,168,209) |
| 4806126 - Other Incidental Revenue | (26,448) |
| 4806129 - Change Fees | (537,618,232) |
| 4806129 - Change Fees | 34,838 |
| 4806129 - Change Fees | 17,173 |
| 4806129 - Change Fees | (16,474,040) |
| 4806129 - Change Fees | (3,239) |
| 4806129 - Change Fees | 21,420 |
| 4806129 - Change Fees | (5,302) |
| 4806129 - Change Fees | 117,013 |
| 4806129 - Change Fees | (192) |
| 4806129 - Change Fees | 43 |
| 4806129 - Change Fees | 45,656 |
| 4806129 - Change Fees | 23,955 |
| 4806129 - Change Fees | (3,610) |
| 4806129 - Change Fees | 16,050 |
| 4806130 - L/A Local Rptd Misc. Revenue | 48,932,033 |
| 4806130 - L/A Local Rptd Misc. Revenue | (4,538,585) |
| 4806130 - L/A Local Rptd Misc. Revenue | (917,583) |
| 4806130 - L/A Local Rptd Misc. Revenue | (13,176,110) |
| 4806130 - L/A Local Rptd Misc. Revenue | (2,173,771) |
| 4806130 - L/A Local Rptd Misc. Revenue | (2,507,833) |
| 4806130 - L/A Local Rptd Misc. Revenue | (1,378,300) |
| 4806130 - L/A Local Rptd Misc. Revenue | (2,032,830) |
| 4806130 - L/A Local Rptd Misc. Revenue | (3,792,301) |
| 4806130 - L/A Local Rptd Misc. Revenue | (1,591,719) |
| 4806130 - L/A Local Rptd Misc. Revenue | (1,213,081) |
| 4806130 - L/A Local Rptd Misc. Revenue | (4,563,053) |
| 4806130 - L/A Local Rptd Misc. Revenue | (819,719) |
| 4806130 - L/A Local Rptd Misc. Revenue | (961,786) |
| 4806130 - L/A Local Rptd Misc. Revenue | (1,976,899) |
| 4806130 - L/A Local Rptd Misc. Revenue | (500,137) |
| 4806130 - L/A Local Rptd Misc. Revenue | (479,221) |
| 4806130 - L/A Local Rptd Misc. Revenue | (1,414,824) |
| 4806130 - L/A Local Rptd Misc. Revenue | (4,894,282) |
| 4806132 - Parking Fees | (24,627) |
| 4806142 - Group 1 Boarding | (5,150,743) |
| 4806145 - Innovations Gen Rev-Mex | (21,741) |
| 4806170 - Tel Pay Station Commissions | (447,555) |
| 4806301 - CRAF Revenue | (3,279,063) |
| 4811898 - Tax Adjustment | 731 |
| 4825301 - Code Share Commission Revenue | (49,459,191) |
| Reclass / Schedule M Adj | 116,806,601 |
| **Total 020 - Other** | **(2,959,792,742)** |
| **Total 30-100 - Gross Receipts or Sales** | **(26,988,340,035)** |
| **TOTAL 1a - Gross Receipts or Sales** | **(26,988,340,035)** |
| **1b - Returns and Allowances** | |
| **1c - Balance - Net Sales** | (26,988,340,035) |
| **2 - Cost of Goods Sold** | |
| **3 - Gross Profit** | (26,988,340,035) |
| **4 - Dividends** | (2,129,809) |

AA_00064

US Airways, Inc

|  |  | **Per 1120** |  |
|---|---|---:|---|
| **1a - Gross Receipts or Sales** | | | |
| **30-100 - Gross Receipts or Sales** | | | |
| **005 - Mainline Passenger** | | (12,866,929,975) | |
| **010 - Express** | | (741,542,889) | |
| **015 - Cargo** | | (157,881,421) | |
| **020 - Other** | | | |
| 300630 - FIRST BAG CHARGE | | (417,135,923) | **a** |
| 300631 - Excess Baggage | | (2,650,389) | **a** |
| 300632 - Earlier Flight fee | | (17,543,416) | |
| 300633 - 2ND BAG FEE | | (61,098,434) | **a** |
| 300634 - EXCESS BAGGAGE(GREATER THAN 3) | | (7,683,169) | **a** |
| 300635 - OVERWEIGHT BAG | | (16,437,201) | **a** |
| 300636 - OVERSIZE BAG | | (640,869) | **a** |
| 300637 - SPORTS EQUIPMENT | | (1,427,421) | **a** |
| 300638 - FORTH + BAG FEE | | (2,339,422) | **a** |
| 300639 - CURBSIDE BAG FEE | | (1,867,770) | **a** |
| 305100 - Awv Tour Packages | | (140,152,520) | |
| 305400 - Commission Revenue | | | |
| 305900 - Fee Revenue | | (3,293,469) | |
| 306100 - Hp Air Fare | | 60,233,641 | |
| 3061SB - Subs - Other Revenue | | | |
| 306200 - Hotel | | 60,315,888 | |
| 306250 - Hotel Breakage | | 527,918 | |
| 306300 - Car Rentals | | 352,452 | |
| 306350 - Car Rental Breakage | | 15,587 | |
| 306550 - Ground Transfers | | 1,988,747 | |
| 306600 - Other Cos | | 128,629 | |
| 306650 - Ground Transfers Breakage | | 339,474 | |
| 460000 - Rev For In-Flight Meals Sold | | 265,223 | |
| 460101 - Liquor Sales | | (19,857,099) | |
| 460120 - Snack sales | | (5,658,455) | |
| 460130 - Pillow & Blanket Sales | | 102 | |
| 460140 - Cargo Misc. Income | | (1,479,689) | |
| 460151 - NON-ALCOHOLIC BEVERAGE SALES | | (87,057) | |
| 4601SB - Subs-Other Revenue (Capacity Purchase Rev) | | | |
| 460200 - Simulator Revenue | | (1,071,676) | |
| 460250 - Fc Training Facility/Equip Inc | | | |
| 4602SB - Subs-Other Revenue (Fuel Sales MSC) | | | |
| 4603SB - Subs-Other Revenue (TR Rev Handling Fees) | | | |
| 460400 - Mktg-Revenue | | (7,493,117) | |
| 460401 - Skycap Revenue | | | |

| | |
|---|---:|
| 460420 - Codeshare Commission Revenue | (115,352) |
| 4604SB - Subs - Other Rev (AC Rent Subleases) | |
| 460500 - Mx-Revenue | (2,665,694) |
| 4605SB - Subs- Other Rev (Catering) | |
| 460600 - Contract Svc-Cargo | (50) |
| 4606SB - Subs-Other Revenue | |
| 460701 - General Freight (Mesa) | |
| 460703 - Second Day Air Freight (Mesa) | |
| 460704 - Yv Premier Pak | |
| 460706 - Express Excess Baggage | |
| 460707 - Express Priority Freight | |
| 460708 - Yv U.S. Mail | |
| 460709 - Express Liquor Revenue | |
| 460711 - Express Misc Operating | |
| 460713 - Express Weekend Freight | |
| 460714 - Express Premier Freight | |
| 460718 - 2ND DAY AIR FREIGHT CCLA | |
| 460790 - Express Reduced Rate | |
| 460791 - Express Service Charges | |
| 460792 - Express Refund/Reissue Penalty | |
| 460793 - Express Unacc Minor Svc Charge | |
| 460796 - Express Tktg Svc Fee | |
| 460798 - Canada Express Freight Revenue | |
| 460800 - Reduced Fares | (30,410,703) |
| 460810 - Service Charges | (5,559,746) |
| 460815 - Service Charges - Dividend Miles | (3,336,847) |
| 460816 - DM DOMESTIC TICKET SERVICE FEES | (2,086,648) |
| 460817 - TATL Mileage Upgrade Co-pay | |
| 460820 - First Class Svc. Charges | |
| 460825 - DM AWARD PROCESSING FEE | (2,053,615) |
| 460830 - Catalog Sales | |
| 460835 - DM AWARD PROC FEE - ALL EUROPE | (1,894,188) |
| 460840 - DM AWARD PROC FEE LATIN CARIB MX | (309,299) |
| 460850 - IC AIRCRAFT RENT | (78,110,531) |
| 460900 - Misc Operating | (26,755,200) |
| 460901 - Allocation - Other Revenue | |
| 460920 - Group Service Charges | (1,407,205) |
| 460925 - Lost Tkt. Svc. Charges | (7) |
| 460930 - Co. Store-Sales | (516,828) |
| 460931 - Co. Store - Cost of Sales | 355,347 |
| 460935 - Refund/Reissue Penalty | (303,194,078) |
| 460938 - Round the World Ticketing Fee | |
| 460939 - RES REISSUE FEE | (6,541,477) |
| 460941 - TICKETING FEE INTERNATIONAL | (214,356) |
| 460942 - DM TICKETING FEE INTERNATIONAL | (454,143) |

| | |
|---|---|
| 460943 - DM AWARD FEE FOR OA SEGMENTS | |
| 460944 - VUSA TICKET FEE | |
| 460945 - Misc Income - Paper Surcharge | (1,969) |
| 460946 - Misc Income - Tickting Svc Fee | (32,543,223) |
| 460947 - RENTAL INCOME | (1,904,757) |
| 460949 - TR REV-SPACE RENTAL | |
| 460950 - Headset Sales | (145,387) |
| 460951 - PAC inflight movie revenue | 11 |
| 460952 - PSA inflight Internet revenue | (7,747,110) |
| 460970 - Pta Service Charges | (3,997) |
| 460975 - TR REV-LOANED CONSIGNED PARTS | (553) |
| 460977 - Preferred Access Charge | (18,594,219) |
| 460978 - Top-Off Promo Double Miles | (545) |
| 460980 - America West Club | (19,716,033) |
| 460982 - EXECUTIVE SERVICES | |
| 460983 - Club Bar Revenue | (1,015,096) |
| 460984 - PET FEES | (8,211,266) |
| 460985 - Unacc. Minor Svc. Charges | (3,397,165) |
| 460986 - TR REV-PSF(AFFILIATES) (non elim) | (3,708,344) |
| 460987 - TR REV-PSF (AFFILIATES) (elim) | (93,730,423) |
| 460988 - TR REV-CATERING (elim) | |
| 460990 - Fare Audit Srv Chrg Revenue | |
| 460991 - Trans Rev Dividend Miles Sold (non-airline) | (38,972,505) |
| 460992 - DIVIDEND MILES SOLD (OTHER) | (287,998,389) |
| 460993 - PARTNER AIRLINES REVENUE | |
| 460994 - Dividend Miles Misc Revenue | (32,285,448) |
| 4609SB - Subs - Other Rev (Exp SVC Fees) | |
| **Total 020 - Other** | **(1,598,996,473)** |
| **Total 30-100 - Gross Receipts or Sales** | **(15,365,350,758)** |
| **TOTAL 1a - Gross Receipts or Sales** | **(15,365,350,758)** |
| **1b - Returns and Allowances** | |
| **1c - Balance - Net Sales** | (15,365,350,758) |
| **2 - Cost of Goods Sold** | |
| **3 - Gross Profit** | (15,365,350,758) |
| **4 - Dividends** | |
| **5 - Interest** | (7,234,276) |
| **6 - Gross Rent** | |
| **7 - Gross Royalties** | |
| **8 - Capital Gains** | |
| **9 - Ordinary Gains** | 5,219,294 |
| **10 - Other Income** | 21,241,724 |
| **11 - Total Income** | (15,346,124,016) |
| **12 - Compensation of Officers** | 189,204,298 |
| **13 - Salaries and Wages (net of credits)** | 1,996,615,285 |
| **14 - Repairs** | 743,095,034 |

AA_00068

**Appendix 21:**

**Plaintiff's Exhibit 19_Excel Spreadsheet Tab 2_TAS-Margin (RR PX 19)**

American Airlines, Inc.  
Fort Worth, TX  Original Audit  PAGE 1 OF 1  
TAX ADJUSTMENT SUMMARY  Preparer/Date: P. Thayer - 03/14/2023  
**FOR REPORT YEAR:** 2015  TP#: 1-13-1502798-4

| (A) Original Audit Results | (B) | (C) FROM: Prior Data Per Last Report | (D) Adjusted Amounts per Verification | (E) Verification Results - From: Col. C or Col. D |
|---|---|---|---|---|
| | REPORT TYPE: | Annual | | Annual |
| | REPORT YEAR: | 2015 | | 2015 |
| METHOD ELECTED: | 70%/EZ/COGS/COMP: | 70% | | 70% |
| **REVENUE** | COL.D & COL.E | | | |
| ACCOUNTING PERIOD | FORWARDED FROM | 01/01/2014 - 12/31/2014 | | 01/01/2014 - 12/31/2014 |
| 1. GROSS RECEIPTS OR SALES | Col. C | 4,475,489,108 | 40,812,087,074 | 40,812,087,074 |
| 2. DIVIDENDS | Col. C | 2,129,809 | 2,129,809 | 2,129,809 |
| 3. INTEREST | Col. C | 32,486,152 | 43,513,362 | 43,513,362 |
| 4. RENTS | Col. C | 17,320,180 | 34,325,796 | 34,325,796 |
| 5. ROYALTIES | Col. C | 0 | 0 | 0 |
| 6. GAINS/LOSSES | Col. C | (1,225,565) | 451,141,861 | 451,141,861 |
| 7. OTHER INCOME | Col. C | 54,993,892 | (83,467,780) | (83,467,780) |
| 8. TOTAL GROSS REVENUE | SUM #1 - #7 | 4,581,193,576 | | 41,259,730,122 |
| 9. DEDUCTIONS FROM GROSS REVENUE | Col. C | 87,391,913 | 38,490,987 | 38,490,987 |
| 10. TOTAL REVENUE | #8 - #9 | $4,493,801,663 | | $41,221,239,135 |
| 10.a. Annualized Total Revenue (# of Days) | 365 | $4,493,801,663 | | $41,221,239,135 |
| **COST OF GOODS SOLD** | | | | |
| 11. COST OF GOODS SOLD | Col. C | 0 | | 0 |
| 12. INDIRECT OR ADMIN COSTS | Col. C | 0 | | 0 |
| 13. OTHER | Col. C | 0 | | 0 |
| 14. TOTAL COST OF GOODS SOLD | SUM #11 - #13 | $0 | | $0 |
| **COMPENSATION** | | | | |
| 15. WAGES AND CASH COMPENSATION | Col. C | 0 | | 0 |
| 16. EMPLOYEE BENEFITS | Col. C | 0 | | 0 |
| 17. OTHER | Col. C | 0 | | 0 |
| 18. TOTAL COMPENSATION | SUM #15 - #17 | $0 | | $0 |
| **MARGIN** | | | | |
| 19. REVENUE (#10 X 70%) | #10 X 70% | 3,145,661,164 | | 28,854,867,395 |
| 20. REVENUE (#10 - COGS) | #10 - #14 | N/A | | 41,221,239,135 |
| 21. REVENUE (#10 - COMPENSATION) | #10 - #18 | N/A | | 41,221,239,135 |
| | LOWEST 19,20,21 | $3,145,661,164 | | $28,854,867,395 |
| 22. MARGIN | (Not Less Than Zero) | $3,145,661,164 | | $28,854,867,395 |
| **APPORTIONMENT FACTOR** | | | | |
| 23. GROSS RECEIPTS IN TEXAS | Col. C | 67,155,756 | 337,395,961 | 337,395,961 |
| 24. GROSS RECEIPTS EVERYWHERE | Col. C | 4,493,801,663 | 41,221,239,135 | 41,221,239,135 |
| 25. APPORTIONMENT FACTOR | #23 / #24 | 0.0149 | | 0.0082 |
| **TAXABLE MARGIN or EZ REVENUE** | | | | |
| 26. APPORTIONED: MARGIN or EZ | Margin: #22 X #25 | 46,870,351 | | 236,609,913 |
| 27. ALLOWABLE DEDUCTIONS | Col. C | 0 | | 0 |
| 28. TAXABLE AMOUNT | #26 - #27 | $46,870,351 | | $236,609,913 |
| **TAX DUE** | | | | |
| 29. TAX RATE (If Rate Changed, See Note Below.) | Col. C | 0.009500 | | 0.00950 |
| 30. TAX DUE | #28 X #29 | 445,268.33 | | 2,247,794.17 |
| **TAX ADJUSTMENTS** | | | | |
| 31. TAX CREDITS | Exam 5B | 149,995.55 | 149,853.06 | 149,853.06 |
| 32. TAX DUE BEFORE DISCOUNT | #30 - #31 | 295,272.78 | | 2,097,941.11 |
| 33. DISCOUNT | | 0.00 | | 0.00 |
| **34. TAX DUE** | #32-#33 | $295,272.78 | | $2,097,941.11 |
| 35. TAX DUE BASED ON: | | 70% | | 70% |
| 36. LESS TAX REPORTED | Tax Reports | 295,272.78 | | 295,272.78 |
| 37. TAX ADJUSTMENT | #34 - #36 | $0.00 | | $1,802,668.33 |
| 38. REFUNDS ISSUED | Per Refunds | 0.00 | | 0.00 |
| 39. FVAR ASGNs (REFUNDS OR ASSESSMENTS) | Per FVAR ASGNs | 0.00 | | 0.00 |
| 40. BART ASGNs (REFUNDS OR ASSESSMENTS) | Per BART ASGNs | 0.00 | | 0.00 |
| 41. AUDIT ADJUSTMENTS | Per Audit | 0.00 | | 0.00 |
| **42. NET TAX ADJUSTMENT** | #37-#38-#39-#40-#41 | 0.00 | | 1,802,668.33 |

Note 1: COGS and Compensation were not verified and therefore zeroed out.  Fwd to Adjustment Report

ON TIME  
5/15/2019

*

**Appendix 22:**

**Plaintiff's Exhibit 19_Excel Spreadsheet Tab 4_Exam 1**

**(RR PX 19)**

American Airlines, Inc.
1-13-1502798-4

| REPORT YEAR | | 2015 | | | |
|---|---|---|---|---|---|
| ACCOUNTING YEAR ENDING | | 01/01/2014 - 12/31/2014 | | | |
| REPORTED TOTAL REVENUE | | $4,493,801,663 | | | |
| | | -----FROM THE FRANCHISE TAX RETURNS----- | | | |
| AUDITED REVENUE | FORWARDED FROM | COMBINED SUMMARY | ELIMINATIONS | AUDITED COMBINED | |
| 1. Gross Receipts or Sales | Exam 1A | 42,899,219,657 | 2,087,132,583 | 40,812,087,074 | **(1)** |
| 2. Dividends | Exam 1A | 2,129,809 | 0 | 2,129,809 | **(1)** |
| 3. Interest | Exam 1A | 43,513,362 | 0 | 43,513,362 | **(1)** |
| 4. Rents | Exam 1A | 34,325,796 | 0 | 34,325,796 | **(1)** |
| 5. Royalties | Exam 1A | 0 | 0 | 0 | **(1)** |
| 6. Gains/Losses | Exam 1A | 451,337,590 | 195,729 | 451,141,861 | **(1)** |
| 7. Other Income | Exam 1A | (83,467,780) | 0 | (83,467,780) | **(1)** |
| 8. Total Gross Revenue | Sum Lines 1-7 | 43,347,058,434 | 2,087,328,312 | 41,259,730,122 | |
| 9. Deductions | Exam 1A | 38,490,987 | 0 | 38,490,987 | **(1)** |
| TOTAL AUDITED REVENUE | Line 8 - Line 9 | | | 41,221,239,135 | |

COMMENTS / FOOTNOTES
(1) FORWARD TO TAX ADJUSTMENT SUMMARY

**Appendix 23:**

**Plaintiff's Exhibit 19_Excel Spreadsheet Tab 5_Exam 1A**

**(RR PX 19)**

American Airlines, Inc.
1-13-1502798-4

EXAM 1A - TOTAL REVENUE BY AFFILIATE

| Company Name | TP # / FEI # | Gross Receipts | Dividends | Interest | Rents | Royalties | Gains/ Losses | Other Income | Total Gross Revenue | Deductions | Total Audited Revenue |
|---|---|---|---|---|---|---|---|---|---|---|---|
| AMERICAN AIRLINES GROUP INC. | 75-1825172 | (1,326,504,263) | - | 8,801,553 | (4,019,850) | - | - | - | (1,321,722,560) | - | (1,321,722,560) |
| AMERICAN AIRLINES INC | 13-1502798 | 26,988,340,035 | 2,129,809 | 25,309,726 | 10,101,746 | - | 284,711,978 | (65,158,264) | 27,245,435,030 | 31,364,017 | 27,214,071,013 |
| ADMIRALS CLUB INC | 75-1698690 | - | - | - | - | - | - | - | - | - | - |
| AA 2002 CLASS C CERTIFICATE | 55-0797219 | - | - | - | - | - | - | - | - | - | - |
| AA 2002 CLASS D CERTIFICATE | 55-0797214 | - | - | - | - | - | - | - | - | - | - |
| AMERICAN AIRLINES REALTY (NYC) HOLDINGS INC. | 47-0899347 | - | - | - | 401,962 | - | - | - | 401,962 | - | 401,962 |
| AA 2003-1 CLASS C CERTIFICATE CORPORATION | 55-0836686 | - | - | - | - | - | - | - | - | - | - |
| AA 2003-1 CLASS D CERTIFICATE CORPORATION | 55-0836690 | - | - | - | - | - | - | - | - | - | - |
| AA 2004-1 CLASS B NOTE CO | 20-0676767 | - | - | - | - | - | - | - | - | - | - |
| AA 2005-1 CLASS C CERTIFICATE CORP | 20-3526758 | - | - | - | 27,841,938 | - | 18,248,330 | - | 46,090,268 | - | 46,090,268 |
| ENVOY AVIATION GROUP INC. | 75-2196520 | - | - | - | - | - | - | - | - | - | - |
| EAGLE AVIATION SERVICES INC. | 75-2533043 | 22,823,652 | - | 28,346 | - | - | - | 19 | 22,852,017 | - | 22,852,017 |
| EXECUTIVE AIRLINES INC. | 66-0433166 | 9,139,538 | - | - | - | - | (48,458) | (28,571) | 9,062,509 | - | 9,062,509 |
| EXECUTIVE GROUND SERVICES INC. | 27-4061679 | - | - | - | - | - | - | - | - | - | - |
| ENVOY AIR INC. | 38-2036404 | 1,039,737,043 | - | 1,634,569 | - | - | 154,354,168 | 503,525 | 1,196,229,305 | 519,712 | 1,195,709,593 |
| US AIRWAYS GROUP, INC. | 54-1194634 | 121,761 | - | 447,103 | - | - | - | 1,223,592 | 1,792,456 | - | 1,792,456 |
| US AIRWAYS, INC. | 53-0218143 | 15,365,350,758 | - | 7,234,276 | - | - | (5,219,294) | (21,241,724) | 15,346,124,016 | 6,607,258 | 15,339,516,758 |
| PIEDMONT AIRLINES, INC. | 52-0970090 | 414,161,944 | - | 21 | - | - | (413,845) | 733,890 | 414,482,010 | - | 414,482,010 |
| PSA AIRLINES, INC. | 25-1382555 | 363,784,399 | - | 565 | - | - | (295,289) | 314,012 | 363,803,687 | - | 363,803,687 |
| MATERIAL SERVICES COMPANY, INC. | 23-2664652 | 17,129,992 | - | 323 | - | - | - | 360,637 | 17,490,952 | - | 17,490,952 |
| AMERICAS GROUND SERVICES INC. | 75-2491387 | 5,134,798 | - | 56,880 | - | - | - | (174,896) | 5,016,782 | - | 5,016,782 |
| SC INVESTMENT INC. | 75-2742622 | - | - | - | - | - | - | - | - | - | - |
| PMA INVESTMENT SUBSIDIARY INC. | 75-2828617 | - | - | - | - | - | - | - | - | - | - |
| RENO AIR - AAQQ | 88-0259913 | - | - | - | - | - | - | - | - | - | - |
| BUSINESS EXPRESS BXOO | 04-3359752 | - | - | - | - | - | - | - | - | - | - |
| | TOTALS | 42,899,219,657 | 2,129,809 | 43,513,362 | 34,325,796 | - | 451,337,590 | (83,467,780) | 43,347,058,434 | 38,490,987 | 43,308,567,447 |

---------FORWARD TO EXAM 1----------

COMMENTS / FOOTNOTES:
** Amounts obtained from each affiliates federal tax return filed with the Internal Revenue Service for federal tax purposes.

**Appendix 24:**

**Plaintiff's Exhibit 19_Excel Spreadsheet Tab 6_Exam 3**

**(RR PX 19)**

American Airlines, Inc.
1-13-1502798-4

EXAM 3 - TOTAL TEXAS & EVERYWHERE RECEIPTS SUMMARY

| REPORT YEAR | 2015 | REPORTED TEXAS RECEIPTS | $67,155,756 |
| ACCOUNTING YEAR ENDING | 01/01/2014 - 12/31/2014 | REPORTED EVERYWHERE RECEIPTS | $4,493,801,663 |
| | | REPORTED APPORTIONMENT FACTOR | 0.0149 |
| | | -----FROM THE FRANCHISE TAX RETURNS----- | |

| AUDITED TEXAS RECEIPTS | FORWARDED FROM | COMBINED SUMMARY | ELIMINATIONS | AUDITED COMBINED | |
|---|---|---|---|---|---|
| 1. Gross Receipts or Sales | Exam 3 | 330,140,904 | 0 | 330,140,904 | |
| 2. Dividends | Exam 3 | 0 | 0 | 0 | |
| 3. Interest | Exam 3 | 28,346 | 0 | 28,346 | |
| 4. Rents | Exam 3 | 0 | 0 | 0 | |
| 5. Royalties | Exam 3 | 0 | 0 | 0 | |
| 6. Gains/Losses | Exam 3 | 8,126,640 | 0 | 8,126,640 | |
| 7. Other Income | Exam 3 | (582,184) | 0 | (582,184) | |
| 8. Bad Debt Recoveries | Exam 3 | (317,745) | 0 | (317,745) | |
| TOTAL AUDITED TEXAS RECEIPTS | Sum Lines 1-8 | | | 337,395,961 | **(1)** |

| AUDITED EVERYWHERE RECEIPTS | FORWARDED FROM | COMBINED SUMMARY | ELIMINATIONS | AUDITED COMBINED | |
|---|---|---|---|---|---|
| 1. Gross Receipts or Sales | Exam 1 | 40,812,087,074 | 0 | 40,812,087,074 | |
| 2. Dividends | Exam 1 | 2,129,809 | 0 | 2,129,809 | |
| 3. Interest | Exam 1 | 43,513,362 | 0 | 43,513,362 | |
| 4. Rents | Exam 1 | 34,325,796 | 0 | 34,325,796 | |
| 5. Royalties | Exam 1 | 0 | 0 | 0 | |
| 6. Gains/Losses | Exam 1 | 451,141,861 | 0 | 451,141,861 | |
| 7. Other Income | Exam 1 | (83,467,780) | 0 | (83,467,780) | |
| 8. Bad Debt Recoveries | Exam 1 | 38,490,987 | 0 | 38,490,987 | |
| TOTAL AUDITED GROSS RECEIPTS EVERYWHERE | Sum Lines 1-8 | | | 41,221,239,135 | **(1)** |

COMMENTS / FOOTNOTES
(1) FORWARD TO TAX ADJUSTMENT SUMMARY

# Appendix 25: Plaintiff's Exhibit 4_American's Texas Franchise Tax Report

## (4 RR 20-21)

*Under Protest*

## Texas Franchise Tax Report - Page 1

**RECEIVED**

**MAY 04 2015**

Comptroller of Public Accounts

■ Tcode       13250 Annual

| ■ Taxpayer number | ■ Report year | Due date | Comptroller of Public Accounts |
|---|---|---|---|
| 11315027984 | 2015 | 05/15/2015 | 01/01/2015 — 12/31/2015 |

Taxpayer name
American Airlines, Inc.

Mailing address
PO Box 619616

| City | State | Country | ZIP Code | Plus 4 | Secretary of State file number or Comptroller file number |
|---|---|---|---|---|---|
| DFW Airport | TX | USA | 75261 | 9616 | 0000816206 |

Check box if the address has changed ■ ☐

Check box if this is a combined report  ■ ☒      Check box if Total Revenue is adjusted for Tiered Partnership Election, see instructions  ■ ☐

Check box if this is a Corporation or Limited Liability Company ☐      Check box if this is an Entity other than a Corporation or Limited Liability Company ☐

**If not twelve months, see instructions for annualized revenue

| | m m d d y y | | m m d d y y | SIC code | NAICS code |
|---|---|---|---|---|---|
| Accounting year begin date** ■ | 0 1 0 1 1 4 | Accounting year end date ■ | 1 2 3 1 1 4 | 4512 | 481000 |

### REVENUE (Whole dollars only)

| | | |
|---|---|---|
| 1. Gross receipts or sales | 1. ■ | 4475489108.00 |
| 2. Dividends | 2. ■ | 2129809.00 |
| 3. Interest | 3. ■ | 32486152.00 |
| 4. Rents (can be negative amount) | 4. ■ | 17320180.00 |
| 5. Royalties | 5. ■ | 0.00 |
| 6. Gains/losses (can be negative amount) | 6. ■ | -1225565.00 |
| 7. Other income (can be negative amount) | 7. ■ | 54993892.00 |
| 8. Total gross revenue (Add items 1 thru 7) | 8. ■ | 4581193576.00 |
| 9. Exclusions from gross revenue (see instructions) | 9. ■ | 87391913.00 |
| 10. TOTAL REVENUE (item 8 minus item 9 if less than zero, enter 0) | 10. ■ | 4493801663.00 |

### COST OF GOODS SOLD (Whole dollars only)

| | | |
|---|---|---|
| 11. Cost of goods sold | 11. ■ | 0.00 |
| 12. Indirect or administrative overhead costs (Limited to 4%) | 12. ■ | 0.00 |
| 13. Other (see instructions) | 13. ■ | 0.00 |
| 14. TOTAL COST OF GOODS SOLD (Add items 11 thru 13) | 14. ■ | 0.00 |

### COMPENSATION (Whole dollars only)

| | | |
|---|---|---|
| 15. Wages and cash compensation | 15. ■ | 0.00 |
| 16. Employee benefits | 16. ■ | 0.00 |
| 17. Other (see instructions) | 17. ■ | 0.00 |
| 18. TOTAL COMPENSATION (Add items 15 thru 17) | 18. ■ | 0.00 |

**Texas Comptroller Official Use Only**

| VE/DE | ☐ |
|---|---|
| PM Date | |

**No. D-1-GN-621**

**Pl.'s Ex. 4**

4W5289 4 000

TX2015    05-158-B
Ver. 6.0   (Rev.9-13/7)

■ Tcode  13251 Annual

RECEIVED
MAY 04 2015
Comptroller of Public Accounts

| ■ Taxpayer number | ■ Report year | Due date | Taxpayer name |
|---|---|---|---|
| 11315027984 | 2015 | 05/15/2015 | American Airlines, Inc. |

MARGIN  (Whole dollars only)

| | | |
|---|---|---|
| 19. 70% revenue (item 10 X .70) | 19. ■ | 3145661164.00 |
| 20. Revenue less COGS (item 10 - item 14) | 20. ■ | 4493801663.00 |
| 21. Revenue less compensation (item 10 - item 18) | 21. ■ | 4493801663.00 |
| 22. Revenue less $1 million (item 10 - $1,000,000) | 22. ■ | 4492801663.00 |
| 23. MARGIN (see instructions) | 23. ■ | 3145661164.00 |

APPORTIONMENT FACTOR

| | | |
|---|---|---|
| 24. Gross receipts in Texas (Whole dollars only) | 24. ■ | 67155756.00 |
| 25. Gross receipts everywhere (Whole dollars only) | 25. ■ | 4493801663.00 |
| 26. APPORTIONMENT FACTOR (Divide item 24 by item 25, round to 4 decimal places) | 26. ■ | 0.0149 |

TAXABLE MARGIN  (Whole dollars only)

| | | |
|---|---|---|
| 27. Apportioned margin (Multiply item 23 by item 26) | 27. ■ | 46870351.00 |
| 28. Allowable deductions (see instructions) | 28. ■ | 0.00 |
| 29. TAXABLE MARGIN (item 27 minus item 28) | 29. ■ | 46870351.00 |

TAX DUE

| | | |
|---|---|---|
| 30. Tax rate (see instructions for determining the appropriate tax rate) | X  X  X   30. ■ | 0.009500 |
| 31. Tax due (Multiply item 29 by the tax rate in item 30) (Dollars and cents) | 31. ■ | 445268.33 |

TAX ADJUSTMENTS  (Dollars and cents)  (Do not include prior payments)

| | | |
|---|---|---|
| 32. Tax credits (item 23 from Form 05-160) | 32. ■ | 149995.55 |
| 33. Tax due before discount (item 31 minus item 32) | 33. ■ | 295272.78 |
| 34. Discount (see instructions, applicable to report years 2008 and 2009) | 34. ■ | 0.00 |

TOTAL TAX DUE  (Dollars and cents)

| | | |
|---|---|---|
| 35. TOTAL TAX DUE (item 33 minus item 34) | 35. ■ | 295272.78 |

Do not include payment if item 35 is less than $1,000 or if annualized total revenue is less than the no tax due threshold (see instructions). If the entity makes a tiered partnership election, ANY amount in item 35 is due. Complete Form 05-170 if making a payment.

| Print or type name | Area code and phone number |
|---|---|
| James Fitzgerald | (817 ) 967 _ 3967 |

I declare that the information in this document and any attachments is true and correct to the best of my knowledge and belief.

sign here ▶

Date  4/20/15

Mail original to:
Texas Comptroller of Public Accounts
P.O. Box 149348
Austin, TX 78714-9348

If you have any questions regarding franchise tax, you may contact the Texas Comptroller's field office in your area or call 1-800-252-1381.
Instructions for each report year are online at www.window.state.tx.us/taxinfo/taxforms/05-forms.html.

**Texas Comptroller Official Use Only**

| VE/DE | ☐ |
|---|---|
| PM Date | |

1062

AA_00002

# Appendix 26: Plaintiff's Exhibit 29_American's Capital Gains and Losses 2014 (4 RR 359)

# SCHEDULE D
## (Form 1120)

Department of the Treasury
Internal Revenue Service

# Capital Gains and Losses

▶ Attach to Form 1120, 1120-C, 1120-F, 1120-FSC, 1120-H, 1120-IC-DISC, 1120-L, 1120-ND, 1120-PC, 1120-POL, 1120-REIT, 1120-RIC, 1120-SF, or certain Forms 990-T.

▶ Information about Schedule D (Form 1120) and its separate instructions is at www.irs.gov/form1120.

OMB No. 1545-0123

**2014**

Name: AMERICAN AIRLINES GROUP INC

Employer identification number: 75-1825172

## Part I — Short-Term Capital Gains and Losses — Assets Held One Year or Less

| See instructions for how to figure the amounts to enter on the lines below. This form may be easier to complete if you round off cents to whole dollars. | (d) Proceeds (sales price) | (e) Cost (or other basis) | (g) Adjustments to gain or loss from Form(s) 8949, Part I, line 2, column (g) | (h) Gain or (loss) Subtract column (e) from column (d) and combine the result with column (g) |
|---|---|---|---|---|
| **1a** Totals for all short-term transactions reported on Form 1099-B for which basis was reported to the IRS and for which you have no adjustments (see instructions). However, if you choose to report all these transactions on Form 8949, leave this line blank and go to line 1b . . . . . . . . . . | 0 | 0 | | 0 |
| **1b** Totals for all transactions reported on Form(s) 8949 with **Box A** checked . . . . . . . . . . . . . . . | 0 | 0 | 0 | 0 |
| **2** Totals for all transactions reported on Form(s) 8949 with **Box B** checked . . . . . . . . . . . . . . . | 0 | 0 | 0 | 0 |
| **3** Totals for all transactions reported on Form(s) 8949 with **Box C** checked . . . . . . . . . . . . . . . | 20,249,337,394 | 20,247,958,409 | 0 | 1,378,985 |

| | | |
|---|---|---|
| **4** Short-term capital gain from installment sales from Form 6252, line 26 or 37 . . . . . . . . . . . . . . . . . | **4** | 0 |
| **5** Short-term capital gain or (loss) from like-kind exchanges from Form 8824 . . . . . . . . . . . . . | **5** | 0 |
| **6** Unused capital loss carryover (attach computation) . . . . . . . . . . . . . . . . . . . . . | **6** | ( 316,230 ) |
| **7** Net short-term capital gain or (loss). Combine lines 1a through 6 in column h . . . . . . . . . . . . . . . . . | **7** | 1,062,756 |

## Part II — Long-Term Capital Gains and Losses — Assets Held More Than One Year

| See instructions for how to figure the amounts to enter on the lines below. This form may be easier to complete if you round off cents to whole dollars. | (d) Proceeds (sales price) | (e) Cost (or other basis) | (g) Adjustments to gain or loss from Form(s) 8949, Part II, line 2, column (g) | (h) Gain or (loss) Subtract column (e) from column (d) and combine the result with column (g) |
|---|---|---|---|---|
| **8a** Totals for all long-term transactions reported on Form 1099-B for which basis was reported to the IRS and for which you have no adjustments (see instructions). However, if you choose to report all these transactions on Form 8949, leave this line blank and go to line 8b . . . . . . . . . . | 0 | 0 | | 0 |
| **8b** Totals for all transactions reported on Form(s) 8949 with **Box D** checked . . . . . . . . . . . . . . . | 0 | 0 | 0 | 0 |
| **9** Totals for all transactions reported on Form(s) 8949 with **Box E** checked . . . . . . . . . . . . . . . | 0 | 0 | 0 | 0 |
| **10** Totals for all transactions reported on Form(s) 8949 with **Box F** checked . . . . . . . . . . . . . . . | 5,661,221,799 | 5,657,001,903 | 0 | 4,219,896 |

| | | |
|---|---|---|
| **11** Enter gain from Form 4797, line 7 or 9 . . . . . . . . . . . . . . . . . . . . . . | **11** | 204,617,261 |
| **12** Long-term capital gain from installment sales from Form 6252, line 26 or 37 . . . . . . . . . . . . . | **12** | 0 |
| **13** Long-term capital gain or (loss) from like-kind exchanges from Form 8824 . . . . . . . . . . . . . | **13** | 0 |
| **14** Capital gain distributions (see instructions) . . . . . . . . . . . . . . . . . . . . . . . | **14** | 0 |
| **15** Net long-term capital gain or (loss). Combine lines 8a through 14 in column h . . . . . . . . . . . . . | **15** | 208,837,157 |

## Part III — Summary of Parts I and II

| | | |
|---|---|---|
| **16** Enter excess of net short-term capital gain (line 7) over net long-term capital loss (line 15) . . . . . . . . . . . | **16** | 1,062,756 |
| **17** Net capital gain. Enter excess of net long-term capital gain (line 15) over net short-term capital loss (line 7) . . . . . . . . . . . . . . . . . . . . . . | **17** | 208,837,157 |
| **18** Add lines 16 and 17. Enter here and on Form 1120, page 1, line 8, or the proper line on other returns . . . . . **Note.** If losses exceed gains, see **Capital losses** in the instructions. | **18** | 209,899,913 |

For Paperwork Reduction Act Notice, see the Instructions for Form 1120.

ERF

No. D-1-GN-621

Pl.'s Ex. 29

Schedule D (Form 1120) (2014)

F4.00.01     US120SD1

AA_000108

**Appendix 27:**

**Plaintiff's Exhibit 1_Tab 1**

|  | A | B<br>Final 1120 & Final | C=B-A |  |
| --- | --- | --- | --- | --- |
|  | **Original Return** | **Analysis** | **Change** |  |
| Revenue Subject to Tax | 4,493,801,664 | 2,507,787,139 | (1,986,014,525) | 0 |
| Times 70% | 70.0000% | 70.0000% | 70.0000% |  |
| Taxable Margin | 3,145,661,165 | 1,755,450,997 | (1,390,210,168) |  |
| Times Apportionment Factor | 1.4900% | 1.4600% |  |  |
| Apportioned Taxable Margin | 46,870,351 | 25,629,585 | (21,240,767) |  |
| Times Tax Rate | 0.9500% | 0.9500% | 0.9500% |  |
| **Total Tax before credits** | **445,268** | **243,481** | **(201,787)** |  |

No. D-1-GN-621

Pl.'s Ex. 1

G:\USER\DXR\Comptroller\American Fran 2 (consolidated case)\2_COURT OF APPEALS\1_RECORDS\2_Reporters Record\20250108 Excel Exhibits\P-001
2/5/2025  12:38 PM

**US Airways Group (Sub Consol)**
**TX Franchise Calc**

**TX-1**

Inputs Verified,
Formulas Recalculated,
Final Results Approved

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Mary Lou Swanson on behalf of Deborah Rao
Bar No. 24131915
marylou.swanson@oag.texas.gov
Envelope ID: 97019569
Filing Code Description: Brief Requesting Oral Argument
Filing Description: 20250205 Appellants Brief
Status as of 2/5/2025 2:46 PM CST

Associated Case Party: AMERICAN AIRLINES, INC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Richard Phillips | 24032833 | Rich.Phillips@hklaw.com | 2/5/2025 2:30:38 PM | SENT |
| Leonora Meyercord | 24074711 | Lee.Meyercord@hklaw.com | 2/5/2025 2:30:38 PM | SENT |
| Mary McNulty | 13839680 | Mary.McNulty@hklaw.com | 2/5/2025 2:30:38 PM | SENT |
| Meghan McCaig | | meghan.mccaig@hklaw.com | 2/5/2025 2:30:38 PM | SENT |

Associated Case Party: GLENN HEGAR COMPTROLLER

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Deborah Rao | | Deborah.Rao@oag.texas.gov | 2/5/2025 2:30:38 PM | SENT |
| Alyson "Ally" Thompson | | ally.thompson@oag.texas.gov | 2/5/2025 2:30:38 PM | SENT |
| Ray Langenberg | 11911200 | ray.langenberg@cpa.texas.gov | 2/5/2025 2:30:38 PM | SENT |